# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-DP-01159-SCT

*ABDUR RAHIM AMBROSE a/k/a ABDUR AMBROSE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/19/2015 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| TRIAL COURT ATTORNEYS: | CROSBY PARKER |
| | LISA COLLUMS |
| | CHARLIE STEWART |
| | FRANK P. WITTMANN, IV |
| | RICHARD JOEL SMITH, JR. |
| | ROBERT C. STEWART |
| | GLENN F. RISHEL, JR. |
| | ANGELA BLACKWELL |
| | DANA CHRISTENSEN |
| | ALISON R. STEINER |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: ALISON R. STEINER |
| | ANGELA BLACKWELL |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| | JASON L. DAVIS |
| | CAMERON BENTON |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 08/02/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.    On December 23, 2013, Abdur Rahim Ambrose, Stevie Ambrose, and Orlander

Dedeaux were indicted for capital murder of Robert Trosclair with the underlying felony

being kidnapping.   The trial court severed the case for separate trials.[1]   Abdur Rahim

Ambrose proceeded to trial, which commenced on June 15, 2015.  Following the culpability

phase of trial, a Harrison County jury found Abdur Rahim Ambrose guilty of capital murder.

Following the penalty phase of trial, the jury imposed the death penalty.  Ambrose appeals,

raising the following twelve assignments of error verbatim:

    I.    WHETHER THE TRIAL COURT VIOLATED AMBROSE'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO CONFRONTATION AND TO PRESENT A DEFENSE BY PREVENTING HIM FROM IMPEACHING PROSECUTION WITNESS DEMETRIUS LEE WITH MATTERS CLEARLY PROBATIVE OF LEE'S BIAS IN FAVOR OF THE STATE AND INTEREST IN PROVIDING INCRIMINATING TESTIMONY AGAINST AMBROSE AND IN SUPPORT OF THE STATE'S THEORY OF PROSECUTION.

    II.    WHETHER AMBROSE'S DEATH SENTENCE MUST BE VACATED AND THIS MATTER REMANDED FOR ENTRY OF A SENTENCE LESS THAN DEATH BECAUSE THE ONLY § 99-19-101(7) SENTENCING ELIGIBILITY FACTOR FINDING BY THE JURY WAS THAT AMBROSE "CONTEMPLATED THAT LETHAL FORCE WOULD BE EMPLOYED."

    III.    WHETHER THE TRIAL COURT REVERSIBLY ERRED IN TWO MATTERS RELATING TO THE SEATING OR REMOVAL OF JU[]RORS, AND IN DENYING A MISTRIAL IN LIEU OF REPLACING THE REMOVED JUROR WITH AN ALTERNATE.

---

[1] On January 22, 2015, Orlander Dedeaux pleaded guilty to second degree murder and was sentenced to forty years, with ten years suspended.  On January 8, 2016, after Ambrose's trial, Stevie Ambrose pleaded guilty to first degree murder and was sentenced to life in prison without the possibility of parole.  Neither Stevie nor Dedeaux testified at Ambrose's trial.

IV. WHETHER THE JURY SELECTION PROCESS WAS ALSO CONSTITUTIONALLY INFIRM IN OTHER RESPECTS AND REQUIRES REVERSAL OF AMBROSE'S CONVICTION AND SENTENCE OF DEATH.

V. WHETHER AMBROSE'S SENTENCE MUST BE REVERSED BECAUSE OF THE PROSECUTOR'S MISCONDUCT IN MAKING CONSTITUTIONALLY IMPROPER AND PREJUDICIALLY INFLAMMATORY CLOSING ARGUMENTS AT THE PENALTY PHASE OF THE TRIAL.

VI. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE EVIDENTIARY ERROR.

VII. WHETHER THE TRIAL COURT CONSTITUTIONALLY ERRED BY DENYING AMBROSE'S REQUESTS THAT EITHER THE INDICTMENT ITSELF OR A BILL OF PARTICULARS, DESCR[I]BE[S] THE ALLEGED CONDUCT BY THE DEFENDANT THAT CONSTITUTED THE KIDNAPPING ELEMENT OF THE CAPITAL MURDER AND/OR THE STATUTORY SENTENCING AGGRAVATOR ON WHICH THE JURY WAS INSTRUCTED AT THE PENALTY PHASE.

VIII. WHETHER THE TRIAL COURT ERRED IN GRANTING THE STATE'S REQUESTED ONE CONTINUOUS TRANSACTION INSTRUCTIONS AT BOTH THE CULPABILITY AND SENTENCING PHASES.

IX. WHETHER THE TRIAL COURT'S ERRONEOUS SENTENCING PHASE INSTRUCTIONS REQUIRE VACATION OF THE DEATH SENTENCE AND REMAND FOR A NEW SENTENCING PROCEEDING.

X. WHETHER THE DEATH SENTENCE WAS IMPOSED IN VIOLATION OF THE UNITED STATES CONSTITUTION.

XI. WHETHER THE DEATH SENTENCE IN THIS MATTER IS CONSTITUTIONALLY AND STATUTORILY DISPROPORTIONATE.

XII. WHETHER THE CUMULATIVE EFFECT OF THE ERRORS IN THE TRIAL COURT MANDATES REVERSAL OF THE VERDICT

OF GUILT AND/OR THE SENTENCE OF DEATH ENTERED PURSUANT TO IT.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**Events at "the Hill"**

¶2.     On the afternoon of April 7, 2013, Demetrius Lee returned home from work between 3:00 and 4:00 p.m.  Lee resided in the DeLisle community at 7486 Lobouy Road, which is part of a larger property commonly known as "the Hill."  The Hill is comprised of two houses and a mobile home.  While Lee was relaxing, someone knocked on his window, but he remained inside.  Twenty to thirty minutes later, Lee went outside and saw Robert Trosclair, whom he knew from frequently being at the Hill.

¶3.     Lee testified that Trosclair was running and looked like he had been in a fist fight, because he was shirtless and bloody.  Trosclair had a busted lip, blood coming out of his nose, and blood on his chest. Ambrose, his brother Stevie Ambrose,[2] and Orlander Dedeaux were following behind Trosclair, taking turns hitting him.  Stevie handed Lee a cell phone and told him to record.  Lee testified that he videoed anywhere from a mere second to two minutes of the assault. Trosclair was trying to get away and was not fighting back.  Ambrose kept asking Trosclair, "[W]here is my stuff, you got some explaining to do" to which Trosclair responded, "it was Terry."  Ambrose, Stevie, and Dedeaux continued taking turns hitting, kicking, and knocking down Trosclair for thirty minutes to an hour.

---

[2]The Court refers to Stevie Ambrose as "Stevie" to avoid confusion with the defendant Abdur Rahim Ambrose.

4

¶4.  Sometime during the assault, Donna Sims arrived at the Hill to return a book bag to her grandson, who had been staying with his mother Crystal Jameson at the Hill. When Sims arrived, she saw someone lying on the ground. Although Sims knew Trosclair, she was unable to recognize him because his head was bloody and swollen. Sims saw Ambrose, Stevie, Lee, and Dedeaux standing around Trosclair. Sims, whose grandson is also Ambrose's nephew, had known Ambrose for years.

¶5.  Sims told Ambrose and Stevie to stop assaulting Trosclair and leave him alone. Ambrose responded that Trosclair had "stolen stuff out of his car." Sims grabbed, pushed, and pulled Ambrose and Stevie in an effort to stop them, but she was unsuccessful. Sims begged them to stop, but they continued hitting Trosclair. Lee also testified that Sims had yelled for them to stop assaulting Trosclair. Sims testified that Trosclair was not fighting back and was unable to stand up other than partially sitting up at one point. Sims testified that Lee was laughing and videoing the assault with a phone.

¶6.  After the beating had subsided, Ambrose got into a white truck and told "them" to put Trosclair in the truck. Sims recognized the truck because it belonged to her daughter Crystal and her boyfriend Luke Turner, who is Ambrose's brother.[3] Sims approached Ambrose while he was in the driver's seat of the truck. Sims spoke to Ambrose for about five minutes. Meanwhile, Sims testified that "they" had put Trosclair in the back of the truck because he could not get up from the ground. Sims testified that Lee helped load Trosclair into the back of the truck. Lee denied helping load Trosclair in the back of the truck at the Hill; rather,

---

[3] Luke is also the father of Crystal Jameson's son, who is Ambrose's nephew.

5

Lee testified that after the fighting had stopped, Trosclair attempted to roll in the back of the truck. Lee testified that someone then picked up his feet and pushed him in the back of the truck. Lee got into the passenger's seat of the truck and Ambrose drove away with Trosclair in the back of the truck. Lee was under the impression that Ambrose was going to take Trosclair home. Stevie got into his car with Dedeaux and they followed the truck.

¶7. Lee testified that, by the time Sims arrived at the Hill that afternoon, most of the assault had subsided. Lee testified that Sims was there about ten minutes before they left the scene; however, Sims testified that the incident at the Hill lasted thirty-five to forty-five minutes from the time she arrived at the Hill to the time they left the scene.

**Events at Fire Tower Road**

¶8. Upon leaving the Hill, Lee described Ambrose's demeanor as "mad, real mad." Lee soon realized Ambrose was not taking Trosclair home, but he was too scared to say anything. Instead, they went to an address about five minutes away on Fire Tower Road where Jimmy Lawton lived. Lawton, also known as "Turk," lived at 9042 Fire Tower Road at the end of a long dirt driveway. Ambrose drove the truck down the driveway and parked in front of a trailer next door to Lawton, where Lashonda Jacobs lived. Ambrose parked, got out of the truck, and went toward Lawton's house. Ambrose walked to Lawton and spoke to him.

¶9. Meanwhile, Stevie got out of his car and pushed Trosclair out of the back of the truck. Lee testified that Trosclair and Stevie "squared off" as if to fight. Trosclair "rushed" Stevie, pushing him away, and ran away toward the main road in an effort to "get away." Lee estimated that Trosclair made it about forty yards away. Lee testified that Ambrose ran after

6

Trosclair and caught him. Ambrose grabbed Trosclair by the waistband of his shorts and said, "you got some more explaining to do." Trosclair responded, "man, I don't know what's going on. It wasn't me. It was Terry." Ambrose walked Trosclair back toward the truck.

¶10. Lee testified that the situation then "turned up a level" and "got more heated." Trosclair ended up on the ground and Ambrose, Stevie, and Dedeaux began kicking him. Other than initially rushing Stevie to get away, Trosclair did not fight back at all. During the assault, Lee grabbed Ambrose and said "[w]e need to figure out who Terry is" because Trosclair continued yelling the name "Terry." Ambrose responded, "there ain't no Terry."

¶11. Lee testified that Stevie hit Trosclair in the head with a garden hose reel with "full force" as Trosclair was lying down on the ground. Lee testified that Ambrose retrieved a fully inflated car tire on a rim and hit Trosclair in the head with it as Troscliar was lying on the ground. Lee testified that Trosclair's head bounced off the ground when Ambrose hit him with the tire. After Trosclair was hit "two to three" times with the tire, Lee testified that Trosclair "went to sleep" and started "making a snoring sound."

¶12. Lawton, who witnessed portions of the assault in front of his house, also testified. That evening, Lawton recalled that Ambrose, whom he had known for about five years, arrived at his house. Lawton saw him getting out of the driver's side of the white truck. At the time, Ambrose regularly stayed at the trailer next door to Lawton's house and Ambrose would come to the house to get the trailer key. Lashonda Jacobs also lived at the trailer next door to Lawton's house. Lawton, assuming Ambrose was there to get the key, went outside under the carport to meet Ambrose with the key.

¶13.   While under the carport, Lawton saw Dedeaux and Trosclair sitting in the back of the truck with no commotion.  As Ambrose reached the carport, Lawton saw Trosclair take off running up the driveway toward the main road.  Lawton testified that Dedeaux and Stevie ran after Trosclair first.  Lawton testified that when Trosclair had run about ten to twenty-five yards, Ambrose also ran after him.  Stevie and Dedeaux caught Trosclair first and knocked him down.  Ambrose made it to Trosclair soon thereafter.  Lawton testified that Ambrose, Stevie, and Dedeaux started kicking and punching Trosclair.  Lawton went inside for a moment to get his phone to call his next door neighbor Jacobs.  Lawton then continued observing from his window.

¶14.   Lawton testified that Trosclair started stumbling back toward the trailer.  Lawton testified that Trosclair would walk for a moment and then "one of them would hit him and he would go a little more and then he fell again."  Lawton testified that Trosclair was not fighting back.  Lawton testified that Ambrose and Dedeaux hit Trosclair with the tire and the hose reel.  Lawton testified that "[t]hey picked up a tire and they picked up a [hose reel]. They struck him with it more than twice, I know that for sure."  Lawton testified that he "kn[e]w [Dedeaux] picked it up once.  And [he was] sure the other one was [Ambrose]."  When asked if he was sure about which one hit him with which object, Lawton responded:

> Not –  I'm not really sure.  I know one of them picked this one up, the other one picked that one up.  I'm just saying it was, boom, and they pick something else up, hit him.  And then the other one, Stevie, was right there with him.  He picked it up and hit him hisself, you know.  And [Lee], the one he was there taking pictures with the camera.

¶15. On cross-examination, Lawton testified that Ambrose hit Trosclair with the hose reel and the tire. Lawton also testified that Stevie picked up the hose reel and hit Trosclair with it. Lawton testified that Trosclair was hit with the tire more than two times. Lawton testified that Trosclair was lying on his side when he was hit with the garden hose reel and the tire. After Trosclair was hit with these two objects, he rolled over. During the assault, Lawton testified that he then went to the bathroom for fifteen or twenty minutes and came back to the window and saw the truck and car leaving the scene. After the two vehicles left, Lawton went outside and saw at least three areas of blood in the gravel driveway. Lawton also noticed that the hose reel and tire, which were used to strike Trosclair, were lying on the ground.

¶16. Lee testified that after Trosclair had been knocked out in front of Lawton's house, Ambrose got into the truck. Stevie and Dedeaux tied Trosclair's hands and body with a yellow ratchet tow strap and put him in the back of the truck. When Trosclair was put in the back of the truck, his head was jerking back and forth.[4] Lee testified that he got in the truck with Ambrose and they left Lawton's with Stevie and Dedeaux following in Stevie's car. Ambrose did not tell Lee where he was driving. Lee testified that Ambrose turned off "some little entrance, and backed up. And then Stevie and Dedeaux pulled [Trosclair] out the truck." Stevie and Dedeaux dumped Trosclair on the side of the road and they left the scene. Lee testified that Trosclair was unable to move or talk.

---

[4] Lee denied helping load Trosclair in the back of the truck. Lee also denied touching Trosclair during any part of the assault. Lee denied videoing anything at Lawton's house.

9

¶17. Later that evening, Lawton testified that Ambrose came to his house with Jacobs. Lawton said that Ambrose apologized about what had happened in front of his house. Lawton said that Ambrose asked for a shovel, but Lawton told him he did not have one. The next day, Lawton went outside and noticed that the areas of blood were covered up. Lawton also noticed that the garden hose reel and tire had been moved and thrown in the bushes.

**Discovery and Investigation**

¶18. The same evening, Bradley Holmes was driving home on Cunningham Road in Pass Christian around 7:00 p.m. Holmes stopped his truck when he noticed what appeared to be a body lying on the side of the road. Holmes called 911, and when he was getting out of his truck, he realized it was an unconscious man, later identified as Trosclair, lying face down between the white line of the road and the roadside ditch. Holmes testified that Trosclair was making a gargling, snoring sound. Holmes testified Trosclair was partially clothed, with short pants and socks on. Holmes described that Trosclair was tied up with a yellow ratchet strap, which was tightly tied around his wrists and loosely tired around his back. Holmes described his head as "very dirty, covered in dirt, black and blue, blood." Holmes said that Trosclair's ears had blood coming out of them. Holmes also observed stab wounds, cuts, and scrapes to Trosclair's body.

¶19. Deputy Carl James of the Harrison County Sheriff's Department received a call at approximately 7:00 p.m. with regard to an assault victim who had been stabbed on Cunningham Road just west of Lobouy Road. Deputy James was the first officer to respond to the scene. Deputy James testified that Trosclair was wearing only a pair shorts and socks.

Deputy James testified that Trosclair had bruising, blood, and abrasions on his face and his whole body. Deputy James observed blood on the middle of his torso, including three stab wounds to the lower back. Deputy James testified that Trosclair's hands and waist were tied with a ratchet tow strap. Deputy James tried to communicate with Trosclair, but he was unresponsive. Trosclair's breathing was shallow and labored with a gurgling sound resembling a snore.

¶20. Trosclair was flown by helicopter to the University of South Alabama Medical Center, where he arrived intubated because he was unable to breathe on his own and had signs of head injuries. Trosclair was unresponsive, and the treating physician determined that Trosclair had undergone some brain injury and diagnosed him with a global severe cerebral edema. Because of the swelling of Trosclair's brain, it had shifted four millimeters to the left. Trosclair also was diagnosed with a jaw fracture, nasal bone fracture, and superficial lacerations on his flank, meaning that they did not enter where his organs were. The treating physician testified that the lacerations were not life threatening in and of themselves. After performing tests to determine brain activity over the next two days, the treating physician determined that Trosclair was clinically brain dead.

¶21. On April 9, 2013, Troslciar's mother Vena Trosclair went to the police station to report her son missing because he had not been home and was not returning her calls. Law enforcement officials advised Vena that an unidentified male matching her son's description was at the University of South Alabama Medical Center. Vena went to the hospital and

identified Trosclair, who was comatose and on life support. Trosclair never regained consciousness and died after he was removed from life support.

¶22. On April 11, 2013, forensic pathologist Dr. Frank Krolikowski performed an autopsy of Trosclair. Dr. Krolikowski found Trosclair had suffered from three stab wounds to his side, substantial amounts of head trauma, multiple hemorrhages within his head, strangulation, and superficial abrasions in a number of different parts of his body. Dr. Krolikowski testified that the hemorrhages within Trosclair's head could be consistent with multiple strikes to the head. Dr. Krolikowski opined that all of Trosclair's various traumas were cumulative and contributed to his demise. Dr. Krolikowski concluded that Trosclair's cause of death was "multiple blunt trauma, multiple stab wounds, and asphyxia by strangulation."

¶23. During law enforcement's investigation, Ambrose and Stevie were developed as suspects and an arrest warrant for aggravated assault was issued because Trosclair was still alive at the time, albeit in a coma. The charges were later upgraded after Troslcair died of his injuries.

¶24. At the Hill, investigators discovered the white truck that had been driven by Ambrose. Investigators observed a red substance appearing to be blood inside the truck's tailgate. Investigators discovered a leather belt and blue, torn up, tank top shirt inside a trash can outside the mobile home. Investigators discovered blood stained gravel in the center of the driveway in front of Lawton's home. Investigators also discovered the blood stained tire and

12

garden hose reel in a wooded area about twenty-five yards from Lawton's home near the driveway where blood was found.

¶25. At trial, the State introduced evidence showing that Trosclair's DNA matched a reddish brown stain sample collected from the interior of the truck bed near the tailgate. Trosclair's DNA matched a reddish brown stain sample consistent with the appearance of blood collected from the garden hose reel. Trosclair's DNA matched a reddish brown sample from the tire rim. Trosclair's DNA matched samples from reddish brown stained rocks found in the middle of the driveway near Lawton's home. Trosclair's DNA also matched samples taken from the blue tank top found in a trash can at Lobouy Road and the ratchet tow strap. Although DNA testing performed on the belt showed a mixed profile from more than one person, Trosclair could not be excluded as being a contributor to the mixture.

**Ambrose's Version of Events**

¶26. Ambrose took the stand in his defense. At the time, Ambrose had been driving the white truck that he had borrowed from Jameson because his car was broken down and parked in front of his mother's trailer at the Hill. On the morning of April 7, 2013, Ambrose received a call from Jameson, who is Sims's daughter. Ambrose learned that his car had been broken into. Ambrose went to the Hill to return the truck to Jameson and to assess the damage to his car. Ambrose arrived and saw that his car's window had been broken out with a brick and the trunk had been opened. When Ambrose opened the driver's side of his car, he discovered that his prescription pills for a back injury that had occurred at work had been

13

taken. Ambrose also discovered that other drugs, a speaker, and an amplifier had been taken from the trunk of the car.

¶27. Ambrose became upset and decided to drive around the DeLisle community and ask if anyone had seen someone trying to sell a speaker and amp so he could determine who had broken into his car. Ambrose picked up Dedeaux from his house, and they drove around the community looking for the stolen items. While they were driving around, Stevie called. Ambrose learned that Trosclair was at the Hill. Ambrose had known Trosclair for more than a decade, and they had grown up together. Ambrose described Trosclair as his "brother, best friend." Ambrose and Trosclair were not actually related; on cross-examination, Ambrose clarified that Trosclair was his friend. Ambrose also confirmed that he, his brother Stevie, Dedeaux, Lee, and Trosclair all were friends.

¶28. When Ambrose returned to the Hill, Ambrose approached Trosclair and asked him about a dog house that Ambrose had asked Trosclair to build. Earlier that day, Trosclair claimed he could not build it because he was on his way to the hospital due to third degree burns he had suffered from working on a car radiator. Because Ambrose saw that Trosclair did not have burns on his body, Ambrose confronted him about the stolen items.

¶29. Trosclair then admitted to breaking into Ambrose's vehicle, but claimed he did not break out the window. Ambrose became angry when Trosclair admitted to breaking into his car. Trosclair claimed that an individual named Terry had broken out the window. Ambrose did not know an individual named Terry and the argument became heated. Ambrose and Trosclair "squared off" and fought for "four to five minutes."

14

¶30.    During the fight, Ambrose ripped off Trosclair's blue tank top. Ambrose punched Trosclair about five or six times. Troslcair fought back and struck Ambrose with a few blows. The only other individuals present at the time were Stevie and Dedeaux. Later, Lee came outside and "blindsided" Trosclair, hitting him from behind and knocking him down. Ambrose told Lee that he did not need any help. Trosclair got up and he and Ambrose continued to fight. Ambrose testified that Dedeaux was "actually the one with the phone [videoing]."

¶31.    The fight subsided and Ambrose told Trosclair to take him to Terry. Ambrose testified that Trosclair was "pretty beat up." Ambrose went toward the truck so they could go to Terry's house. Ambrose claimed that Sims pulled up as they were on their way to the truck. Ambrose denied that Sims had pleaded for him to stop beating Trosclair because the fight already had ended. Ambrose told "them to get on back of the truck and take me to whoever this guy named Terry is house [sic]." Ambrose testified that Trosclair got in the back of the truck so they could get his belongings back. Ambrose testified that he did not force Trosclair into the truck and Trosclair willingly got in the truck. Ambrose told Trosclair that once he received his speakers, he "wasn't going to mess with him anymore." Stevie followed Ambrose to "go get the stuff."

¶32.    Instead of going to where Terry supposedly lived, as Ambrose originally had planned, he remembered that he had purchased four tires from Lawton for his other vehicle, which had a flat tire. Even though Ambrose was angry about his belongings being stolen, he decided to take a detour to Lawton's. Ambrose drove to Lawton's house, which was "right around

15

the corner." Ambrose pulled up and Lawton had the trailer keys in his hand, but Ambrose advised Lawton that he was there just to get the tires.[5]

¶33. While Ambrose and Lawton were talking, "a commotion . . . was going on by the trailer a few feet away, and [Ambrose] saw people running." Ambrose testified: "I didn't really know what the commotion was about, but when I saw people running, I instantly just ran. I took off. I did. I took off to see what the commotion was about." Ambrose saw Lee, Dedeaux, and Stevie striking Trosclair. Ambrose caught up with them and began striking Trosclair too. Ambrose admitted that all of them were beating Trosclair after they chased him down. Ambrose also admitted that "this whole thing [was] about [Ambrose] being mad at [Trosclair] because [Ambrose] believe[ed] he [had] broke[en] into [his] car." Ambrose admitted that was the reason everyone was beating him at the time. Ambrose testified the beating lasted two minutes until Ambrose learned that Terry was not involved and Stevie actually had broken into his car. Ambrose then fought Stevie for about three minutes. When Ambrose and Stevie started fighting, Ambrose testified that Trosclair was injured but got up and walked back toward Lawton's house.

¶34. When Ambrose was finished fighting with Stevie, he saw Dedeaux strike Trosclair in the head with the tire. After Dedeaux struck Trosclair with the tire, Trosclair just "laid there" and did not get up. Ambrose testified that he was hurt by Stevie and just wanted to get away. Ambrose left the scene alone in Stevie's car because it was the closest vehicle to him.

---

[5] Lawton was called as a rebuttal witness and denied having a conversation with Ambrose about the tires that day.

16

¶35. Later that evening, Ambrose returned to Lawton's house with Jacobs. Ambrose apologized to Lawton about the fight that had occurred earlier that day. Ambrose testified that he and Lawton spoke for about three minutes and he left. Ambrose denied asking Lawton for a shovel. Ambrose denied intentionally killing Trosclair or making him go anywhere against his will. Ambrose denied stabbing, strangling, or choking Trosclair. Ambrose denied striking Trosclair with the tire or hose reel.

¶36. Ambrose's defense theory presented at trial was that he was criminally responsible as an accomplice to the events in question or, at most, guilty of a lesser homicide than capital murder.

**The Verdict**

¶37. Following the culpability phase of trial, the jury returned a verdict finding Ambrose guilty of capital murder. After an approximately one hour cooling off period, the penalty phase of the trial commenced. The State reintroduced and incorporated by reference all testimony, evidence, and exhibits contained in the culpability phase of trial and rested. Ambrose called several family members and friends to the stand to serve as mitigation witnesses and then rested.

¶38. During a recess following the conclusion of the mitigation witnesses' testimony, a juror submitted a note disclosing his personal relationship with Ambrose's family. Ambrose moved for a mistrial. The juror was called to the stand and questioned by counsel for Ambrose. The trial court denied the motion for a mistrial. Over Ambrose's objection, the trial court excused the juror and replaced him with the first alternate juror. The next day, the jury heard closing arguments and retired to the jury room to deliberate. The jury returned a

17

verdict finding that Ambrose should receive the death penalty. The trial court duly entered an order sentencing Ambrose to death.

¶39. On June 25, 2015, Ambrose filed a motion for a new trial or, in the alternative, for acquittal notwithstanding the verdict. On November 24, 2015, the trial court held a hearing on the motion. On July 30, 2015, the trial court entered an order denying the motion. Ambrose timely appeals, raising twelve assignments of error. In addressing the issues, additional relevant facts and procedural history will be set out as necessary.

## STANDARD OF REVIEW

¶40. The Court applies heightened scrutiny to capital murder convictions where a sentence of death has been imposed. *Keller v. State*, 138 So. 3d 817, 835 (¶ 15) (Miss. 2014). The Court repeatedly has held that what may be harmless error in a case with less at stake may become reversible error when the penalty is death. *Id*.

## DISCUSSION

**I. WHETHER THE TRIAL COURT ERRED BY EXCLUDING EVIDENCE OF DEMETRIUS LEE'S PRIOR NONADJUDICATED BURGLARY AND ARMED ROBBERY ARREST.**

¶41. Ambrose argues that the trial court unconstitutionally and prejudicially prevented him from confronting and impeaching Lee with evidence highly probative of Lee's bias in favor of testifying in the manner desired by the State. Ambrose argues that Lee, an uncharged coparticipant in the events leading to Trosclair's death, was the most crucial witness to the State's theory presented at trial. Ambrose argues that at the time Lee made his bargain with the State to be a witness rather than a defendant, the jury did not additionally learn that Lee also needed the State to refrain from seeking revocation of probation for a nonadjudicated

18

sentence for burglary that he was serving at the time. Ambrose also argues that Lee faced a similar risk of prosecution for an unrelated armed robbery for which he had been arrested while he was being questioned as a suspect in the present matter.

### A. Motion *in Limine* and Proffer

¶42. On June 5, 2015, the State filed a motion *in limine* to prohibit Ambrose from cross-examining Lee about his prior nonadjudicated burglary and armed robbery arrest. The State asserted that on August 16, 2010, Lee had pleaded guilty to burglary and was sentenced to five years of nonadjudicated probation.[6] Also, on April 10, 2013, Lee was arrested for armed robbery, which ultimately was no true billed by a grand jury.

¶43. On June 11, 2015, prior to trial, the trial court held a hearing on the State's motion *in limine*. The State argued that the prior nonadjudication and armed robbery arrest were inadmissible under Mississippi Rule of Evidence 609 because neither was a felony conviction. The State represented that, at the time of the hearing, Lee still was on nonadjudicated probation. Ambrose responded that because the grand jury returned a no true bill for Lee's armed robbery arrest, he sought to introduce the evidence as evidence of bias under Mississippi Rule of Evidence 616.

¶44. According to Ambrose, a probation revocation had been filed in the burglary matter and was heard six to ten months later. The record is silent as to the basis of the filed

---

[6] During a proffer offered at trial, Lee testified that he was sentenced to three years' nonadjudicated probation.

19

revocation or its disposition.[7]  Ambrose claimed that at the time Lee was interviewed by investigators, he was facing twenty-five years for the burglary nonadjudication.[8]  Ambrose argued that Lee was not charged with capital murder, not charged with armed robbery, and did not have his probation revoked even though evidence existed that he had violated "a couple of terms of his probation."[9]  The trial court granted the State's motion based on Mississippi Rule of Evidence 609.

¶45.  At trial, Ambrose cross-examined Lee.  Lee admitted giving two different stories to investigators on April 10, 2013, about the events leading to Trosclair's death.  Hours after giving the first version, Lee testified that investigators had asked whether he wanted to be a capital murder defendant or a witness.  Lee testified that he chose to be a witness rather than a defendant and cooperated with investigators.  The trial court then granted Ambrose's request to make a proffer outside the presence of the jury and allowed cross-examination with regard to Lee's criminal past.

¶46.  The testimony offered during the proffer showed that, at the time of Trosclair's murder on April 7, 2013, Lee was serving nonadjudicated probation for burglary of a

---

[7] The information surrounding Lee's criminal past is gleaned from the motion *in limine*, Lee's testimony during the proffer, and representations made by counsel, because no documentation such as a no true bill, nonadjudication sentence, revocation, or order is in the record.

[8] At trial, Ambrose's counsel represented that Lee was facing twelve years at the time of the interview.

[9] The actual terms of Lee's nonadjudication probation are unknown.  Ambrose suggests that Lee may have violated a term by associating himself with harmful or disreputable characters such as Dedeaux, who allegedly was a convicted felon at the time and on probation for felony possession of a controlled substance.

20

dwelling. Lee acknowledged that he initially was concerned about his probation status while being questioned by investigators about the case *sub judice*. After Lee gave his first statement, an investigator asked Lee about an unrelated, January 27, 2013, armed robbery for which he had been identified as a suspect. Lee testified that he was not worried about his probation being revoked as a result of being a suspect in the armed robbery because he was innocent of the armed robbery.

¶47. Following the proffer, the trial court entertained arguments from counsel. According to Ambrose, Lee had been arrested for the unrelated armed robbery in April 2013[10] and had remained in jail for eight months until January 2014 when the grand jury returned a no true bill on the charge. Ambrose urged that Lee's criminal past was admissible as evidence of bias under Rule 616. The trial court retained its prior ruling and also found that Lee's testimony Ambrose sought to elicit had no relevance to the case *sub judice*. The trial court refused to "allow questioning about a situation where [Lee] could have been revoked on a prior [nonadjudication] by an arrest which was presented to the [g]rand [j]ury and no true billed."

¶48. On appeal, Ambrose acknowledges that the trial court properly recognized that Rule 609 restricts impeachment of a witness's character for truthfulness with prior criminal conduct to only conduct that has resulted in a conviction. *See* M.R.E. 609. However, Ambrose argues that the trial court failed to recognize that Lee's prior criminal conduct went

[10] According to Ambrose's counsel, Lee "went to jail on April 7th, 2013, right at midnight, and he didn't leave until January . . . 2014." The State represented that Lee was arrested on April 10, 2013, for the armed robbery.

21

not merely to his general credibility, but to a specific factual basis for his being biased in favor of the State or having an interest in receiving a benefit or forestalling harm from prosecution.

¶49.    Ambrose argues that the trial court erred by excluding testimony that Lee faced unresolved criminal charges, over which the prosecutor retained the power to exercise favorable or unfavorable discretion.  Ambrose argues that the trial court's error clearly was prejudicial because Lee's testimony was key to implicating Ambrose for kidnapping and designating him as the lead participant in the blows with the tire that resulted in Trosclair's fatal brain injuries.  In response to Ambrose's claim of prejudice, the State argues that the jury heard evidence of Lee's motive and bias to testify as a witness rather than as a defendant charged with capital murder for his involvement in the events leading to Troslciar's death.  The State argues that any bias stemming from the deal was fully explored by defense counsel.

## B.    Applicable Law and Analysis

¶50.    The trial court generally is allowed wide discretion concerning the admission of evidence offered to suggest bias on the part of a witness against the defendant.  *Tillis v. State*, 661 So. 2d 1139, 1142 (Miss. 1995).  We review the trial court's ruling for an abuse of discretion.  *Id*.  "We will affirm the trial court's exercise of discretion unless the ruling resulted in prejudice to the accused."  *Anthony v. State*, 108 So. 3d 394, 397 (¶ 5) (Miss. 2013).

¶51.    "The Confrontation Clause of the Sixth Amendment of the United States Constitution provides, 'In all criminal prosecutions, the accused shall enjoy the right  to be confronted

22

with the witnesses against him.'" ***White v. State***, 785 So. 2d 1059, 1062 (¶ 9) (Miss. 2001). Likewise, "Article 3, Section 26, of the Mississippi Constitution grants and guarantees a criminal defendant the right to confront witnesses against him." ***Young v. State***, 731 So. 2d 1145, 1151 (¶ 38) (Miss. 1999). "The right of confrontation extends to and includes the right to fully cross-examine the witness on every material point relating to the issue to be determined that would have a bearing on the credibility of the witness and the weight and worth of his testimony." ***Id***.

¶52.    "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." ***Holmes v. South Carolina***, 547 U.S. 319, 324 (2006). "While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." ***Id***. at 326-27. ("Plainly referring to rules of this type, we have stated that the Constitution permits judges to exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues.") (quotations omitted).

¶53.    Mississippi Rule of Evidence 611(b) allows wide open cross-examination of witnesses, and Rule 616 allows evidence of bias for the purpose of attacking the credibility of a witness. ***McFarland v. State***, 707 So. 2d 166, 176 (¶ 33) (Miss. 1997); *see also **Meeks***

*v. State*, 604 So. 2d 748, 755 (Miss. 1999). For purposes of attacking the credibility of a witness under Rule 616, evidence of bias, prejudice, or interest of the witness "includes interrogating the witness's belief or perception as to whether the State could extend leniency for pending charges." *Anthony*, 108 So. 3d at 397 (¶ 6).

¶54. At the time of trial,[11] Rule 616 provided: "For the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible." M.R.E. 616. However, "Rule 616 must be interpreted as it relates to other rules of evidence, particularly [Rules] 104, 401 and 402." *Tillis v. State*, 661 So. 2d 1139, 1142 (Miss. 1995). "Rule 616 states the general rule of admissibility of such evidence subject to the trial court finding, in the exercise of its discretion under [Rule] 104, that it is relevant, under [Rules] 401 and 402, to the specific facts in the case." *Id*. Rule 401[12] provided: "'Relevant Evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.E. 401. Rule 402[13] provided: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the

---

[11] In 2016, the language of Rule 616 was amended as part of the general restyling of the evidence rules. Rule 616 now provides: "Evidence of a witness's bias, prejudice, or interest – for or against any party – is admissible to attack the witness's credibility." M.R.E. 616.

[12] In 2016, the language of Rule 401 was amended as part of the general restyling of the evidence rules.

[13] In 2016, the language of Rule 402 was amended as part of the general restyling of the evidence rules.

24

United States, the Constitution of the State of Mississippi, or by these rules. Evidence which is not relevant is not admissible." M.R.E. 402.

¶55. Here, the trial court ultimately found the evidence of Lee's criminal past not relevant. *See* M.R.E. 401, 402. However, the Court has emphasized that a material witness's favored treatment from law enforcement authorities when the witness is subject to prosecution is probative of the witness's interest or bias and may be developed through cross examination. *See, e.g., Anthony*, 108 So. 3d at 397-98 (¶¶ 5-7); *McFarland v. State*, 707 So. 2d at 176 (¶¶ 32-34); *Suan*, 511 So. 2d at 147-48 (Miss. 1987); *Hall v. State*, 511 So. 2d 144, 27-28 (Miss. 1985).

¶56. In general, "one accused of a crime has the right to broad and extensive cross-examination of the witnesses against him, and especially is this so with respect to the principal prosecution witness." *Suan*, 511 So. 2d at 148. The right is secured by our rules of evidence, namely Rule 611(b), and it is a function of the Confrontation Clauses of the federal and state constitutions. *Id*. "Evidence that a material witness has received favored treatment at the hands of law enforcement authorities, particularly where that witness is himself subject to prosecution, is probative of the witness'[s] interest or bias and may be developed through cross-examination or otherwise presented to the jury." *Id*. at 147–48. We specifically have held that "[a] leniency/immunity agreement may be presented to the jury where such would tend to impeach or show bias in the testimony of a State's witness." *Barnes v. State*, 460 So. 2d 126, 131 (Miss. 1984). In the context of the State failing or refusing to disclose witness leniency and immunity agreements, "the law is clear that the immunity deal must be disclosed to the defense." *Barnes*, 460 So. 2d at 131.

25

¶57. The record fails to show that a leniency or immunity agreement had been struck with Lee and the State in regard to the nonadjudicated burglary or armed robbery arrest. Indeed, Ambrose did not argue at the trial level or in its initial brief on appeal that the State had failed or refused to disclose a leniency or immunity deal to the defense in violation of our holding in *Barnes*. *Id*. The only actual leniency or immunity agreement between the State and Lee demonstrated in the record was the deal he had cut with investigators to serve as a witness in the present case rather than be charged for his involvement in the events leading to Trosclair's murder. Evidence of the deal was disclosed at trial during Lee's cross-examination.

¶58. In direct conflict with a leniency or immunity deal, the record shows that the State actually pursued Lee's armed robbery charge, but the grand jury returned a no true bill. The record also suggests that the State sought revocation of Lee's nonadjudication, although the basis of the revocation and ultimate disposition are unclear. On appeal, the State argues that "presumably, the [trial] judge denied revocation." In contrast, Ambrose claims that, although the State filed revocation proceedings, it "abandoned" the revocation of Lee's nonadjudication probation sentence. To the extent that Ambrose is arguing for the first time that the State failed or refused to disclose a leniency or immunity deal to Ambrose, that argument has been waived and simply is not supported by the record. *See Hansen v. State*, 592 So. 2d 114, 127 (Miss. 1991) (holding that the Court must decide each case by the facts shown in the record, not assertions in the brief); *Evans v. State*, 725 So. 2d 613, 632 (¶ 2) (Miss. 1997) (holding that issues that were not presented to the trial court therefore are procedurally barred, and error, if any, is waived).

26

¶59. The State maintains that Ambrose's entire argument hinges on the premise that the jury could have *inferred* that the State promised leniency by not seeking revocation of Lee's probation and not charging him in the armed robbery case, or that the charges were leveraged over Lee in exchange for his testimony. The State argues that the trial court properly excluded the evidence of Lee's criminal past because both charges against him had been resolved prior to Ambrose's trial; therefore, nothing existed for the State to leverage against Lee to make him a biased witness in favor of the State. The State claims that Lee had completed his nonadjudicated probation at the time of trial and his testimony.

¶60. However, although it is unclear whether Lee's probation sentence was three or five years, the record shows that Lee was on probation at the time of trial because the State represented at the motion *in limine* hearing that Lee was still on probation. Regardless, it is undisputed that Lee was subject to revocation at the time of his interview and for some time thereafter. Ambrose is correct that, although Lee's armed robbery charge was no true billed, he remained subject to have the armed robbery charge presented to the grand jury again.

¶61. In *Suan*, the defendant sought to show that a witness had been involved in criminal activity but had not been prosecuted. *Suan*, 511 So. 2d at 148. Specifically, the defendant sought to establish that the witness had a motive for testifying falsely, and that if he did not testify falsely, he would be subject to parole revocation proceedings and returned to prison. *Id*. at 147. The Court noted that the witness's "neck was on the line if he did not testify in a manner pleasing to the prosecution." *Id.* at 148. The Court held that the trial court had erred when it refused to allow such cross-examination because the witness was the principal

27

witness for the State, and because so much of the prosecution's case turned upon his credibility. *Id.*

¶62. Likewise, in *McFarland*, the defendant argued that the trial court had erred by refusing to allow defense counsel to question a witness fully regarding any favorable treatment by the State so as to demonstrate the witness's possible bias in testifying for the State. *McFarland*, 707 So. 2d at 176 (¶ 32). The Court recognized that defense counsel may have had a colorable argument that he should have been permitted to question the witness regarding any favorable treatment by the State. *Id*. at 176 (¶ 33). However, the defense failed to make a proffer at trial or demonstrate on appeal or at trial that the witness was subject to prosecution for the alleged criminal conduct. *Id*. at 176-77 (¶ 33). The Court held that any error was not properly preserved for review because the defendant failed at trial to make a proffer or even argue that the witness received favorable treatment from the State. *Id*. at 177 (¶ 34).

¶63. In *Hall v. State*, 476 So. 2d 26, 27 (Miss. 1985), the defendant Johnny Hall was indicted for armed robbery and sought to question a coindicted defendant (Dennis Smart) and a witness (Elizabeth Hughes) about the separate, unrelated criminal charges pending against both of them at the time of the defendant's trial. The trial court forbade questioning Smart and Hughes about their pending charges. *Id*. at 27. The Court examined Mississippi Code Section 13-1-13, the controlling evidentiary statute at the time, which provided that "[a]ny witness may be examined touching his interest in the cause or his conviction of any crime." *Id*. at 27-28. The Court recognized that such questioning has been allowed for purposes of showing motivation to testify. *Id*. at 28 (citing *Rouse v. State*, 65 So. 501 (Miss. 1914);

28

*Perry v. State*, 64 So. 466 (Miss. 1914)).  The Court rejected the State's argument that the existence of an immunity or leniency agreement had not been definitely established.  *Id*. at 28.  The Court held:

> The circumstances of this case strongly support the admission of such evidence.  The state relied heavily on the testimony of Smart and Hughes.  Smart and Hughes were brother and sister, and may have colluded.  Smart was charged with the same crime as Hall.  Both Smart and Hughes had criminal charges pending against them at the time of the trial.  Although there was no evidence of a bargain, they might well have believed that their testimony in Hall's case could somehow affect the disposition of their own.  It would be naive to suppose that the absence of a formal agreement with the prosecution precluded such an expectation.  Smart and Hughes had an "interest in the cause" (to use the statutory language), and fuller inquiry into it should have been allowed.  We believe that the trial judge's decision on this point prevented Hall from presenting his defense effectively, and thus deprived him of a fair trial.  Accordingly, this case must be reversed and remanded for a new trial.

*Hall*, 476 So. 2d at 28.

¶64.    The State argues that, unlike *Suan* and *McFarland*, where the witnesses had not been prosecuted, the State actually pursued charges against Lee.  However, *Suan* and *McFarland* lend support to Ambrose's position because Lee may have been subject to probation revocation proceedings for a number of reasons, not just his armed robbery arrest, as presumed by the trial court.  Although the jury heard that Lee chose to be a witness rather than a defendant in the present case, Ambrose's chief argument is that it did not hear that Lee also had an *additional* reason to be a witness, *i.e.*, the possibility of probation revocation.

¶65.    Aside from the obvious distinction that the evidentiary statute controlled in *Hall*, the State argues that *Hall* may be distinguished because Lee had no charges pending at the time of Ambrose's trial.  The State argues that the jury could not have inferred that Lee was given

29

leniency in exchange for testimony because the State sought revocation and presented the armed robbery case to the grand jury. The State argues that the charges were "fully resolved by the time Lee testified at Ambrose's trial." As suggested by Ambrose, certain terms of his revocation may have included his arrest or involvement in the case *sub judice* or his association with alleged convicted felon Dedeaux. At the time he was interviewed by investigators, Lee certainly was subject to prosecution. Moreover, the record shows that Lee continued to be subject to prosecution through trial. The State admitted that Lee was "still on non-adjudicated probation" at the motion *in limine* hearing on June 11, 2015.

¶66.    Here, Lee was a principal witness in the sense that he was an eyewitness to nearly the entire sequence of events leading to Trosclair's death on April 7, 2013. We explained in ***Suan***:

> The impeachment sought here, however, was not of that sort. Here the defense sought to show that Eddie Grammer had been involved in criminal activity but had not been prosecuted. The point was that Grammer's neck was on the line if he did not testify in a manner pleasing to the prosecution. This Suan was entitled to show—or at least to attempt to show. The Circuit Court erred when it refused to allow such cross-examination. Because Grammer was the principal witness for the State, and because so much of the prosecution's case turned upon his credibility, the error is of reversible proportions.

***Suan***, 511 So. 2d at 148.

¶67.    In the same way, Lee's neck was on the line at the time he was interviewed by police and through trial. Although Lee's testimony was not necessary to finding Ambrose guilty of capital murder beyond a reasonable doubt, as further explained below, we hold that, under the heightened scrutiny standard of review, the trial court erred by excluding the evidence.

By limiting Ambrose's cross examination of Lee, the trial court denied Ambrose the opportunity to fully challenge Lee's credibility.

¶68. Alternatively, the State argues that, even if the evidence was admissible under Rule 616, it was properly excluded under Rules 611(a) and 403. While the State may be correct that the evidence may have been properly excluded under Rule 403, the trial court did base its decision to exclude the evidence on Rule 403. Here, the trial court erroneously concluded that the evidence of bias was not relevant, as we have held that similar testimony is probative of the witness's interest or bias. *See Anthony*, 108 So. 3d at 397-98 (¶¶ 5-7); *McFarland*, 707 So. 2d at 176 (¶¶ 32-34); *Suan*, 511 So. 2d at 147-48 (Miss. 1987); *Hall*, 476 So. 2d at 27-28. We decline to conduct a Rule 403 balancing analysis for the first time on appeal.

### C. Harmless Error

¶69. The State argues that, even if cross-examination regarding Lee's criminal past should have been permitted, the trial court's exclusion of the evidence was harmless beyond a reasonable doubt. Ambrose argues that, in light of his own testimony, no overwhelming evidence of guilt exists to render harmless the trial court's error in restricting the impeachment of Lee.

¶70. "[E]ven errors involving a violation of an accused's constitutional rights may be deemed harmless beyond a reasonable doubt where the weight of the evidence against the accused is overwhelming." *Clark v. State*, 891 So. 2d 136, 142 (¶ 29) (Miss. 2004). "The well-settled standard for determining whether a constitutional error is harmless is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Gillett v. State*, 148 So. 3d 260, 266 (Miss. 2014) (quoting *Chapman v.*

31

*California*, 386 U.S. 18, 23-24 (1967)).  The constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to harmless error analysis under *Chapman*.  In *Clark*, we explained:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.  Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.  These factors include the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Clark*, 891 So. 2d at 142 (¶ 29) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

¶71.    The State argues that it proved Ambrose was guilty beyond a reasonable doubt without Lee's testimony.  We agree.  Ambrose admitted to fighting Trosclair at the Hill, driving him to Lawton's house, chasing down Trosclair, and beating Trosclair again.  At the Hill, Sims testified that she saw Ambrose beating Trosclair, who was not fighting back.  Sims testified that she begged Ambrose to stop beating Trosclair, but he refused.  Sims also testified that Ambrose instructed Stevie, Dedeaux, and Lee to put Trosclair in the truck before they left.  Sims testified that they complied with Ambrose's instructions.  Although Ambrose claimed Trosclair did not go anywhere against his will, Ambrose admitted telling Trosclair that, once he received his speakers, he "wasn't going to mess with him anymore."

¶72.    At Lawton's house, Lawton testified that he saw Trosclair try to run away, but Stevie, Dedeaux, and Ambrose chased him down.  Lawton testified that they began beating

Trosclair. Lawton testified that Ambrose hit Trosclair with a fully inflated tire with rim. Ambrose admitted that all of them were beating Trosclair after they chased him down. Ambrose also admitted that the reason everyone was beating Trosclair was because Ambrose was angry about Trosclair breaking into his car.

¶73. A passing motorist discovered an unconscious Trosclair on the side of the road nearby. Trosclair had significant injuries and was tied up with a ratchet tow strap. Without Lee's testimony, Ambrose's guilt was proven beyond a reasonable doubt. Thus, we conclude that the error excluding evidence of Lee's criminal past was harmless beyond a reasonable doubt.

## II. WHETHER THE SOLE FINDING BY THE JURY THAT AMBROSE "CONTEMPLATED THAT LETHAL FORCE WOULD BE EMPLOYED" UNDER MISSISSIPPI CODE SECTION 99-19-101(7) IS CONSTITUTIONALLY SUFFICIENT.

¶74. Ambrose argues that his death sentence is invalid because, by itself, the Section 99-19-101(7) sentence eligibility factor found by the jury that Ambrose "contemplated that lethal force would be employed" is constitutionally insufficient under *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987). The State responds that the jury's sole finding that Ambrose contemplated that lethal force would be employed satisfies Section 99-19-101(7). The Court repeatedly has held the finding to be constitutional.

¶75. In *Enmund*, the United States Supreme Court concluded: "Because the Florida Supreme Court affirmed the death penalty in this case in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken, we reverse the judgment upholding the death penalty and remand for

33

further proceedings not inconsistent with this opinion." *Enmund*, 458 U.S. at 801. "Following *Enmund v. Florida*, Mississippi amended its capital sentencing scheme to require that a jury must find that the defendant actually killed, attempted to kill, intended that a killing take place, and/or contemplated that lethal force would be employed in order to return and impose a sentence of death. Ch. 429, Senate Bill No. 2699, 1983 General Laws of Mississippi." *Dickerson v. State*, 175 So. 3d 8, 32 (¶ 79) (Miss. 2015) (citing Miss. Code Ann. § 99-19-101(7)).

¶76.    In *Tison*, the Supreme Court held "that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Tison*, 481 U.S. at 158.  "In *Tison*, the [Supreme] Court noted that Mississippi had modified the capital murder sentencing scheme following *Enmund*." *Dickerson*, 175 So. 3d at 32 (¶ 79) (citing *Tison*, 481 U.S. at 152, n.4).

¶77.    Section 99-19-101(7) provides:

> (7) In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
>
> > (a) The defendant actually killed;
> >
> > (b) The defendant attempted to kill;
> >
> > (c) The defendant intended that a killing take place;
> >
> > (d) The defendant contemplated that lethal force would be employed.

Miss. Code Ann. § 99-19-101 (Rev. 2015).

¶78.    The jury was duly instructed in accordance with Section 99-19-101(7): "To return the death penalty in this case you must first unanimously find from the evidence beyond a reasonable doubt that one or more of the following facts existed: 1. That the Defendant actually killed Robert Trosclair; 2. That the Defendant attempted to kill Robert Trosclair; 3. That the Defendant intended the killing of Robert Trosclair take place; or, 4. That the Defendant contemplated that lethal force would be employed."

¶79.    Following the penalty phase of the trial, the jury returned the verdict:

We, the Jury, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the Capital Murder.

    Section A:

    That the Defendant contemplated that lethal force would be employed.

Next we, the jury, unanimously find that the aggravating circumstances of:

    1.    The Capital offense was committed when the Defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a Kidnapping.

    2.    The Capital offense was especially heinous, atrocious or cruel.

    Exists beyond a reasonable doubt and is sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances, and we further find unanimously that the Defendant should suffer death.

¶80.    We have held that the State must prove only one of the four facts listed in Section 99-19-101(7).  *Stevens v. State*, 806 So. 2d 1031, 1053 (¶ 99) (Miss. 2001).  Indeed, Section 99-

35

19-101(7) requires that only one of the factors be found to support a death sentence. *Id.* (citing *Smith v. State*, 729 So. 2d 1191, 1218-19 (Miss. 1998); *Bell v. State*, 725 So. 2d 836, 860-61 (Miss. 1998)). We also have held that "[i]n compliance with *Enmund*, Section 99-19-101(7) of the Mississippi Code requires the jury to find beyond a reasonable doubt at least one of the four enumerated scienter factors before imposing the death penalty." *Ronk v. State*, 172 So. 3d 1112, 1145 (¶ 91) (Miss. 2015).

¶81. Recently, we addressed whether the scienter provisions of Mississippi's capital sentencing scheme are constitutional. In *Evans v. State*, 226 So. 3d 1, 39 (¶ 106) (Miss. 2017), the capital murder defendant argued that Section 99-19-101(7)(d), which requires that the jury find the defendant contemplated that lethal force would be employed, is an unconstitutional basis for a person convicted of capital murder to be sentenced to death under *Enmund* and *Tison*.

¶82. In *Evans*, we rejected the same constitutional argument that Ambrose makes today and held that Section 99-19-101(7)(d)'s scienter provision was constitutional. *Evans*, 226 So. 3d at 39 (¶ 106). Likewise, in *Corrothers v. State*, we held that Section 99-19-101(7)(d) was constitutional because the State must prove only one of the four facts; it is not necessary that the State prove intent where the victim actually was killed. *Corrothers*, 148 So. 3d at 322 (¶ 126).

¶83. As noted by the State, the Court repeatedly has held Section 99-19-107(7)(d) to be constitutional in capital cases. *See Evans v. State*, 725 So. 2d 613, 683-84 (¶¶ 311-316) (Miss. 1997) (holding that, in light of *Enmund* and *Tison*, a critical review of our capital sentencing scheme reveals no constitutional infirmities); *see also Ronk*, 172 So. 3d at 1145

(¶¶ 91-92); *Cox v. State*, 183 So. 3d 36, 61 (¶ 91) (Miss. 2015); *Batiste v. State*, 121 So. 3d 808, 871-72 (¶¶ 177-178) (Miss. 2013); *Knox v. State*, 901 So. 2d 1257, 1268 (¶¶ 38-39) (Miss. 2005); *Lockett v. State*, 517 So. 2d 1317, 1338 (Miss. 1987). Ambrose acknowledges that the Court has declined to declare Section 99-19-101(7)(d) unconstitutional on a number of occasions, but urges the Court to revisit its prior holdings because the constitutionality of a sentence with the sole finding that the "defendant contemplated that lethal force would be employed" has never been squarely before the Court.

¶84. Ambrose also quotes the Court in *Dickerson*: "Under *Enmund* and *Tison*, a defendant who participated in the commission of a felony, but did not actually kill or intend to kill the victim, cannot receive the death penalty." *Dickerson*, 175 So. 3d at 31-32 (¶ 79). However, the *Dickerson* Court, relying on *Evans*, confirmed that Section 99-19-101(7) was constitutional. *Id*. at 31-33 (¶¶ 78-79) (citing *Evans*, 725 So. 2d at 683 (¶¶ 311-316)).

¶85. Ambrose also recognizes that the Court has affirmed a death sentence in which the trial court, sitting as the fact finder, made the sole finding that the capital murder defendant had contemplated that lethal force would be used. *See Bishop v. State*, 812 So. 2d 934, 937 (¶¶ 1) (Miss. 2002). In addressing the sufficiency of the evidence on appeal, we held, at a minimum, the defendant had contemplated that lethal force would be used and had taken an active role in the killing. *See id*. at 948-49 (¶¶ 48-52) ("A jury could have easily found that Bishop killed, intended to kill, or at least contemplated that deadly force would be used."). Although Ambrose does not raise a sufficiency of the evidence argument, the evidence here was sufficient to satisfy *Enmund* culpability, given Ambrose's major participation of the kidnapping, combined with reckless indifference to human life.

¶86.    In support of Ambrose's argument, he relies on *Randall v. State*, 806 So. 2d 185, 232-234 (¶¶ 132-141) (Miss. 2001), in which the jury made the sole finding that Armon Randall had contemplated that lethal force would be employed.  Relying on *White v. State*, 532 So. 2d 1207 (Miss. 1988),   Randall argued that the jury's sole finding allowed him to be sentenced to death on nothing more than tort forseeability.  *Randall*, 806 So. 2d at 232 (¶ 134).  The *Randall* Court quoted what the Court wrote in *White*:

> We are less than certain of the precise difference between Subsection (c), "the defendant intended that a killing take place," and Subsection (d), "the defendant contemplated that lethal force would be employed." Subsection (c) has reference to the defendant's mental purpose and design that someone's life be taken. But what of Subsection (d)'s contemplation of lethal force?  The two surely are not synonymous, although "contemplate" is one synonym for intend. *See* Roget's *International Thesaurus* § 653.7 (4th ed. 1977).   This alone excludes the notion that Subsections (c) and (d) describe two mutually exclusive categories of culpability.

> Careful attention to the King's English, definitional and grammatical, [led] to the view that Subsection (c) is subsumed in Subsection (d), for we cannot imagine a case in which a defendant intended that a killing take place but somehow did not contemplate use of lethal force.  In this sense, Subsection (c)'s "intended that a killing take place" is surplusage and may with profit be set aside.  But the converse is not necessarily so.  One may contemplate lethal force while stopping short of a definite plan or design to kill.  In a sense, Subsection (d) describes a contingent intent.  Where, as a part of pre-crime planning, a defendant includes in his plans the substantial probability that fatal force will be employed, Subsection (d) is satisfied.  On the other hand, mere tort foreseeability–an objective, reasonable man approach–falls well short of what the statute requires.

*Randall*, 806 So. 2d at 232 (quoting *White*, 532 So. 2d at 1220-21).

¶87.    In *Randall*, the Court agreed with Randall's argument "that because the jury found 'contemplation' alone, the language of *White* required the jury to find that he had some sort of 'pre-crime,' 'contingent intent,' or plan that establishes a mental state beyond mere

38

foreseeability or reckless indifference to human life." *Id*. at 233 (¶ 135). The Court held that "[b]ecause the instruction failed to properly instruct the jury on the mental state required, this instruction was erroneously given." *Id*.

¶88.   The *Randall* Court's reliance on *White* was misplaced. First, the *White* Court was addressing whether the evidence was legally insufficient to support a sentence of death, not whether a sole Section 99-19-101(7)(d) finding was constitutional. *White*, 532 So. 2d at 1219-20. Second, the *White* Court unequivocally said: "More precisely, this sentence of death may be upheld only if we have before us a record which contains evidence legally sufficient that the jury may have found that Willie Lee White, Jr., killed, attempted to kill, intended that a killing take place, *or contemplated that lethal force would be employed*." *Id*. at 1219 (emphasis added).

¶89.   Indeed, "only one of Subsection (7)'s facts must be found." *Id*. at 1220. "More specifically, there is no evidence that White made any attempt to kill Lewis, *or that he contemplated that lethal force would be used*." *Id*. at 1221  (emphasis added). The *White* Court continued: "Because nothing in the record legitimately suggests that White killed or contemplated any physical harm to Lewis, the death verdict dies." *Id*. at 1221. The Court concluded: "In the present state of the record, we hold that the evidence was legally insufficient to enable a rational trier of fact to find beyond a reasonable doubt that Willie Lee White, Jr., killed, attempted to kill, intended that a killing take place, or contemplated that lethal force would be employed." *Id*. at 1222.

¶90.   To the extent that *Randall*, purportedly relying on *White*, holds that a sole finding that a capital defendant contemplated that lethal force would be employed is insufficient, it is

39

wrongly decided. *White* issues no such holding; rather, *White* stands for the proposition that a death verdict may be upheld if the legally sufficient evidence supports a finding that the defendant contemplated that lethal force would be used. *Id*. at 1221.

¶91. Even though *Randall*'s reliance on *White* is misplaced, *Randall* is distinguishable in some significant ways. The State argues that *Randall* is different because there was no evidence that Randall had participated in the killing, and proof of his participation in the underlying robbery appeared to be no more than his possession of a gun and presence at the scene. *See Randall*, 806 So. 2d at 233-34 (¶¶ 136-141). The State argues that the stark difference is Ambrose's level of involvement in both the kidnapping and the killing. The State also points out that in *Randall*, the Court held that the evidence to support a finding that Randall contemplated that lethal force would be employed was legally insufficient, whereas here, Ambrose does not challenge the legal sufficiency of the evidence on the jury's finding. *See id*. at 234 (¶ 141) ("The mere possession of a gun when there is no evidence that there was a plan to kill, although sufficient under the felony-murder statute, does not establish that there was a "substantial probability that fatal force will be employed.").

¶92. The Court's decision in *Abram v. State* is somewhat at odds with *Randall*. *See Abram v. State*, 606 So. 2d 1015, 1041-42 (Miss. 1992), *overruled on other grounds by Foster v. State*, 961 So. 2d 670 (Miss. 2007) (a jury's single statutory finding under Section 99-19-101(7) that the capital defendant contemplated that lethal force would be employed is adequate if supported by sufficient evidence). In *Abram*, we looked to the *White* Court for guidance and wrote:

40

In the federal context, there is little doubt that the evidence here is sufficient to satisfy the ***Enmund*** culpability requirement given Abram's "major participation in the felony committed, combined with [the supportable finding] of reckless indifference to human life." ***Tison v. Arizona***, 481 U.S. 137, 158, 107 S. Ct. 1676, 1688, 95 L. Ed. 2d 127, 145 (1987).

However, as noted in ***Tison***, and affirmed in ***Minnick v. State***, 551 So. 2d 77, 98 (Miss.1988), *reversed on other grounds* [*by*] 498 U.S. 146, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990), Mississippi by statute requires more in the felony-murder scenario than major participation and reckless indifference to the value of human life. [***Tison***,] 481 U.S. at 154, n.10, 107 S. Ct. at 1686, n.10, 95 L. Ed. 2d at 142, n.10. And obviously, "mere tort foreseeability—an objective, reasonable man approach—falls well short of what the statute requires." ***White v. State***, 532 So. 2d 1207, 1221 (Miss.1988).

***Abram***, 606 So. 2d at 1041-42.

¶93. The ***Abram*** Court explained:

The circuit court was right to conclude that something more than a "possibility" is required. But the [trial] court went too far in the other direction when it concluded that there are only three tests under ***Enmund***, and that under § 99–19–101(7), subsections (c) and (d) are conjunctive. The court at times appeared to zero in on the precise meaning of subsection (d) by restricting its application to those killings which are a "necessary or probable result of the initial felony." But the circuit court ultimately applied a more restricted interpretation of § 99–19–101(7)(d) by requiring proof of actual intent to kill, an interpretation which for all practical purposes blurs any distinction between subsections (c) and (d) of § 99–19–101(7).

***Abram***, 606 So. 2d at 1042.

¶94. The ***Abram*** Court noted that we have articulated at least some difference between subsections (c) and (d). ***Id***. However, in ***Abram***, we unequivocally rejected the idea that "there must be proof in either case of an actual intent or definite plan or design to kill." ***Id***. The ***Abram*** Court held that the trial court erred in its interpretation and application of Section 99-19-101(7)(d) to the facts of the case because the jury's finding that Abram contemplated the use of lethal force was within the permissible range of law and evidence. ***Id***. at 1043.

41

However, the Court cautioned that, on remand, absent new admissible evidence sufficiently implicating Abram, a finding under Section 99-19-101(70(d) would not be justified. *Id*. Thus, although the *Abram* Court's decision addressed the sufficiency of the evidence, it properly held that a sole finding under Section 99-19-101(7)(d) would be justified if supported by sufficient evidence. *Id*.

¶95.    Again, Ambrose does not challenge the sufficiency of the evidence. To the extent he does, the argument is without merit. For the foregoing reasons, we reaffirm the well settled principle that a sole finding under Section 99-19-101(7)(d) is constitutional.

III.    **WHETHER THE TRIAL COURT ERRED IN THE SEATING OR REMOVAL OF CERTAIN JURORS**.

¶96.    Ambrose argues that the trial court reversibly erred by (1) seating Juror Gary Garner, an admittedly biased juror who served in both phases of trial; (2) and improperly removed Juror Jeffrey Jenkins, an unbiased juror, and replaced him with an alternate at the conclusion of the penalty phase evidence.

A.    **Juror Gary Garner**

¶97.    During voir dire, the trial court asked whether any jurors or their family members currently or have been in the past connected with law enforcement. Eleven potential jurors answered in the affirmative, including Garner. The entire exchange between Garner and the trial court is set out below:

> THE COURT:    Mr. Garner?
>
> MR. GARNER:    Yes.
>
> THE COURT:    There you are.

42

MR. GARNER:     My son is a supervisor with Biloxi PD.

THE COURT:      Is he now?

MR. GARNER:     Now, yes, Sir.

THE COURT:      Okay. You've got a real close connection with law enforcement. Does he discuss cases with you and his job?

MR. GARNER:     There are some things that he and I discuss as his pastor that we have discussed, and there are situations that I am aware of that he is involved in, yes.

THE COURT:      Okay. Would the fact that you take an interest in his job, and he is active in law enforcement at this time, would that cause you maybe to lean toward the law enforcement side of this case?

MR. GARNER:     Yes, sir. I'm actively involved in his life, not his work.

THE COURT:      Not his work, okay. Good. Thank you.

MR. GARNER:     Yes, sir.

¶98. Ambrose did not follow up with Garner on the issue of bias. Garner was accepted by Ambrose without a challenge for cause or exercising a peremptory strike and was seated on the jury.

¶99. Ambrose argues that Garner's response to the question asking whether he would maybe lean toward the law enforcement side of the case was an admission that he was biased. Ambrose relies on *Brown v. State*, 164 So. 3d 1046 (Miss. Ct. App. 2014), in support of his argument. Ambrose's reliance on *Brown* is misplaced for two reasons. First, the bias was unequivocal because the juror stated "it would be hard to be impartial." *Brown*, 164 So. 3d at 1048 (¶¶ 3-4). Second, the issue was addressed within the context of a claim for

43

constitutional ineffective assistance of counsel for failing to challenge the allegedly biased juror. *Id*. at 1051 (¶ 12).

¶100. Ambrose urges the Court to review the issue for plain error because his fundamental right to a fair trial by an impartial jury has been violated. "As a rule, the Supreme Court only addresses issues on plain error review when the error of the trial court has impacted upon a fundamental right of the defendant." *Dora v. State*, 986 So. 2d 917, 924 (¶ 17) (Miss. 2008). "The right to a fair trial by an impartial jury is fundamental and essential to our form of government. It is a right guaranteed by both the federal and state constitutions." *Carr v. State*, 655 So. 2d 824, 840 (Miss. 1995). "Plain-error review is properly utilized for 'correcting obvious instances of injustice or misapplied law.'" *Armstead v. State*, 196 So. 3d 913, 916 (¶ 11) (Miss. 2016). "To determine if plain error has occurred, we must determine if the trial court has deviated from a legal rule, whether the error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial. *Id*.

¶101. In *Archer v. State*, 986 So. 2d 951, 958 (¶ 27) (Miss. 2008), the Court, without discussing whether plain error review was employed, addressed the defendant's argument that a juror should have been removed by the trial court *sua sponte* during voir dire due to the juror's relationship with the victim and her circumstance as a victim herself. First, the Court held that the issue was procedurally barred by the failure to object to the potential juror's competence to sit before the jury was empaneled. *Id*. at 958 (¶ 28). Next, the Court held that in limited circumstances, the Court will set aside the procedural bar and reverse when it is clear that a juror disqualified under Mississippi Code Section 13-5-67 was not removed before the jury retired to consider its verdict. *Id*. The Court went on to address the

substantive arguments advanced by the defendant, holding that the defendant's claim was without merit and the trial court did not err by not *sua sponte* removing the juror. *Id*. at 959 (¶ 959).

¶102. In *Archer*, we also held that "[a] party who chooses not to challenge a juror peremptorily when he has unused challenges may not thereafter seek to put the trial court in error because the court declined to permit the juror to be challenged for cause." *Archer*, 986 So. 2d at 957-58 (¶ 26); *see also Hansen v. State*, 592 So. 2d 114, 129 (Miss. 1991). "To hold otherwise would allow the defendant to invite error and later take advantage of it on appeal." *Archer*, 986 So. 2d at 957-58 (¶ 26) (citing *Hansen*, 592 So. 2d 129–30).

¶103. Here, we decline to employ plain error review because Ambrose had used only four peremptory strikes at the time Garner was tendered and Ambrose accepted him. At the conclusion of jury selection, Ambrose had four unused peremptory challenges. Thus, the trial court's failure to remove Garner does not constitute reversible error under the well settled rule that a party who chooses not to challenge a juror peremptorily when he has unused challenges may not thereafter seek to put the trial court in error because the court declined to permit the juror to be challenged for cause. *Archer*, 986 So. 2d at 957 (¶ 26).

¶104. Even assuming that Garner's response may be construed as demonstrating bias, the Eighth Circuit Court of Appeals[14] has addressed a nearly identical scenario with the same

---

[14] Ambrose relies on a different Eighth Circuit opinion in *Johnson v. Armontrout*, 961 F. 2d 748, 755-56 (8th Cir. 1992) (holding harmless error analysis does not apply in an ineffective assistance of counsel claim for failure to challenge a juror for cause because the presence of a biased jury is no less a fundamental structural defect than the presence of a biased judge). Ambrose's reliance on the *Armontrout* opinion is misplaced because (1) the claim was for ineffective assistance of counsel, and (2) the case turned on whether harmless

procedural posture. In ***United States v. Johnson***, 688 F.3d 494, 500-01 (8th Cir. 2012), the Court was faced with the issue of whether "whether the empaneling of Juror S.R., who admitted there 'might be a possibility' she would find law enforcement officers more credible than other witnesses, violated Johnson's Sixth Amendment right to be tried by an impartial jury[.]" The Court of Appeals declined to employ plain error review on appeal when reviewing a scenario in which the defendant failed to object to the seating of a juror during voir dire when the basis for the objection was then known. ***Id***. at 500. The Court of Appeals wrote that the "failure to object at the time the jury is empaneled operates as a conclusive waiver if the basis of the objection is known or might have been known or discovered through the exercise of reasonable diligence." ***Id***. at 501. The reasoning for the rule is simple: "if a defendant is allowed to forego challenges for-cause to a biased juror and then allowed to have the conviction reversed on appeal because of that juror's service, that would be equivalent to allowing the defendant to plant an error and grow a risk-free trial." ***Id***. at 501-02.

¶105. Here, on appeal, Ambrose argues that Garner was biased based solely on his response when asked if his relationship with his policeman son would cause him to "maybe lean toward the law enforcement side of this case." Undoubtedly, the basis for the objection that Ambrose now advances was known during voir dire. We follow the guidance of the Court of Appeals in ***Johnson*** and decline to employ plain error review. Ambrose waived his right to challenge the seating of allegedly biased Juror Garner by not challenging him during voir

---

error analysis applied.

dire, because the basis for the objection was then known. *See **Johnson***, 688 F.3d at 500 (holding that by failing to object to the seating of the allegedly biased juror during voir dire, the defendant intentionally relinquished or abandoned a known right).

¶106. As to the merits, the State argues that it is "painfully obvious" that Garner's substantive answer to the question of whether his relationship would cause him to lean toward the law enforcement side of the case was "no" even though he led in with "yes, sir." The State also argues that the trial court's followup statement, "Not his work, okay. Good. Thank you[,]" confirms that the trial court understood Garner to be answering the question in the negative. Furthermore, the State points out how Garner responded to the trial court's follow up statement with "Yes, sir," which was not an actual response to a question. The State argues that the record demonstrates that neither the trial court nor Ambrose perceived Garner's response as demonstrating bias. The State's interpretation of the record is persuasive, and thus, we cannot say that evidence of bias is plain and obvious, based on a reading of the entire exchange in context.

**B.    Juror Jeffrey Jenkins**

¶107. Ambrose argues that the trial court reversibly erred at the conclusion of the penalty phase evidence when it removed Juror Jeffrey Jenkins, who asserted his lack of bias, and then compounded the error by replacing him with an alternate rather than granting a mistrial. During jury selection, Jenkins responded that he knew Ambrose's uncle, Mark Turner. The exchange was as follows:

> MR. JENKINS:    Yes, sir. In reference, when she was mentioning Mark Turner, I also know him by Pastor Turner, but I know him.

47

| | |
|---|---|
| THE COURT: | I see. Okay, would the fact that your pastor is going to testify in this case cause you to automatically lean toward the side that he testifies for? |
| MR. JENKINS: | He is not my pastor, your Honor. No, sir. His nephew and me were real good friends when we were young. |
| THE COURT: | Okay. Would that have any effect on you? |
| MR. JENKINS: | No, sir. When she mentioned that I was like that is the same pastor. I just want to be truthful. That's all. |

¶108. Jenkins ultimately was seated on the jury without a challenge for cause lodged by the State or Ambrose. Jenkins remained on the jury through the culpability phase of trial, returned a guilty verdict, and heard the testimony presented during the penalty phase. During the penalty phase, Ambrose called several family members and friends to testify on his behalf.

¶109. During a recess following the conclusion of the mitigation witnesses' testimony, but before the jury was instructed, a juror submitted a note disclosing his personal relationship with Ambrose's family. The note read: "I cannot sit on the penalty phase of the trial due to my personal relationship with the defendant's family. Jeffrey Jenkins." Ambrose suggested to the trial court that counsel "should voir dire him, find out what his relationship is, and it may be that it doesn't amount to anything." Then Ambrose moved for a mistrial on the basis that the juror had misinformed the trial court and he should not have been on the jury at all. The trial court brought in Jenkins and allowed voir dire. Jenkins gave the following testimony:

Q.     Mr. Jenkins, you sent out a note stating that you could not sit in on the punishment phase of this trial because you're related to someone.  Is that true?

A.     No, my personal relationship is with the defendant's father's side of the family.

Q.     Personal relationship with the defendant's father's side of the family?

A.     Yes.

Q.     Are you talking about Willie Dedeaux or Mark Turner?

A.     Mark Turner.

Q.     Okay. Do you know the defendant?

A.     After the testimony, I knew him when he was a young child. Because when I first were in the Jury pool when you asked did anybody know Mark Jackson–not Mark Jackson, Mark Turner, I raised my hand, said I knew him as Pastor Turner.  I'm good friends with his nephew.  So I didn't realize until the penalty phase when they came up and mentioned Luke Turner I realized at that time that at the time when his father was killed I was staying -- I was still good friends with his cousins Sam and Jonathan.  And I remember Rahim as a young child when he came through.  I say he was around two or three, you know, so many years ago, he would come by and visit his grandmother.

Q.     So at the time that we were doing the voir dire when you were sitting out front and we were picking Jurors –

A.     Yes, sir.

Q.     -- you didn't realize that you were related to Rahim in some way?

A.     I'm not related to him.  I didn't realize who Rahim's father was.  Rahim's father's last name is Turner.  When you asked did I know Mark Turner, I raised my hand, said yes, I do know Mark Turner.  But I didn't realize until we came up to the penalty phase and they mentioned that his father was Luke Turner, at that time I'm like, I know Luke.  And when Mark came up and I realized that they were brothers, because at the time when you was asking the jury pool, you never asked

49

was Mark and Luke brothers. If you would have said that, I would have said yes, sir.

Q. You knew Luke Turner, Junior?

A. I knew Luke, too.

Q. How old are you?

A. I'm 44.

Q. Okay. Well, you were very young when you knew Luke Turner, senior, weren't you?

A. I was very young. But as I stated, I was good friends with his -- which is the defendant's cousin, would be with Jonathan, Rahim and Sam Turner. And I'm still good friends with them today. But I was very young, yes, but I happened to be, if he was two, I happened to be twelve at that time.

Q. Well, do you think you can't be fair and impartial in this?

A. In the penalty phase?

Q. Yeah –

A. I don't feel comfortable. I can be fair and impartial, as I stated. I still stand by my original verdict. But as far as what the penalty phase, I just wanted to make it be known and be truthful that I knew the family. And, you know, I have been with my Jurors for the last three or four days, and I just wanted to be truthful to the court to say, hey, I know Mark Turner. I knew the defendant as he came along. But, your Honor, I didn't want to be, like, I was hiding some type of secret, because I don't feel comfortable sitting in there, and I got this background, unfair background to say I know this man. So I just wanted to be honest. As I stated, when I did in the beginning, I just wanted to be honest, say, hey, I know him. I don't want it to come back either way, because if I didn't make this be known, you know, to me it gives the defendant an unfair advantage because I got a personal relationship with Mark, Ms. Bernice, Jonathan, Sam, Sherrell. I know the whole family. Like I said, your Honor, we stay –

Q. You didn't recognize the name Rahim?

50

A. No. I knew a lot of -- I know a lot of different people with

Q. Ambrose?

A. No, I don't know Ambrose. Like I said, I know a lot of different people with Masonic names, because his cousin Wajida, they got Masonic names. I didn't recognize Rahim. I haven't seen him since he was two.

Q. Well, you don't think you could be fair and impartial in deciding what his punishment should be?

A. I mean, yeah, I can be fair and impartial. But as my note said, I didn't feel comfortable going into that situation without advising the court and the judge and things like that. I didn't feel comfortable to go in that situation with my jurors to keep this secret that I knew the defendant, and I knew Mark. I mean, you can ask me history about the family, I know it.

Q. Have you discussed this with any jurors?

A. No. So none of the other Jurors know about this?

A. I mean, I discussed with them that I was coming out because of my personal relationship. And I told the foreman that I need to write a note advising the jury that I know the defendant. I don't know the defendant, but I know the defendant's immediate family.

Q. So you told the other jury members about that, at least some of them?

A. Yeah. I wrote the note. They knew why I was coming out, yes.

Q. You say they, who are you talking about?

A. I mean, we were all in the room. They knew the reason why I was stepping out because I wrote the note.

Q. The other thirteen people in there know why you're in here now?

A. Yes, sir.

¶110. The trial court then heard arguments for and against the grant of a mistrial. Ambrose's counsel spoke to the concern about Jenkins's possible influence on the other

51

jurors and what Jenkins may have told the other jurors about Ambrose's family. The trial court asked what prejudice Ambrose would suffer if the juror was removed. Ambrose's counsel responded that "We don't know. We don't have any firm information one way or the other regarding this man. Quite frankly, part of our team thinks he is a positive influence. And others are uncertain, and you know it's one of those deals." The trial court denied the motion for a mistrial and then heard from counsel whether Jenkins should be removed and replaced with an alternate.

¶111. The State argued that Jenkins should be removed because he had indicated that his personal relationship with Ambrose's family would give Ambrose an unfair advantage. Ambrose's counsel responded, "I can't deny what he said, your Honor. He did, in fact, say that. I would like to see him stay on the jury." The trial court determined that, based on the note and Jenkins's testimony that continuing to serve would be an unfair advantage to Ambrose, Jenkins should be removed from the jury. Jenkins was removed and replaced with the first alternate Juror Glen Turner.

¶112. The standard of review for the denial of a mistrial is abuse of discretion. *Hutto v. State*, 227 So. 3d 963, 984 (¶ 66) (Miss. 2017). "A trial judge need declare a mistrial only when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case." *Id*. Ambrose argues that the Court should employ a *de novo* standard of review because the denial of the mistrial violated the Constitution.

¶113. This Court disagrees with Ambrose's proposed standard of review because neither case cited by Ambrose employs a *de novo* standard of review to the present scenario. As discussed more fully below, the Court addressed a nearly identical issue recently and held

that the trial court's decision to dismiss a juror for good cause and substitute an alternate is reviewed for an abuse of discretion. *See **Evans***, 226 So. 3d at 25 (¶ 55). Moreover, the Court held that a defendant must show actual prejudice from the exclusion and substitution. *Id*. Thus, we review the trial court's decision for an abuse of discretion.

¶114. Ambrose abandons the exact grounds for a mistrial he initially made to the trial court, *i.e.*, Jenkins may have improperly influenced the jury. To the extent that Ambrose reurges the argument, the trial court did not abuse its discretion in denying the motion for the mistrial based on Jenkins's testimony and as evidenced by Ambrose's counsel's uncertain response to the trial court's inquiry as to what prejudice Ambrose would suffer if Jenkins was removed from the jury.

¶115. In Ambrose's motion for a new trial or, alternatively, for acquittal notwithstanding the verdict, Ambrose argued that the trial court had erred by removing Jenkins and replacing him with the first alternate juror in violation of Mississippi Code Section 13-5-67. On appeal, Ambrose advances the same argument he advanced in his post trial motion.

¶116. Section 13-5-67 provides, in relevant part: "An alternate juror who does not replace a regular juror shall be discharged at the time the jury retires to consider its verdict." Miss. Code Ann. § 13-5-67 (Rev. 2012).[15] Ambrose argues that, under the plain language of the statute, Turner should have been discharged and should not have been available to replace Jenkins. Ambrose argues that once deliberations have commenced, no replacement of a juror

---

[15] Section 13-5-67 also provides, in part: "Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties." Miss. Code Ann. § 13-5-67.

with an alternate is permitted. In support, Ambrose relies on **Balfour v. State**, 598 So. 2d 731, 754 (Miss. 1992) (holding that it was error for the trial court to excuse a juror after the jury had retired to deliberate a sentencing verdict), and **Folk v. State**, 576 So. 2d 1243, 1251-52 (Miss. 1991) (holding the trial court erred by substituting an alternate juror after the alternate juror had been dismissed from jury service and after the jury had been in deliberations for almost two hours).

¶117. Ambrose contends that, for purposes of a death penalty case governed by Mississippi Code Section 99-19-101(1), the discharge of alternates occurs when the jury retires to deliberate guilt during the culpability phase.

¶118. Section 99-19-101(1) provides, in part:

> (1) Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a jury to determine the issue of the imposition of the penalty.

Miss. Code Ann. § 99-19-101 (Rev. 2015).

¶119. Ambrose argues that the statute mandates that the trial jury hears the sentencing phase, and if through impossibility or inability the trial jury is unable to reconvene, the only statutory solution available is to summon a jury to act. Ambrose argues that the Court narrowly construes the capital sentencing statutes. *See* **Bell v. State**, 160 So. 3d 188 (Miss. 2015). Ambrose argues that a mistrial is the only option if a juror cannot continue serving once guilt deliberations commence, since a unanimous twelve person jury is required to

return a valid verdict under Mississippi's Constitution, caselaw, and the Uniform Rules of County and Circuit Court Practice in effect at the time. Ambrose also argues that the failure to grant a mistrial violated his Fourteenth Amendment right due to "state procedural shortcomings" affecting his "substantial and legitimate expectation[s]."

¶120. Alternatively, Ambrose argues that the trial court abused its discretion by removing and replacing Juror Jenkins because there was no evidence Jenkins was unable to continue to perform his duties for any reason, including bias. Ambrose argues that the record was "devoid of evidence" that Jenkins had "lied under oath or withheld information" and he had assured that he was capable of being a fair and impartial juror. Ambrose argues that the trial court has "no license to remove jurors and replace them with alternates willy nilly." Jenkins was not removed "willy nilly;" rather, the note and Jenkins's own testimony provided good cause to remove him from the jury. *See **Shaw v. State***, 540 So. 2d 26, 28 (Miss. 1989) (holding that the dismissal of a juror for good cause and his replacement with an alternate is within the sound discretion of the trial judge).

¶121. The State argues that Ambrose is procedurally barred because an objection on one ground waives all other grounds on appeal. *See **Rubenstein v. State***, 941 So. 2d 735, 760 (¶87) (Miss. 2006)). Although Ambrose did not raise the statutory argument at trial, he raised the argument in his post trial motion. "On numerous occasions, th[e] Court, has held that an objection on one ground waives remaining grounds for purposes of appeal and that the failure to raise an issue in the trial court requires this Court to impose a procedural bar on appeal. Notwithstanding [an appellant's] failure to raise [a] specific ground before the

55

trial court, th[e] Court may, alternatively, consider the merits of the argument." *Evans*, 725 So. 2d at 638 (¶ 48).

¶122. After Ambrose filed his initial brief, the Court handed down *Evans v. State*, 226 So. 3d 1, 24-25 (¶¶ 53-55) (Miss. 2017), addressing the precise argument Ambrose now advances. In *Evans*, the capital murder defendant Timothy Evans argued that his state and federal rights to a fair trial by a qualified jury and the state constitutional and statutory guarantees of jury sentencing in death penalty cases were violated by the departure of Juror Tanya Ladner and the seating of an alternate juror, Larry Lind, during the sentencing phase. *Id.* at 24 (¶ 53).

¶123. After guilt phase deliberations, but prior to the sentencing phase, Juror Ladner was excused upon learning that her son had suffered an injury requiring emergency surgery. *Id*. Alternate Juror Lind had heard all the evidence as an alternate, but had not participated in guilt phase deliberations. *Id*. The trial court replaced Ladner with Alternate Juror Lind, who joined the jury and participated in the sentencing phase deliberations. *Id*.

¶124. On appeal, Evans argued that the seating of Juror Lind violated Section 99-19-101(1). *Id*. at 24-25 (¶¶ 54-55). The Court recognized Section 13-5-67 is applicable to capital and noncapital cases. *Id*. at 24-25 (¶ 55). The Court wrote that "[s]ubstitution of an alternate juror is proper if done before the jury retires for deliberations." *Id*. (citing *Folk*, 576 So. 2d at 1251). The Court also wrote that a "substitution of an alternate during jury deliberations is improper." *Evans*, 226 So. 3d at 25 (citing *Folk*, 576 So. 2d at 1252; *Balfour*, 598 So. 2d at 753).

¶125. The *Evans* Court reviewed the trial court's decision to dismiss a juror for good cause and substitute an alternate for an abuse of discretion. *Evans*, 226 So. 3d at 25. The Court wrote that the defendant must show actual prejudice from the exclusion and substitution. *Id*. The *Evans* Court held:

> Considering the fact that Section 13–5–67 allows the substitution of alternate jurors in capital cases, the trial court's substitution of Lind at the sentencing phase did not violate Section 99–19–101. Rather than discharging the alternate jurors after the guilt phase ended, the trial court permitted them to remain through the sentencing phase in case substitution was necessary. As an alternate juror, Lind did not participate in deliberations with the twelve-member panel, which undoubtedly would have been improper. *See* *Luster v. State*, 515 So. 2d 1177, 1180 (Miss. 1987). However, when the trial court dismissed Tanya Ladner, the trial court substituted Lind for the sentencing-phase jury trial and deliberations, leaving the jury composed of twelve jurors who had heard all of the evidence presented. A purpose of selecting alternate jurors is so they are available to "fill the gap created by some contingency." *Walls v. State*, 371 So. 2d 411, 413 (Miss. 1979). We discern no error.

*Evans*, 226 So. 3d at 25 (¶ 56).

¶126. In Ambrose's reply brief, he argues that *Evans* was wrongly decided and urges the Court to revisit the holding. We decline to disturb the holding. According to the reasoning in *Evans*, the trial court did not violate Sections 99-19-101(1) and 13-5-67 by replacing Juror Jenkins with Alternate Juror Turner after the culpability phase had concluded, but before the penalty phase deliberations had begun. We follow the guidance of *Evans* and hold that the trial court did not abuse its discretion by removing Juror Jenkins and replacing him with Alternate Juror Turner, who had heard all of the evidence presented.

¶127. We likewise reject Ambrose's alternative argument that Jenkins's removal was improper because he had testified that he could remain fair and impartial. The trial court did

not abuse its discretion by removing Juror Jenkins for good cause based on the note and Jenkins's testimony that in his own estimate, remaining on the jury would give Ambrose an "unfair advantage," an admission also acknowledged by Ambrose's counsel at trial. *See Shaw*, 540 So. 2d at 28. Finally, Ambrose also fails to show any actual prejudice by the trial court's ruling on the motion for a mistrial or on the removal and replacement of the juror. *See Hutto*, 227 So. 3d at 984 (¶ 66); *Evans*, 226 So. 3d at 25 (¶ 55).

## IV.  WHETHER THE JURY SELECTION PROCESS WAS CONSTITUTIONALLY INFIRM.

¶128. First, Ambrose argues that, in violation of *Morgan v. Illinois,* 504 U.S. 719 (1992), the trial court denied his request that the trial court excuse or, at minimum, allow individual voir dire of venire members whose general voir dire responses suggested they were disqualified in their ability to consider imposition of a sentence other than death. Second, Ambrose argues that in violation of *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), the trial court unconstitutionally excused three jurors who had scruples against the death penalty. Third, and alternatively, Ambrose argues that any death qualification whatsoever is unconstitutional.

### A.    Individual Voir Dire

¶129. Ambrose argues that the trial court erroneously refused individual voir dire of all prospective jurors who indicated in general voir dire that they would impose a death sentence only on the basis of having found the defendant guilty.

¶130. "The Constitution . . . does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury. Even so, part of the guarantee of a defendant's right

58

to an impartial jury is an adequate voir dire to identify unqualified jurors." ***Morgan***, 504 U.S. at 729. "Voir dire plays a critical function in assuring the criminal defendant that his constitutional right to an impartial jury will be honored. ***Id***. The trial court's responsibility to remove prospective jurors who will not be able to follow the trial court's instructions impartially and evaluate the evidence cannot be fulfilled without an adequate voir dire. ***Id***. at 729-30.

¶131. "In general, voir dire is presumed sufficient to ensure a fair and impartial jury. To overcome the presumption, a party must present evidence indicating that the jury was not fair and was partial and must show that prejudice resulted from the circuit court's handling of voir dire." ***Keller v. State***, 138 So. 3d 817, 843 (¶ 47) (Miss. 2014). "Voir dire of a jury is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." ***Pitchford v. State***, 45 So. 3d 216, 229 (¶ 43) (Miss. 2010). Likewise, whether to allow individual sequestered jury voir dire is within the discretion of the trial court. ***Stevens v. State***, 806 So. 2d 1031, 1055 (¶ 112) (Miss. 2001). As such, the standard of review in examining the conduct of voir dire is abuse of discretion. ***Howell v. State***, 860 So. 2d 704, 727 (¶ 75) (Miss. 2003). An"abuse of discretion will only be found where a defendant shows clear prejudice resulting from undue lack of constraint on the prosecution or undue constraint of the defense." ***Id***.

¶132. "***Morgan*** provides that a 'juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.'" ***Batiste v. State***, 121 So. 3d 808, 851 (¶ 95) (Miss. 2013) (quoting ***Morgan***, 504 U.S. at 729). "Indeed, because such a juror has

59

already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror." ***Keller***, 138 So. 3d at 846 (¶ 60) (citing ***Morgan***, 504 U.S. at 729). "Based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." ***Batiste***, 121 So. 3d at 851 (¶ 95) (quoting ***Morgan***, 504 U.S. at 729).

¶133. During voir dire, Ambrose's counsel posed two questions with respect to voting for the death penalty. First, Ambrose's counsel asked:

> So let me ask you this, I want you to assume some facts. I want you to assume that there's some evidence been presented and it's proven beyond a reasonable doubt in your mind that these facts exist, that the defendant killed someone, he intended to kill him, he didn't have any good cause to kill him, it wasn't in self-defense, he wasn't insane, there was nothing wrong with him, he just did it. If that were the case, how many of you would vote to impose the death penalty, raise your cards?

¶134. Forty-six members of the venire responded to the question in the affirmative. After recording the members of the venire who had responded affirmatively, Ambrose's counsel posed a follow-up question:

> Now, I asked you that question, and I, didn't mention anything about mitigating circumstances, did I? Mitigating circumstances are factors in the background, record and life of the defendant if he is found guilty of capital murder. Those things are admissible to tell the jury a little bit about the defendant, give you some idea of what kind of person he is, and to also let you understand that he is a human being and that what you're trying to do, what you're determining is whether this person is -- this human being is so much of an offense to the community of other human beings that we have to eliminate him, we have to get rid of him. Would you at least consider the mitigating circumstances? Those of you who would -- you don't care about mitigating circumstances, you don't care what kind of life he's had, what kind of

problems he's had, what kind of things that have developed and molded him into the person that he is, you don't care about any of that. If that's true, raise your card, if you don't care.

¶135. Of the forty-six potential jurors who had answered the first question affirmatively, nine answered the follow-up question affirmatively. Ambrose's counsel recorded the nine potential jurors' numbers. After a brief follow up, the trial court called for a recess to allow for individual voir dire. The potential jurors who indicated that they had conscientious scruples against the death penalty were identified and the following exchange occurred:

MR. RISHEL [Defense]: Yes, sir. I would like to bring back everybody that said they would automatically vote against the death penalty after they –

THE COURT: Is that would automatically vote –

MR. RISHEL: Yes, sir. You asked them if they would automatically vote for the death penalty, and they all sit there nobody says anything. But when you say you have actually convicted this guy of capital murder, would you vote for the death penalty. So they are, in fact, automatically voting. If the guy is found guilty of capital murder, they're going to vote for the death penalty. That's as automatic as it gets.

MR. SMITH [State]: I agree if you're talking about the nine that after you explained your question to them, and the ones when you said I didn't mention mitigating factors, who would not at least consider mitigating factors. Those nine are the ones automatic death. I assume that's who you're talking about, not the 75[16] that raised their card the first time.

---

[16] Based on the record and parties' representations on appeal, the number of members who raised their card in response to the first question was forty-six, not seventy-five.

| | |
|---|---|
| MR. RISHEL: | Well, I would argue that they are automatic death people. That they're going to automatically vote for the death penalty if they – |
| THE COURT: | Well, the problem with that is that you didn't explain to them the procedures, the mitigating factors and -- all they were asked if they would just automatically vote against the death penalty. So I agree with Mr. Smith, and I have no problem bringing those last nine in that- - |
| MR. RISHEL: | Yeah, we'll talk about the last nine. I think they're going to vote for the death penalty no matter what you say or do. |

¶136. The trial court allowed individual voir dire of the nine potential jurors who had raised their cards to the second question. None of the nine venire members served on the jury.[17]

¶137. Of the remaining thirty-seven venire members who had answered the first question affirmatively, five ultimately served on the jury, including First Alternate Juror Turner, who was seated during the penalty phase as discussed above, and Second Alternate Juror Mary Bourdin. The other three who served on the jury were Don Martin, Dorothy Wells, and Doug Schloemer.

¶138. On appeal, Ambrose maintains that he should have been allowed to individually voir dire all forty-six venire members had also answered the first question affirmatively, not just the remaining nine venire members who had also answered the second question affirmatively. The State responds that, based on the exchange, Ambrose failed to preserve

---

[17] Four were excused for cause because they stated they could not consider mitigating evidence. Two were excused for cause based on sequestration issues. One was peremptorily struck. The remaining two were not seated because the jury was selected before they were tendered.

his argument because he did not specifically ask to individually voir dire all forty-six venire members. Ambrose's counsel did advance an argument, albeit unsuccessful, that all forty-six venire members who answered the first question would automatically vote for the death penalty. Ambrose properly preserved the issue for appeal.

¶139. As to the merits, the State argues that Ambrose was permitted to and did follow up to the first question during general voir dire. The State also argues that Ambrose's failure to challenge for cause or use a peremptory strike on any of the jurors he alleges were seated in violation of *Morgan*, renders his claim procedurally barred or, at minimum, void of prejudice.

¶140. The Court's decision in *Foster v. State*, 639 So. 2d 1263, 1272-73 (Miss. 1994), guides our analysis. In *Foster*, capital murder defendant Ronald Foster argued that the trial court prevented him from asking whether members of the venire automatically would vote for the death penalty if they found Foster guilty of capital murder. We held:

> We find that Foster was not denied the opportunity, and in fact did question the venire members about their views on the death penalty and whether it should be imposed in the event of a murder conviction. The fact that counsel for Foster chose not to rephrase his question to inquire whether the venire persons would automatically impose the death penalty if Foster was convicted is no ground for reversal under the differing facts of *Morgan*.

*Foster*, 639 So. 2d at 1275. We explained that Foster's counsel had the opportunity to choose and form his own questions, and by gauging responses from the venire, could freely rephrase or ask follow-up questions where the responses were insufficient or indicated the jurors were confused. *Id*. at 1275. We determined that the record did not support Foster's

claim that his counsel was denied any opportunity to question the venire in a manner of his own choosing. *Id*.

¶141. Similarly, Ambrose's counsel had the opportunity to choose and form his own questions, and by gauging responses from the venire, could freely rephrase or ask follow up questions. Ambrose's counsel confessed in his follow-up question that his first question did not mention anything about mitigating circumstances. In the context of jury instructions, we have stated that "sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual." *Evans*, 226 So. 3d at 20 (¶ 39) (citing *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007)).

¶142. Only nine venire members answered that they would not consider mitigating circumstances. Thus, the trial court did not abuse its discretion by not allowing individual voir dire of the remaining venire members who affirmatively answered that they would consider mitigating circumstances. To the extent that Ambrose argues that the remaining jurors did not state that they would give "meaningful consideration and effect to all mitigating evidence," the argument is without merit because no such question was asked by Ambrose's counsel, nor did the trial court prevent Ambrose's counsel from rephrasing or posing such a follow-up question. *See Howell*, 860 So. 2d at 727 (¶ 75) ("A jury selection procedure which gives the defendant a fair opportunity to ask questions of individual jurors which may enable the defendant to determine his right to challenge that juror is proper.").

¶143. Moreover, Ambrose fails to show how he was prejudiced by the trial court's decision. *See id*. at 727-28 (¶ 76). He was not prevented from rephrasing or posing follow-up

questions in general voir dire, nor did Ambrose exercise a peremptory strike for any of the five of the remaining thirty-seven venire members who actually served on the jury, even though he had peremptory strikes remaining. *See Evans*, 725 So. 2d at 652 (explaining that the appellant has the power to cure substantially any error so long as he has remaining unused peremptory challenges); *see also Galloway v. State*, 122 So. 3d 614, 645 (¶ 87) (Miss. 2013) ("A defendant cannot complain on appeal of alleged errors invited or induced by himself."). The precise issue now raised with respect to the five jurors seated obviously was known at trial based on the venire's responses during voir dire, and Ambrose chose not to exercise a peremptory strike on the venire members. We discern no prejudice.

### B. Jurors With Scruples Against the Death Penalty

¶144. Ambrose argues that the trial court erroneously excused three prospective jurors with scruples against the death penalty who were not disqualified under *Witherspoon* and *Wainwright*.

¶145. The Court gives deference to the trial court's decision to exclude a juror for cause, and we will not disturb the trial court's decision unless there was an abuse of discretion. *Batiste*, 121 So. 3d at 850 (¶ 91). The trial court "does not commit reversible error by excusing for cause a prospective juror who gave contradictory responses, wavered on their position, and generally appeared confused regarding the death penalty issue." *Bennett v. State*, 933 So. 2d 930, 942 (¶ 31) (Miss. 2006).

¶146. In *Witherspoon*, the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed

65

conscientious or religious scruples against its infliction." *Witherspoon*, 391 U.S. at 522.

*Witherspoon* and its progeny stand for the "general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Moffett v. State*, 49 So. 3d 1073, 1094 (¶ 61) (Miss. 2010) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Therefore, the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Wilcher v. State*, 863 So. 2d 776, 813–14 (¶ 116) (Miss. 2003) (quoting *Wainwright*, 469 U.S. at 424).

¶147. In *Wainwright*, the Supreme Court clarified *Witherspoon*, holding that the standard "does not require that a juror's bias be proved with unmistakable clarity." *Moffett*, 49 So. 3d at 1094 (¶ 61) (quoting *Wainwright*, 469 U.S. at 424). The Supreme Court explained:

> This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

*Wainwright*, 469 U.S. at 424-26 (explaining why deference must be paid to the trial judge who sees and hears the juror).

¶148. "[A] juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." ***Pitchford v. State***, 45 So. 3d 216, 229 (¶ 38) (Miss. 2010) (quoting ***Morgan***, 504 U.S. at 728). However, "[v]enire members may be jurors even if they have remaining scruples about the death penalty, so long as the individuals agree to follow the law and consider the sentence in accordance therewith." ***Cox***, 183 So. 3d at 51 (¶ 50).

¶149. The individual voir dire of the three venire members in question is set out below:

### i.    Venire Member Allison Meleones

THE COURT:    All right. Ma'am, you were one of the ones who held up your card when I asked if anyone had any conscientious scruples or other feelings against the death penalty. Is that correct?

MS. MELEONES:  Uh-huh.

THE COURT:    And are you telling the court and these lawyers that you don't believe in the death penalty?

MS. MELEONES:  I just don't know if I could actually go through with it. I don't know if I could live with that on my mind. I don't know. I haven't really given it a lot of thought before this. Now, I mean, I just don't know the circumstances. Maybe.

THE COURT:    Well, if the evidence proved someone to be guilty of capital murder, and the law allowed the death penalty as one of the penalties, do you think you could vote for it?

MS. MELEONES:  No.

THE COURT:    Are you telling the lawyers and me that you could not vote for the death penalty under any circumstances?

MS. MELEONES:  Um, I -- it's just hard to say if I don't know the case. Like, I'm a teacher, so I see a lot of kids that maybe they

67

could have gone a different way if they had different parents or made different choices. It's hard to think somebody could be defined by just one mistake. I don't know. I don't know any details on the case. Maybe.

THE COURT: Well, let me ask you this, if you followed the law that the court gives you, could you consider the death penalty for someone -- I mean, not knowing the circumstances, obviously you don't know the circumstances. And don't worry, there is nothing wrong. If you have your own feelings, you have your feelings. So nobody is going to criticize you. We're just here to try to find out exactly how everyone feels in regard to this issue. And I guess what I'm trying to find out is regardless of the proof and the evidence that is brought out during the course of the trial, are you telling me that you won't vote for the death penalty?

MS. MELEONES: I don't think I would. I don't think I would.

THE COURT: All right. State?

MR. SMITH: And just to echo what the judge is saying, nobody is trying to get you to say that you would vote for the death penalty. Everybody has their own beliefs about that. But do you think that if given the choice between voting for the death penalty or voting for life in prison as a juror that you would ever vote for the death penalty?

MS. MELEONES: Probably not. I would probably choose life in prison.

MR. SMITH: No questions, judge.

MR. RISHEL: You say probably not. Why would you say probably not? Why not just say no, I'm not voting for the death penalty ever. I'm not telling you what to say, but what is it that is sticking in your mind keeping you from making a full commitment?

MS. MELEONES: To be honest, I haven't given a whole lot of thought about the death penalty or how I felt about it. I've only been a registered voter for two months, and this is my first jury duty, so I really don't know how I feel about it

68

100 percent. I feel like that is not something that I agree with.

MR. RISHEL: So when you say probably, you don't really know, do you? You have to wait until you know what happened, don't you?

MS. MELEONES: Yes.

MR. RISHEL: Once you found out what happened you might be able to vote for the death penalty if you thought it was appropriate, would that be true?

MS. MELEONES: Maybe. I don't probably not. I can't say anything else besides probably not.

MR. RISHEL: All right. Well, okay. That's all I have, judge.

### ii. Venire Member Carolyn Owen

MR. SMITH: Ma'am, you stated earlier that you had conscientious scruples against the death penalty?

MS. OWEN : Yes.

MR. SMITH: Would those views impair or hurt your ability to serve as a juror in this case because the death penalty is a possible sentence?

MS. OWEN: I don't feel like I would have any trouble listening to the case to determine guilt or innocence, but when it comes to punishment I would definitely have issues with the death penalty.

MR. SMITH: Although you said that you think you would always if you got to that sentencing phase, that you would always vote for life as a sentence instead of death?

MS. OWEN: I would probably be very hardpushed to consider fairly the death penalty. It's just, I'm a Christian, and it's something that I'm having a difficult time wrapping my head around.

69

MR. SMITH: No questions, your Honor.

THE COURT: All right. Mr. Rishel?

MR. RISHEL: Ma'am, are you saying that if during the phase where you're considering innocence or guilt that you could vote for the guilty even though it may lead to a death penalty?

MS. OWEN: Yes. I think I could judge guilt or innocence, yes.

MR. RISHEL: So you could vote guilty even though it may result in the death penalty?

MS. OWEN: Yes.

MR. RISHEL: Could you?

MS. OWEN: Yes. I could vote innocent or guilty based on the evidence.

MR. RISHEL: Thank you, ma'am.

THE COURT: Well, let me ask you this, in other words, Mr. Rishel was saying you could vote guilty even if it leads to the death penalty, but if you were on the jury that voted for the death penalty then what would your –

MS. OWEN: I would not vote for the death penalty.

THE COURT: You would not under any circumstances?

MS. OWEN: None that I could think of, no, sir.

### iii. Venire Member Susan Quillen

THE COURT: Okay. Ms. Quillen, we just want to ask you a few questions. You were one of the ones who raised your card when I asked if anyone was opposed to the death penalty or had scruples against the death penalty. You raised your card, is that correct?

MS. QUILLEN: Yes, sir.

70

THE COURT:     All right. Would you explain to me and the lawyers your feelings in regard to the death penalty. And nobody is going to criticize you one way or the other. We're not here to do that. We just want to find out how you feel.

MS. QUILLEN:   I feel like if I said somebody was guilty and they got the death penalty I would feel like I did that to them, you know. I'm not sure I could sleep at night knowing I put somebody to death. I have three children of my own, and I think that would be hard for me to deal with.

THE COURT:     So you're telling us that you think that your feelings with regard to the death penalty might cause you some problems even deliberating the guilt of the defendant?

MS. QUILLEN:   I do. I do.

THE COURT:     Yes, ma'am.

MS. QUILLEN:   I have been sitting there debating between the two, you know, can I do this, how would I feel, and I just think it would be hard.

THE COURT:     Well, let me ask you this, if you were sitting on the jury and the state convicted a person of capital murder, the evidence showed that he or she was guilty of capital murder, are you telling me that when you go into the penalty phase where there are options of either death or life without parole, that you would always vote for life without parole?

MS. QUILLEN:   More than likely, I would. I just couldn't put somebody to death. That would be too hard for me.

THE COURT:     All right. Thank you, ma'am. Mr. Smith?

MR. SMITH:     No questions. Thank you for your honesty.

THE COURT:     Mr. Rishel?

MR. RISHEL:    Ma'am, I'm a little confused. You said more than likely.

71

MS. QUILLEN: Yeah. No, I mean, honestly I don't know how I would feel after sitting on a jury listening to the evidence, but I just think it would hurt me knowing I put somebody to death.

MR. RISHEL: Okay. Let me ask you this, do you think you could vote whether a person is guilty or not guilty of capital murder?

MS. QUILLEN: Uh-huh.

MR. RISHEL: If the state proved beyond a reasonable doubt in your mind that the person was guilty, would you vote for that person to be found guilty?

MS. QUILLEN: I could vote for him to be found guilty, yes.

MR. RISHEL: So then the question is can you vote -- can you consider the two choices as far as punishment is concerned, death and life without parole? Are you telling the court you would never consider life without parole -- I mean death? You would always go with life without?

MS. QUILLEN: I think so, yes.

MR. RISHEL: You think so or you know so?

MS. QUILLEN: I know so. I don't think I could sleep at night with that on my mind. I mean, I would feel like I did it to them, which basically I did. Yeah, no, I don't think I would be comfortable with that.

MR. RISHEL: Okay. It's always a hard thing to do.

MS. QUILLEN: It is. It's a very hard thing.

¶150. Over the objection of Ambrose, the trial court excused Meleones, Owen, and Quillen for cause.

¶151. Again, the test for determining when a prospective juror's views on the death penalty justify her removal is whether the trial court finds that the juror's views would prevent or

72

substantially impair the performance of her duties in accordance with the instructions and oath and the trial court is left with the impression that a prospective juror would be unable to faithfully and impartially apply the law. *King v. State*, 784 So. 2d 884, 892-92 (¶ 39) (Miss. 2001). "To meet th[e] test, the prospective juror's response can be less than unequivocal." *Id*.

¶152. The Court has affirmed the exclusion of jurors who "repeatedly switched positions," "gave wavering responses," or "exhibited an obvious confusion concerning the issue." *Moffett*, 49 So. 3d at 1094 (¶ 62) (citing *King v. State*, 960 So. 2d 413, 435 (Miss. 2007)); *King*, 784 So. 2d at 888. We have held that "[i]t goes without saying that a potential juror who cannot give a straight answer would be unlikely to follow the law." *King*, 784 So. 2d at 888. We also have held that "[a] juror's position on the death penalty must be unmistakably clear, or a trial judge may properly remove the juror for cause in a capital case." *Moffett*, 49 So. 3d at 1094 (¶¶ 62-63) (holding that none of the three prospective jurors provided an unmistakably clear and consistent answer regarding whether his or her views on the death penalty would prevent or substantially impair the performance of their duties in accordance with the jury instructions and oath).

¶153. Here, the record shows that the trial court had sufficient bases for excluding the three venire members, given their responses to questioning as to whether their personal beliefs regarding capital punishment would prevent or substantially impair them from carrying out their duties as jurors.

¶154. Owen affirmatively stated that she would not vote for the death penalty and she could not think of any circumstances in which she would. Quillen stated that she "just couldn't put

somebody to death. That would be too hard for me." Quillen also stated she thought she would always vote for life without parole, and when asked whether she "thinks so" or "knows so," she answered that she knew so. Quillen explained: "I don't think I could sleep at night with that on my mind. I mean, I would feel like I did it to them, which basically I did. Yeah, no, I don't think I would be comfortable with that."

¶155. Meleones was asked initially if she thought she could vote for the death penalty for someone convicted of capital murder, to which she responded, "No." When asked whether she could vote for the death penalty under any circumstances, Meleones responded that "maybe," because she did not know any details on the case. Meleones was asked whether she could ever vote for the death penalty, given the choice between the death penalty or life in prison, to which she responded, "Probably not. I would probably choose life in prison." Meleones also stated: "I feel like [the death penalty] is not something that I agree with." Meleones was asked "[o]nce you found out what happened, you might be able to vote for the death penalty if you thought that was appropriate, would that be true?" Meleones responded, "Maybe. I don't – probably not. I can't say anything else besides probably not."

¶156. Ambrose argues that it was reversible error to strike Meleones based on our holding in *Fuselier v. State*, 468 So. 2d 45, 55 (Miss. 1985):

> As stated by the United States Supreme Court in *Adams v. Texas*, "Neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty." *Adams*, 448 U.S. at 50, 100 S. Ct. at 2529, 65 L. Ed. 2d at 593. Absent a clear showing that the prospective juror would be unable to follow the court's instructions and obey the juror's oath, that juror's feelings regarding the death penalty do not constitute grounds for

74

a challenge and the granting of such a challenge is reversible error. *Wainright v. Witt*, *supra*, *Adams v. Texas*, *supra*.

*Fuselier*, 468 So. 2d at 55. However, the *Fuselier* Court noted that "there was no indication from [the] jurors' comments that they would be prevented or substantially impaired in the performance of their duties as jurors, nor that they would be able to decide the facts impartially and conscientiously apply the law. *Id*. at 54.

¶157. Given the deference to the trial court, which observed the three potential jurors' demeanors, we cannot say the trial court abused its discretion in excluding Owen, Quillen, and Meleones. *See Wainwright*, 469 U.S. at 426 ("[D]eference must be paid to the trial judge who sees and hears the juror."). The trial court did not abuse its discretion because it very well may have thought that the jurors would be unlikely to follow the law because they were unable to give a straight answer. *See King*, 784 So. 2d at 888.

### C.     Death Qualification

¶158. Alternatively, Ambrose claims that *any* death qualification of the jury at all violates the Sixth and Fourteenth Amendments and Mississippi's capital sentencing statute because it allowed the State to remove potential jurors based solely on their opposition to the death penalty and not on their ability to follow the process prescribed by Section 99-19-101(2). Ambrose cites *Adams v. Texas*, 448 U.S. 38 (1980), in support of his position. *Adams*, 448 U.S. at 48 (stating that "if prospective jurors are barred from jury service because of their views about capital punishment on any broader basis than inability to follow the law or abide by their oaths, the death sentence cannot be carried out.")).

75

¶159. Neither the United States Supreme Court nor the Mississippi Supreme Court has held that the death qualification process is unconstitutional *per se*. "The best way to ensure that a prospective juror would not automatically vote for the death penalty is to ask." **Morgan**, 504 U.S. at 729 n.3. "Any juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence and to decide if it is sufficient to preclude imposition of the death penalty." **Morgan**, 504 U.S. at 738. In comparison, "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." **Pitchford**, 45 So. 3d at 229 (¶ 38) (quoting **Morgan**, 504 U.S. at 728). Ambrose's alternative argument is without merit.

## V. WHETHER THE STATE ENGAGED IN PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS.

¶160. Ambrose argues that two instances of prosecutorial misconduct occurred during the rebuttal portion of the prosecutor's sentencing phase closing statements. Specifically, Ambrose alleges that the State made an improper golden rule argument and an improper "in-the-box" argument. Because no objection was made to the alleged improper statements, Ambrose urges the Court to review the statements for plain error. The State responds that the statements were neither improper nor inflammatory, so reversal under plain error review is not warranted.

¶161. We have held that "the plain-error doctrine is applied to closing arguments only when the substance of the statement is out of bounds for closing arguments." **Boyd v. State**, 977 So. 2d 329, 337 (¶ 34) (Miss. 2008); *see also* **Minor v. State**, 831 So. 2d 1116, 1123 (¶¶ 22-

23) (Miss. 2002). Moreover, the "plain error doctrine has been construed to include anything that seriously affects the fairness, integrity or public reputation of judicial proceedings." *Boyd*, 977 So. 2d at 338. We also have held that a defendant could not be prejudiced by unnecessary and inappropriate prosecutor statements when the evidence presented was insurmountable. *Franklin v. State*, 136 So. 3d 1021, 1032 (¶ 40) (Miss. 2014).

¶162. Normally, "[t]he standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Jackson v. State*, 174 So. 3d 232, 236 (¶ 9) (Miss. 2015); *see also* *Sheppard v. State*, 777 So. 2d 659, 661 (¶ 7) (Miss. 2000). "Even when a prosecutor has made an impermissible comment, this Court requires a showing of prejudice to warrant reversal." *Outerbridge v. State*, 947 So. 2d 279, 286 (¶ 23) (Miss. 2006).

¶163. However, because Ambrose did not object to the alleged improper statements, the assignment of error has been waived and his arguments are barred procedurally on appeal. *See* *Evans*, 226 So. 3d at 31 (¶ 78); *Jackson*, 174 So. 3d at 236 (¶ 11); *O'Connor v. State*, 120 So. 3d 390, 400 (¶ 27) (Miss. 2013).

¶164. In *Walker v. State*, 913 So. 2d 198 (Miss. 2005), the capital murder defendant argued that "[a]lthough no objection was raised during the argument, under th[e] Court's heightened level of scrutiny of death penalty cases, they will be reviewed." *Id*. at 238 (¶ 147) (noting that we have relaxed the contemporaneous objection rule and applied the plain error rule, which allows an appellate court to address an issue not raised at trial if the record shows that

error did occur and the substantive rights of the accused were violated). The Court "refused" to consider the issue of prosecutorial misconduct because "on numerous occasions [the Court] has refused to consider the issue of prosecutorial misconduct where the defendant did not raise it at trial." *Id*. at 238 (¶¶ 148-49).

¶165. In *O'Connor*, we wrote that "[w]e repeatedly have provided that, though the failure to object contemporaneously generally waives a claim of prosecutorial misconduct during closing argument, we will review such a claim if the prosecutor's statement was so inflammatory that the trial judge should have objected on his own motion." *O'Connor*, 120 So. 3d at 399 (¶ 26). We explained the purpose for applying the "so inflammatory" standard of review in cases where no contemporaneous objection is lodged:

> We hold that the proper inquiry is not whether the language "tracks" language found to be misconduct, for such a standard would require the Court prematurely to consider the merits of the claim to resolve a so-called "threshold" question. Moreover, such a standard essentially would negate the requirement of contemporaneous objecting during closing argument—if we will review, in the absence of a contemporaneous objection, any claim that a statement during closing argument was improper so long as it "tracks" language found to be misconduct, then the failure to contemporaneously object would never operate as a waiver. Accordingly, to resolve the confusion created by *Spicer* [*v. State*, 921 So. 2d 292 (Miss. 2006)], we now declare that the "so inflammatory" standard is the proper threshold inquiry for appellate review of claims of prosecutorial misconduct during closing argument.

*O'Connor*, 120 So. 3d at 400–01 (¶ 29).

¶166. In *Jackson*, the Court noted that "even without the defendant attorney's objection, 'unwarranted and improper remarks of a district attorney would warrant reversal where there was "most extreme and intolerable abuse of his privilege."' *Jackson*, 174 So. 3d at 236 (¶ 11) (quoting *Randall v. State*, 806 So. 2d 185, 221 (¶ 101) (Miss. 2001)). Thus, we have

held that "in extreme cases, a failure to object to questions which were violative of a constitutional right will not act as procedural bar to consideration." *Jackson*, 174 So. 3d at 237 (¶ 13). Recently in *Evans*, we applied the so inflammatory standard of review because the defendant's failure to object during the prosecutor's closing arguments operated as a procedural bar on appeal. *Id*. The application of the so inflammatory standard is in accord with the Court's concern that "the failure to contemporaneously object would never operate as a waiver." *See O'Connor*, 120 So. 3d at 401 (¶ 29).

¶167. Based on the foregoing, the Court reviews whether the alleged prosecutorial misconduct was so inflammatory that the trial court should have intervened on its own. *Evans*, 226 So. 3d at 31 (¶ 78); *O'Connor*, 120 So. 3d at 400-01 (¶ 29). "Attorneys generally are afforded wide latitude in arguing their cases to the jury." *Ronk v. State*, 172 So. 3d 1112, 1137 (¶ 60) (Miss. 2015). "Any allegedly improper prosecutorial comment must be considered in context, considering the circumstances of the case, when deciding on their propriety." *Id*.

## A. Golden Rule Argument

¶168. "[A] golden-rule argument, which asks the jurors to put themselves in the place of one of parties, is impermissible." *Evans*, 226 So. 3d at 31 (¶ 79).

¶169. Ambrose claims that the following portion of the closing statement made by the prosecutor during the penalty phase in rebuttal constituted an improper golden rule argument:

> I thought about how when you're a child 18 and you run–and you're playing a game of chase that adrenaline that hits you when you hear the foot steps behind you, and you realize that whoever is chasing you is getting close and they're going to catch you or that dream when you wake up in the middle of the night and somebody is chasing you, and the panic and fear of that person

79

actually catching you. I wonder if Robert was having the same feelings and the same thoughts at that moment when he realized he was not going to get away from this man and his men, the panic and fear of that moment as he heard the foot steps getting closer. And then the very last moment in his life as he laid on that ground, eyes looking up at the defendant's eyes and at the defendant's men, and looking at all of those eyes back at him knowing that he knew that -- Robert knew they had already inflicted all of this punishment on him, and before they hit him with those items what must have gone through Robert Trosclair's mind? Why? Why? And the panic that he must have felt when he realized that he would no longer be on this earth at age 30.

¶170. The State argues that it did not explicitly or implicitly ask the jurors to place themselves in the shoes of Trosclair. Moreover, the State argues that the comments were in response to Ambrose's counsel's remarks "minimizing [Trosclair's] kidnapping." At one point, Ambrose's counsel posed the following question to the jury: "Is the kidnapping so severe that the mere fact that he was taken from one place to another would create a circumstance where he should be given a death penalty as opposed to life without?" The State points out that we have stated that "[i]n order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remark, but must also take into account defense counsel's opening salvo." *Rubenstein v. State*, 941 So. 2d 735, 778 (¶ 188) (Miss. 2006).

¶171. Ambrose argues that the prosecutor's comments are similar to the improper golden rule arguments made by the prosecutor in *Holliman v State*, 79 So. 3d 496 (Miss. 2011). In *Evans*, we distinguished *Holliman* and rejected a similar golden rule argument that Ambrose advances today. *Id*. at 31 (¶¶ 76-79). We held:

> "Attorneys are to be given wide latitude in making their closing arguments." *Jimpson v. State*, 532 So. 2d 985, 991 (Miss. 1988). But a golden-rule argument, which asks the jurors to put themselves in the place of one of parties, is impermissible. *Holliman v. State*, 79 So. 3d 496, 500 (Miss. 2011).

80

> Evans argues that the prosecutor's speculation about the thoughts that might have gone through Holling's mind improperly invited the jury members to place themselves in Holling's position. He contends that the argument was the equivalent of the improper argument in **Holliman**. But in **Holliman**, this Court reversed because the prosecutor, over objection, repeatedly asked the jurors to imagine how they would feel if a loaded shotgun were pointed in their faces. **Id**. at 499–500. Thus, in **Holliman**, the prosecutor explicitly violated the prohibition on golden-rule arguments by repeatedly asking the jurors to put themselves in the place of the victim. While the prosecutor's argument in the instant case approaches a golden-rule violation, the argument was not so inflammatory as to have required intervention by the trial court. Thus, no plain error occurred.

**Evans**, 226 So. 3d at 31-32 (¶ 79).

¶172. We have held that the "mental anguish and physical torture suffered by the victim prior to death, and the vulnerability of the victim are factors which should be considered in determining whether the capital offense was especially heinous, atrocious, and cruel." **Ronk**, 172 So. 3d at 1143 (¶ 83). Here, the prosecutor's statements were not so inflammatory as to have required intervention by the trial court.

### B.     In-the-Box Argument

¶173. "It is an improper influence to put the jury in a 'box' by voir dire tactics which extract a promise, prior to trial, to ignore evidence favorable to the defendant." **Keller**, 138 So. 3d at 859 (¶ 106) (quoting **Stringer v. State**, 500 So. 2d 928, 938–39 (Miss. 1986)). Such a promise or pledge prevents the jurors from considering all factors relative to the verdict. **Keller**, 138 So. 3d at 859 (¶ 106).

¶174. Ambrose argues that the State had gotten a commitment from the jury during voir dire with respect solely to its deliberations and decision making at the culpability phase. Ambrose

81

admits the prosecutor's following statements were not improper at the time because the

prosecutor did not ask the jury to return any particular verdict:

> I also ask that you don't compromise or come to a lesser verdict based on sympathy alone, because at times in these types of cases some may try to appeal to your sympathy or to your bias in asking for a specific or for a lesser verdict. If you can agree that we should base our decision solely on the evidence and the law as given to you by the judge, please indicate so by raising your card. Thank you.

> As the judge also told you, your job as jurors will be to judge the facts of the case. You get to decide the proof of what happened back on April 7th, 2013. Your job is not to judge the defendant as a person. Your job is only to judge the actions that he took on April 7th, 2013. Is there anybody here who just doesn't think that they can do that, they don't think that they can sit in judgment of the actions of another human being? If you don't think you can do that, let us know. Thank you.

¶175. In light of the prosecutor's statement during voir dire, however, Ambrose claims that

the prosecutor's following rebuttal statement made during the penalty phase constituted an

improper "in-the-box" argument:

> Often times in this process the defendant will place witnesses on the witness stand. Then they come before you and they ask you for sympathy. Ladies and gentlemen, in these last few minutes I want to boil it down for you. What the defendant is asking you to tell him by your verdict today is that what he did to Robert Trosclair, what they did out there that day was bad, but not that bad. He wants you to tell him that the way that Robert Trosclair died at the age of 30 was just not bad enough. That's what he wants you to tell him by your verdict today.

> In Jury selection we all promised and raised our cards. I know that seems probably like a long time ago, but we promised that we would not make our decision based on sympathy. A difficult childhood cannot excuse what this defendant did to Robert Trosclair. A difficult childhood does not excuse what happened on April 7th, 2013. Your job as jurors has been a tough one, and I know it's been a long week, and you've been ripped from your families and your personal lives. You had to listen to two days of pretty graphic awful testimony, and you had to see some pretty bad pictures and photographs. And yesterday you saw the nine witnesses.

¶176. Ambrose argues that the prosecutor's comment regarding sympathy was unconstitutionally improper because eliciting sympathy for the defendant often is the only mitigating evidence presented. Ambrose argues that his entire mitigation case consisted of testimony by family and friends who knew and loved him, and it was expressly designed to elicit the sympathy of the jury to spare him from the death penalty. Ambrose claims the prosecutor "misrepresented to the jury the nature of the commitment it had made with respect to sympathy" and it was a "direct misstatement of the law concerning their right to consider it at sentencing." Ambrose claims the statement was similar to the statements condemned in *Stringer v. State*, 500 So. 2d 928, 938 (Miss. 1986).

¶177. In *Stringer*, the capital murder defendant argued that the prosecutor improperly asked the jury to promise not to consider certain mitigation factors. *Stringer*, 500 So. 2d at 938. During voir dire, the prosecutor asked whether there was anyone who would base his or her decision on sympathy. *Id*. In closing argument during the penalty phase, the prosecutor stated:

> Each one of you said under oath–I can vote for the death penalty in the proper case. Will it matter that he's young? Will he have to have killed more than one person? Will he have to have pulled the trigger himself on this murder? Can you still do it? Can you do it based on the testimony of the two people that you convicted him on? And every single one of you said yes–on your oath–I can do that. If you hadn't you wouldn't be here.
>
> If one of you–if one of you looks for an excuse and says–I'm not gonna vote for the death penalty and I'm not gonna give you a reason–just as Mr. Kelley said you can do–then you can keep from giving this person the death penalty. *You can forget what you promised me.* You can forget what you said under oath Monday.

*Stringer*, 500 So. 2d at 938 (emphasis added).

83

¶178. We stated that "[i]t is reversible error to ask a juror during voir dire to commit to returning a particular verdict." *Id*. We said that the prosecutor had "characterized the jurors' negative responses to his voir dire as a promise, under oath, to return the death penalty in [the] case." *Id*. We held:

> When combined with the question regarding Stringer's involvement in the crime and the question about sympathy, the jurors could have had the mistaken impression that they had pledged to ignore the only mitigating factors which he could present in his defense. Those factors were his relatively minor role in the killing of Mr. McWilliams, and his unique personal characteristics which would invoke sympathy: his age, his high school record, his troubled home life, and the domination by his father. It is an improper influence to put the jury in a "box" by voir dire tactics which extract a promise, prior to trial, to ignore evidence favorable to the defendant. This promise or pledge prevents the jurors from considering all factors relative to the verdict. The jurors are then called upon during closing argument to fulfill that promise, and the effect–whether calculated or not–is to shame or coerce the jury into rejecting factors which would tend to mitigate against the death penalty. We charge the jury in a capital murder case to narrow and distinguish the cases deserving of the death penalty from those which do not warrant such an extreme punishment. This awesome responsibility demands the freedom and flexibility to consider all relevant factors. A verdict returned on the basis of anything less cannot stand. When combined with other tactics used by the prosecution during the sentencing phase, we hold that the cumulative effect was to deny Jimbo Stringer a fundamentally fair trial at the penalty phase.

*Id*. at 938–39.

¶179. The State argues that the prosecutor's reference to sympathy was merely a response to Ambrose's counsel's plea for mercy. *See Rubenstein*, 941 So. 2d at 778-79)). The State also argues that it is permitted to fairly comment on or even disparage mitigation evidence offered by the defense. *See Holland v. State*, 705 So. 2d 307, 335 (¶ 93) (Miss. 1997). Also, the State argues that the prosecutor's statements in *Stringer* are not comparable to the

84

statements made in the present case. The State cites *Goff v. State*, 14 So. 3d 625, 653 (¶ 112)

(Miss. 2009), in support of its position. In *Goff*, we wrote:

> It is reversible error to ask a juror during voir dire to commit to returning a particular verdict. [*Stringer*, 500 So. 2d] at 938; *see also West v. State*, 485 So. 2d 681 (Miss. 1985); *Murphy v. State*, 246 So. 2d 920 (Miss. 1971). Here, however, the prosecutor did not ask the jurors for a promise to convict, nor did he ask the jurors to ignore any piece of evidence; rather, he asked the jurors to listen to the evidence and return a verdict based upon the evidence presented at trial.

*Goff*, 14 So. 3d at 653 (¶ 112). "In order for there to be *per se* error, the questions must be

a direct request for a promise for a specific verdict." *Simmons v. State*, 805 So. 2d 452, 505

(¶ 149) (Miss. 2001).

¶180. The State also points out that, following the alleged improper comment, the prosecutor

also stated to the jury:

> Ladies and gentlemen, as you go back into that Jury room, I submit to you that the law in the State of Mississippi allows you to return a verdict that imposes the highest penalty. The oath that you took as jurors, it did not require you to give the death penalty. It does not.

¶181. Here, the prosecutor did not ask the jurors for a promise to impose the death penalty;

rather, the prosecutor reminded the jurors that the oath they took as jurors did not require

them to impose the death penalty. Although the prosecutor's statement could be construed

as asking the jurors to ignore sympathy or mercy, the prosecutor's statement cannot be

construed as asking the jurors to ignore the mitigation factors *in toto*.

¶182. The jury was instructed as to the mitigation factors to be considered. "It is presumed

that jurors follow the instructions of the court." *Keller*, 138 So. 3d at 845 (¶ 54). The jury

was instructed that it "should consider and weigh any aggravating and mitigating

circumstances . . . but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." In light of the jury instructions, the Court does not conclude the statements at issue were so inflammatory that the trial court should have intervened when the trial court similarly had just instructed the jury not to be swayed by sympathy.

## VI. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE EVIDENTIARY ERROR.

¶183. Ambrose argues that the trial court committed several reversible evidentiary errors. "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Corrothers v. State*, 148 So. 3d 278, 310 (¶ 76) (Miss. 2014) (citing *Jefferson v. State*, 818 So. 2d 1099, 1104 (Miss. 2002) (quoting *Fisher v. State*, 690 So. 2d 268, 274 (Miss. 1996))).

### A. Photos of Trosclair (Exhibits S-5, S-6, S-7, S-8, S-9)

¶184. Ambrose argues that the admission of photos of Trosclair was unduly inflammatory and unnecessary to establishing any fact at issue. At trial, five photographs of Trosclair were admitted into evidence. Prior to trial, Ambrose had objected to the photos of Trosclair. The trial court found that the photos were admissible. Exhibits S-5 and S-6 were taken by an investigator at the hospital while Trosclair was comatose and on life support on April 8, 2013. Exhibits S-7, S-8, and S-9 were autopsy photos of Trosclair taken on April 11, 2013.

¶185. Exhibit S-5 shows multiple scratch type injuries to Trosclair's arm with an IV. Exhibit S-6 shows injuries to Trosclair's head and face and life support equipment. Exhibit

86

S-7 shows stab wounds to Trosclair's left side that the treating physician had characterized as superficial and non life-threatening. Exhibit S-8 shows Trosclair's head and face. Exhibit S-9 is a close up of Trosclair's eyes with his eyelids held open by clips.

¶186. "[T]he admissibility of photographs rests within the sound discretion of the trial court." *Manix v. State*, 895 So. 2d 167, 177–78 (¶ 30) (Miss. 2005). "The decision of the trial judge will be upheld unless there has been an abuse of discretion, which is a standard very difficult to meet." *Id*. at 178 (¶ 30). The admission of photos of a deceased is within the sound discretion and is proper so long as the photos serve some useful, evidentiary purpose. *Bennett v. State*, 933 So. 2d 930, 946 (¶ 53) (Miss. 2006). "Photographs that aid in describing the circumstances of the killing, the location of the body and cause of death, or that supplement or clarify a witness's testimony have evidentiary value and are admissible before a jury." *Id*.

¶187. "The discretion of a trial judge to admit photos in criminal cases, runs toward almost unlimited admissibility regardless of gruesomeness, repetitiveness, and the extenuation of probative value." *Bennett*, 933 So. 2d at 946 (¶ 53). "The trial judge's discretion is nearly unlimited, no matter the gruesomeness or extent of probative value." *King v. State*, 83 So. 3d 376, 378 (¶ 7) (Miss. 2012). "Only some probative value is needed to support a [trial] judge's admission of a gruesome photograph." *Id*. at 378 (¶ 7). "A photograph has a meaningful evidentiary purpose when it: (1) aids in describing the circumstances of the killing; (2) describes the location of the body or cause of death; or (3) supplements or clarifies witness testimony." *Id*.

87

¶188. Photographs of bodies may be admitted into evidence in criminal cases where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory. *King*, 83 So. 3d 378 (¶ 9). In *Bonds v. State*, 138 So. 3d 914, 920-921 (¶¶ 15-16) (Miss. 2014), we held that a close up full color photograph of the shooting victim's rotting, maggot infested, and disfigured skull and face was far more prejudical than probative. The *Bonds* Court also held that, while trial courts do have wide discretion to admit photographs, there are meaningful limits, and they are defined by weighing the probative value of the photograph against the prejudicial effect and potential to inflame and arouse the passions of the jury. *Id*. at 920-21 (¶ 16).

¶189. Although *Bonds* had not been handed down by the time of the trial court's ruling, the record does not show that the trial court believed its discretion had no meaningful limits. The trial court heard arguments from counsel in regard to the photographs' probative value, prejudicial effect, and potential to inflame and arouse the passions of the jury. After considering the arguments made by counsel, the trial court noted that, while it considered the photographs "gruesome," it determined that the photographs were admissible because they would assist the pathologist in explaining his opinions on the cause of death.[18]

¶190. The photographs at issue had probative value and a meaningful evidentiary purpose. Exhibits S-5 and S-6 were offered to aid in describing Troscliar's injuries and the circumstances of his fatal beating. Exhibits S-7, S-8, and S-9 were offered to assist the

---

[18] Although the trial court determined that one of the photos, an autopsy photograph of Trosclair's open scalp, was admissible to assist the pathologist, the State chose not to offer the photograph into evidence at trial, citing the trial court's "concern regarding the photographs of the open scalp of the victim."

pathologist, Dr. Krolikowski, in giving his opinion as to the cause of Trosclair's death, which he concluded was "multiple blunt trauma, multiple sharp wounds, and asphyxia by strangulation." Dr. Krolikowski identified the stab wounds in Exhibit S-7 and opined that the blood loss from the wounds contributed to Troscliar's demise. Exhibit S-8 assisted Dr. Krolikowski in his testimony describing the blunt force trauma to Trosclair's head. Exhibit S-9, the close up photograph of Trosclair's eyes, assisted Dr. Krolikowski in describing how he formed his opinion that Trosclair had been strangled.

¶191. The photographs simply do not reach the level of the extremely gruesome and prejudicial photograph described in *Bonds*. We cannot say the trial court abused its discretion in admitting the photographs because the photographs had probative value and they were not so gruesome or used in such a way as to be overly prejudicial or inflammatory. *King*, 83 So. 2d at 378 (¶ 9).

### B.    Puncture Wounds to Trosclair's Side

¶192. Ambrose argues that admission of evidence from several witnesses in regard to their observations of non life-threatening stab wounds to Trosclair's side were irrelevant and highly inflammatory. Ambrose did not object to the introduction of such testimony at trial. Because Ambrose did not raise a contemporaneous objection to the admission of stab wound evidence, his argument is procedurally barred. *Ronk*, 172 So. 3d at 1134 (¶ 51). "If no contemporaneous objection is made, the error, if any, is waived. Th[e] rule is not diminished in a capital case." *Id*. Ambrose acknowledges his failure to object to the stab wound evidence and urges the Court to consider the issue under the plain error doctrine.

¶193. "Under the plain-error doctrine, we can recognize obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right." *Conners v. State*, 92 So. 3d 676, 682 (¶ 15) (Miss. 2012). "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id*.

¶194. Ambrose argues that the State did not offer any knife into evidence and did not adduce any testimony that Ambrose, Stevie, or Dedeaux stabbed Trosclair during the assault. Ambrose claims evidence of the stab wounds was proof of a crime distinct from that alleged in the indictment. *See Palmer v. State*, 939 So. 2d 792, 795 (Miss. 2006) (holding that proof of a crime distinct from that alleged in an indictment is not admissible against an accused). However, it was undisputed that Trosclair had suffered puncture wounds to his side. Moreover, the record does not suggest that another crime distinct from capital murder with the underlying felony of kidnapping had occurred. Ambrose's issue with the evidence essentially is that no one admitted to stabbing Trosclair or witnessed Trosclair being stabbed during the events leading to Trosclair's death.

¶195. A reasonable juror could conclude from the evidence that Trosclair was stabbed during the lengthy fatal beating that he endured. "It is within the jury's province to draw reasonable inferences from facts based on experience and common sense." *Howell v. State*, 860 So. 2d 704, 739 (¶ 125 (Miss. 2003); *see also Flowers v. State*, 240 So. 3d 1082, 1111 (¶ 63) (Miss. 2017) (holding that a reasonable juror could conclude from evidence that the defendant had a motive to rob his former workplace and four of its employees).

90

¶196. At trial, Lee testified that, after the beating at Lawton's house, Trosclair was unresponsive and was dumped on the side of the road with his hands and waist tied with a ratchet tow strap. Holmes discovered Trosclair lying unconscious on the side of the road tied with the ratchet tow strap. Holmes immediately observed Troscliar's stab wounds. Holmes testified that when Trosclair was rolled over, he "could see like the blood pouring out." A law enforcement official also observed the stab wounds upon his arrival. Trosclair's treating physician and the pathologist also confirmed the presence of puncture wounds.

¶197. The admission of the evidence of Trosclair's stab wounds does not constitute plain error. The evidence was particularly relevant because Dr. Krolikowski opined that Trosclair's death was caused by "multiple blunt trauma, multiple sharp wounds, and asphyxia by strangulation." Dr. Krolikowski opined that the causes of death worked in combination as an aggregate to cause Trosclair's death. Although the treating physician testified that the stab wounds were superficial and not life threatening in and of themselves, Dr. Krolikowski opined that the stab wounds contributed to Trosclair's death. Based on the evidence presented at trial, a reasonable juror could infer from the evidence that Trosclair was stabbed during the course of the beating and kidnapping. Ambrose's argument is without merit.

### C. 911 Call

¶198. On April 7, 2013, around 7:00 p.m., Holmes discovered Trosclair lying on the side of the road as he was traveling home and immediately called 911. Prior to trial, the trial court denied Ambrose's motion to suppress Holmes's 911 call. The trial court found that the 911 call was more probative than prejudicial to the issues and should be admitted into evidence under Mississippi Rule of Evidence 403. The trial court also found that Holmes's statements

with regard to Trosclair's injuries qualified as a lay opinion under Rule 701 and as a present sense impression exception to hearsay under Rule 803(1). Over the defense's renewed objection, Holmes's 911 call was played for the jury at trial.

¶199. Ambrose argues that the evidence improperly bolstered Holmes's testimony when his credibility had not been attacked. Ambrose relies solely on *White v. State*, 616 So. 2d 304 (Miss. 1993), in support of his position. The State distinguishes *White*, in which the Court held that testimony was admitted improperly as a prior consistent statement under Mississippi Rule of Evidence 801(d)(1)(B) because the credibility of the declarant witness had not been attacked. *White*, 616 So. 2d at 308. The State correctly notes that the 911 call was not admitted as a prior consistent statement, so *White* is inapplicable. Finally, *White* does not pertain to the admission of a 911 call into evidence. We have held that the trial court has not abused its discretion in admitting 911 calls. *See Dickerson v. State*, 175 So. 3d 8, 20–21 (¶¶ 37-40) (Miss. 2015); *Corrothers*, 148 So. 3d at 310–11 (¶¶ 78-81). We agree with the State that Ambrose fails to cite any authority holding that a 911 call is inadmissible because it improperly bolsters the declarant witness's testimony. *See Batiste*, 121 So. 3d at 861 (¶ 134) (appellant's failure to cite relevant authority obviates the appellate court's obligation to review such issues).

¶200. Ambrose also takes issue with Holmes's statements that Trosclair was "internally bleeding," and that he had been "tortured."[19] Here, the trial court found that Holmes's

---

[19] Ambrose also mentions that the 911 operator's statements reacting to Holmes's own statements constituted hearsay. Ambrose raises the issue for the first time on appeal, and without citations to any authority in support of his position. To the extent that Ambrose is raising an argument, the argument is procedurally barred and waived. *Batiste*, 121 So. 3d

statements in regard to Trosclair's injuries qualified as a lay opinion under Mississippi Rule of Evidence 701. Ambrose does not cite any relevant authority that the trial court's finding was an abuse of discretion. *See id*.

¶201. Ambrose argues that the excited utterance exception to the hearsay rule does not apply as the State had argued at the motion hearing that because Holmes was not a victim of the crime, his utterances did not fall under the exception. Although the State argued at trial that the excited utterance hearsay exception applied to the 911 call, the trial court actually found that the 911 call qualified as a present sense impression exception to the hearsay rule. As such, Ambrose's argument is misplaced.

¶202. Under Mississippi Rule of Evidence 803(1), a "present sense impression" is "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." *Clark v. State*, 693 So. 2d 927, 932 (Miss. 1997) (affirming a trial court's finding that statements made by the 911 caller while talking to the operator perceived the event, described what was happening to her, and were sufficiently contemporaneous to fit within the exception).

¶203. Ambrose argues that the 911 call did nothing but add inflammatory emotion and improperly incite the jury. "Under Rule 403, evidence which is deemed admissible may still be excluded if its probative value is substantially outweighed by the danger of its resultant unfair prejudice." *Batiste*, 121 So. 3d at 863 (¶ 143). "Rule 403 is an ultimate filter through

at 861 (¶ 134) ("The appellant's failure to cite relevant authority obviates the appellate court's obligation to review such issues.").

which all otherwise admissible evidence must pass." *Id*. "The trial court has broad discretion under Rule 403." *Id*.

¶204. Here, the trial court found that the probative value of the 911 call was not outweighed by the danger of unfair prejudice under Rule 403. Holmes testified at trial as to his observations of Trosclair on the side of the road and was subject to cross examination with regard to his 911 call. The admission of the evidence did not constitute an abuse of discretion so as to be prejudicial to Ambrose. *See Corrothers*, 148 So. 3d at 310 (¶ 76).

**D.      Autopsy Evidence of the Presence of Cocaine in Trosclair's System**

¶205. Prior to trial, the State filed a motion *in limine* to preclude Ambrose from mentioning that Trosclair's toxicology results from the autopsy showed that he had tested positive for benzoylecgonine, a cocaine metabolite. In support of the motion, the State argued that only a defense of a self-defense would permit such evidence. The State also argued that there was uncertainty about whether Trosclair used drugs in general and what motivated the car break in. Ambrose opposed the motion, arguing that the preclusion would impede his right to present a defense because he had a right to show that Trosclair had a drug problem that motivated him to break into Ambrose's car. However, at the hearing, when asked what witness would testify in support of the theory, Ambrose's counsel stated that he did not know, but he suspected that one or several of the State's witnesses would testify as such. The trial court granted the motion *in limine*, but reserved to Ambrose the right to approach the bench and revisit the issue if one of the witnesses said something during the course of the trial that concerned him or if he wished to cross examine a witness in that regard.

¶206. On appeal, rather than arguing how the toxicology report was relevant, Ambrose relies on *Richardson v. State*, 147 So. 3d 838, 841 (Miss. 2014), arguing that the autopsy test results are not limited to cases of self defense and that they were admissible to show any other pertinent trait or character of the victim of the crime. *Richardson*, 147 So. 3d at 841 (Miss. 2014) (citing M.R.E. 404(a)(2) and 404(b)). However, *Richardson* involved a defense of self-defense and did not involve a toxicology report of the victim. *See id*. Even so, in the case *sub judice*, the trial court granted the State's motion *in limine* because it found that Ambrose's reason for offering the results was based on "pure speculation." Even though Ambrose had failed to demonstrate the relevance of the toxicology report at the motion *in limine* hearing, the trial court assured that Ambrose would have the opportunity to revisit the issue in the course of the trial.

¶207. Ambrose also claims that a decedent's contribution to his own demise is a statutory mitigating factor of which a capital defendant has a right to adduce evidence, and if he adduces such evidence, to rely upon in mitigation if he so desires. *See* Miss. Code Ann. § 99-19-101(6)(c) (Rev. 2015) ("The victim was a participant in the defendant's conduct or consented to the act."). Surely Ambrose is not suggesting that Trosclair participated in or consented to his own murder because he may have stolen speakers or drugs from Ambrose's car. We decline to hold that Trosclair participated in and consented to being killed because autopsy results revealed that he tested positive for cocaine.

¶208. Again, "[t]he admissibility of evidence rests within the discretion of the trial court, and reversal is appropriate only when a trial court commits an abuse of discretion resulting in prejudice to the accused." *Ross v. State*, 954 So. 2d 968, 992 (¶ 44) (Miss. 2007).

95

Relevance is a threshold requirement of admissibility. M.R.E. 402. "Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Ross*, 954 So. 2d at 992-93 (¶ 44) (citing M.R.E. 401).

¶209. We cannot say the trial court abused its discretion in excluding the evidence, resulting in prejudice to the defense. The trial court found the basis on which Ambrose sought to offer the toxicology results was "pure speculation" and granted the State's motion *in limine*, while also reserving to Ambrose the right to revisit the issue in trial. Despite the trial court's ruling, Ambrose's theory that he sought to prove through the victim's toxicology results was indeed presented to the jury, *i.e.*, that Trosclair had broken into his car and that drugs had been taken. As such, even assuming the trial court abused its discretion, Ambrose's claim that he was denied his right to present a defense on the issue simply is not supported by the record. *See, e.g., Newell v. State*, 49 So. 3d 66, 73 (Miss. 2010) ("We will not reverse the trial court's evidentiary ruling unless the error adversely affects a substantial right of a party.).

## VII. WHETHER THE INDICTMENT WAS LEGALLY SUFFICIENT AND WHETHER THE TRIAL COURT ERRED BY DENYING AMBROSE'S REQUEST FOR A BILL OF PARTICULARS.

¶210. Prior to trial, Ambrose filed a motion to quash the indictment for failure to include the elements of the underlying charge of kidnapping and a motion to require the State to submit a bill of particulars stating what acts by Ambrose constituted a kidnapping. The trial court denied both motions based on *Harrell v. State*, 134 So. 3d 266 (Miss. 2014), *Batiste v. State*,

96

121 So. 3d 808 (Miss. 2013), *Keen v. State*, 164 So. 3d 1039 (Miss. Ct. App. 2014), and

*Tapper v. State*, 47 So. 3d 95 (Miss. 2010).

¶211. On appeal, Ambrose argues that the trial court erred by failing either to quash the

indictment for failing to list the elements of the underlying felony of kidnapping or failing

to require the State to provide a bill of particulars describing the conduct by Ambrose that

constituted kidnapping.

¶212. Ambrose argues that the failure to specify the conduct constituting kidnapping in the

indictment or in a bill of particulars violated his rights under the Sixth, Eighth, and

Fourteenth Amendments of the United States Constitution and Article 3, Sections 14, 26, and

28 of the Mississippi Constitution.

¶213. Ambrose acknowledges that the Court and the Mississippi Court of Appeals

repeatedly have rejected claims like those he advances today under the present assignment

of error. However, he requests that the Court revisit the issue and reverse his sentence. *See*

*Gray*, 887 So. 2d at 166 (¶ 17); *Batiste*, 121 So. 3d at 836 (¶ 43); *Carson*, 212 So. 3d at 31-

32 (¶¶ 34 -36). In short, we hold that Ambrose's indictment was legally sufficient and he

was not entitled to bill of particulars.

¶214. In *Carson*, we wrote:

> The sufficiency of an indictment is a question of law, and therefore is reviewed
> de novo. *Berry v. State*, 996 So. 2d 782, 785–86 (¶ 8) (Miss. 2008) (quoting
> *Quang Thanh Tran v. State*, 962 So. 2d 1237, 1240 (Miss. 2007)). "So long
> as a fair reading of the indictment, taken as a whole, clearly describes the
> nature and cause of the charge against the accused, the indictment is legally
> sufficient." *Farris v. State*, 764 So. 2d 411, 421 (¶ 28) (Miss. 2000) (citing
> *Harrison v. State*, 722 So. 2d 681, 687 (Miss. 1998)). Carson correctly cites
> *Burks v. State*, 770 So. 2d 960, 963 (¶ 12) (Miss. 2000), for the proposition
> that where the identity of the victim is an essential element of the crime

97

charged, the indictment indeed must state the name. A failure to do so "or a material variance between statement and proof is fatal, but an immaterial variance is not." *Id*. (quoting *Hughes v. State*, 207 Miss. 594, 603, 42 So. 2d 805, 807 (1949)).

*Carson*, 212 So. 3d at 31 (¶ 34).

¶215. Ambrose's indictment reads as follows:

ABDUR RAHIM AMBROSE, STEVIE CREON AMBROSE, SR. AND ORLANDER PATRICK DEDEAUX, II in the First Judicial District of Harrison County, Mississippi, on or about April 7, 2013 did then and there willfully, unlawfully, feloniously and with or without design to effect death, kill and murder Robert Trosclair, a human being, without authority of law, while in the commission of the crime and felony of Kidnapping, as defined by Section 97-3-53, Miss. Code of 1972, (as amended), contrary to Section 97-3-19(2)(e), Miss. Code of 1972, (as amended), and against the peace and dignity of the State of Mississippi.

¶216. The State points to the following analysis in *Batiste*, in which the Court rejected a similar argument to that Ambrose advances today:

Batiste's indictment placed him on notice that the capitalizing crime was robbery. Section 97–3–19(2)(e) states that "the killing of a human being without the authority of law by any manner or in any means shall be capital murder . . . when done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery . . . ." Miss. Code Ann. § 97–3–19(2)(e) (Rev. 2006). Because Batiste's indictment charged him with capital murder predicated on robbery, the State sufficiently narrowed Batiste's conduct to a level of egregiousness sufficient to support imposition of the death penalty. *See Romano*, 512 U.S. at 7, 114 S. Ct. at 2009. The particular item stolen in the robbery is immaterial. This issue is without merit.

*Batiste*, 121 So. 3d at 838 (¶ 50).

¶217. "In capital-murder cases, unless the underlying felony is burglary, the underlying felony that elevates the crime to capital murder must be identified in the indictment along with the section and subsection of the statute under which the defendant is being charged."

98

*Batiste*, 121 So. 3d at 836 (¶ 43) (Miss. 2013). "No further detail is required." *Id*. As in *Batiste*, Ambrose's indictment provided that the felony underlying his capital murder charge was kidnapping and stated the Code section defining the crime of kidnapping. *See id*. at 835-36 (¶¶ 40-43).

¶218. Ambrose argues that his indictment was insufficient to protect him from double jeopardy in the event of a subsequent attempt to prosecute him. Ambrose claims that he could not invoke a double jeopardy claim in the event the State elected to try him for a freestanding kidnapping of Trosclair that purportedly was not connected to the capital murder charge. The State argues that Ambrose fails to explain how his indictment was insufficient so as to prevent him from pleading double jeopardy if the State sought to prosecute him in the future for the same crime. We agree. Here, Ambrose was charged with one count of capital murder predicated on kidnapping, occurring on April 7, 2013. Nothing would prevent Ambrose from pleading double jeopardy if the State sought to prosecute him in the future for the kidnapping. Ambrose's argument is without merit.

¶219. Ambrose argues that the indictment did not provide him notice of exactly what conduct during a several hours period of interaction with Trosclair made Ambrose guilty of the underlying felony of kidnapping. As a result, Ambrose argues he could not ensure that the State met its burden to establish for the jury beyond a reasonable doubt the crime of capital murder predicated on kidnapping, or obtain the requisite jury unanimity for any verdict of conviction or sentence of death.

¶220. We rejected the same argument in *Fulgham v. State*, 212 So. 3d 22 (Miss. 2016). In *Fulgham*, the capital murder defendant Kristi Fulgham argued that the jury should have been

instructed that it must agree unanimously on which item was taken with regard to the underlying felony of robbery. *Id*. at 323 (¶ 19). We wrote that the jury was properly instructed that one of the elements of robbery is taking, stealing, and carrying away some "personal property of another." *Id*. at 326 (¶ 28). We held:

> The facts necessary to prove this element can be shown by alternative fact patterns, but still lead to the conclusion that there was but one offense—that of robbery. We are satisfied that this jury was perfectly capable of sifting through the evidence presented and was able to discard any factually insufficient theories. We find that there was sufficient evidence to support the taking of the wallet and its contents. By its verdict, twelve jurors unanimously agreed that Fulgham had robbed Joey of personal property. If we were to accept Fulgham's position as embodied in instruction D–48, it could lead to an absurd result. For example, while all twelve jurors might agree that Fulgham had killed Joey and had stolen some of his personal property, acquittal would be required if six believed she had stolen his money and the other six believed she had stolen the CPU. We find this argument to be without merit.

*Fulgham*, 46 So. 3d 326 (¶ 28). The *Fulgham* Court's analysis likewise applies to the present case, where Trosclair's kidnapping may be shown by alternative fact patterns based on the evidence presented at trial. As in *Fulgham*, the jury did not have to agree unanimously on which facts constituted the kidnapping, so long as the jury found that the State had proved each element of kidnapping beyond a reasonable doubt.

¶221. Ambrose also argues that the death sentence must be set aside because the crime of conviction was not narrowed sufficiently to permit the imposition of the death penalty. We rejected a similar argument in *Batiste*:

> Batiste argues that, without notice of the specific item that is the subject of the robbery, the State failed to narrow his conduct to a level of egregiousness that could support the imposition of the death penalty. Under the Eighth Amendment, states must ensure that the death penalty is appropriate and not randomly imposed. *Romano v. Oklahoma*, 512 U.S. 1, 7, 114 S. Ct. 2004,

100

2009, 129 L. Ed. 2d 1 (1994). "To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Id*. (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988)). To accomplish this narrowing, the "State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold." *Romano*, 512 U.S. at 7, 114 S. Ct. at 2009.

Our capital-murder statute narrows the class of murders to those with additional egregious characteristics. Miss. Code Ann. § 97–3–19(2)(a)–(h) (Rev. 2006). Batiste's indictment placed him on notice that the capitalizing crime was robbery. Section 97–3–19(2)(e) states that "the killing of a human being without the authority of law by any manner or in any means shall be capital murder . . . when done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery . . . ." Miss. Code Ann. § 97–3–19(2)(e) (Rev. 2006). Because Batiste's indictment charged him with capital murder predicated on robbery, the State sufficiently narrowed Batiste's conduct to a level of egregiousness sufficient to support imposition of the death penalty. *See Romano*, 512 U.S. at 7, 114 S. Ct. at 2009. The particular item stolen in the robbery is immaterial. This issue is without merit.

*Batiste*, 121 So. 3d at 838 (¶¶ 49-50).

¶222. Likewise, Ambrose's indictment charged him with capital murder predicated on kidnapping occurring on April 7, 2013; thus, the State sufficiently narrowed Ambrose's conduct to a level of egregiousness sufficient to support imposition of the death penalty. *Id*.

¶223. As to the bill of particulars argument, the State argues that Mississippi law has long recognized that criminal defendants are not entitled to a bill of particulars, as the indictment is the formal document which places the defendant on notice of the charge against him. *See Westbrooks v. State*, 25 So. 491, 492 (Miss. 1899); *Sanders v. State*, 105 So. 523, 525 (Miss. 1925); *State v. McClendon*, 168 So. 2d 737, 737-38 (Miss. 1964)). We agree.

## VIII. WHETHER THE TRIAL COURT ERRED BY GRANTING THE STATE'S REQUESTED ONE CONTINUOUS TRANSACTION INSTRUCTIONS.

¶224. Ambrose argues that the trial court erred by granting the State's requested one continuous transaction instructions at both the culpability and sentencing phases. Ambrose acknowledges that the Court has rejected the same argument he makes today, but he urges the Court to revisit the issue and overrule caselaw in which his argument has been rejected.

¶225. "Mississippi follows the one-continuous-transaction rule for determining whether the evidence establishes the requisite nexus between the killing and the underlying felony to constitute capital murder." *Batiste*, 121 So. 3d at 831 (¶ 33) (Miss. 2013). During the culpability phase, the trial court granted the State's request to give Instruction S-3. Instruction S-3, a one continuous transaction instruction, was given to the jury and provided:

> The Court instructs the Jury that a killing occurring while engaged in the commission of a kidnapping includes the actions of the defendant leading up to the kidnapping, the occurrence of the kidnapping, and the aftermath of the kidnapping.

¶226. In *Ronk*, we reaffirmed the propriety of the one continuous transaction instruction:

> Ronk argued at trial that he could not be convicted of capital murder because Craite's death did not occur while Ronk was "engaged in the commission" of an arson. At the conclusion of the trial, over Ronk's objection, the trial court accepted the State's instruction S–101, which defined the one-continuous-transaction doctrine applicable to felony-murder cases. The instruction provided, in relevant part: "[A] killing occurring while engaged in the commission of an arson includes the actions of the defendant leading up to the arson, the arson and the flight from the scene of the arson." On appeal, Ronk argues that the trial court erred in giving instruction S–101 because the evidence does not support a finding that Craite died "as a result of the arson."
>
> We find that the trial court did not err in instructing the jury on the one-continuous-transaction doctrine, which was adopted by this Court to define the requisite causal nexus between a killing and the underlying felony in a capital felony-murder case. *Fisher v. State*, 481 So. 2d 203, 212 (Miss.

1985). This Court repeatedly has approved of instructions in felony-murder cases with language identical to instruction S–101. *See* ***Batiste v. State***, 121 So. 3d 808, 832–33 (Miss. 2013); ***Fulgham v. State***, 46 So. 3d 315, 328–29 (Miss. 2010). Thus, instruction S–101 was a correct statement of the law governing capital felony-murder cases.

***Ronk***, 172 So. 3d at 1129 (¶¶ 31-32); *see also* ***Duplantis v. State***, 708 So. 2d 1327, 1342-43

(¶¶ 68-70) (Miss. 1998).

¶227. Recently, in ***Evans***, we wrote:

> Evans contends that the one-continuous-transaction doctrine impermissibly allows a felony-murder conviction based on mere temporal proximity between a homicide and one of the felonies listed in the capital-murder statute, violating the Sixth and Fourteenth Amendments.
>
> In ***Turner v. State***, the Court explained that the one-continuous-transaction doctrine applies to felony-murder cases and defines the causal nexus required between the killing and the underlying felony. ***Turner***, 732 So. 2d 937, 950 (Miss. 1999). The Court held that "a killing occurring while engaged in the commission of one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony." *Id*. "In other words, 'where the two crimes [e.g., murder and robbery] are connected in a chain of events and occur as part of the *res gestae*, the crime of capital murder is sustained.'" ***Gillett v. State***, 56 So. 3d 469, 492 (Miss. 2010) (quoting ***Pickle v. State***, 345 So.2d 623, 627 (Miss. 1977)).

***Evans***, 226 So. 3d at 35 (¶¶ 90-91).

¶228. We likewise hold that Ambrose's argument is without merit.

## IX. WHETHER THE TRIAL COURT ERRED BY GIVING OR REFUSING CERTAIN SENTENCING PHASE INSTRUCTIONS.

¶229. Ambrose argues that the trial court's erroneous sentencing phase instructions require

vacation of the death sentence and remand for a new sentencing proceeding.

### A. Whether aggravating circumstances were legally and/or factually supported.

103

¶230. Here, the jury was instructed to consider two statutory aggravating circumstances, *i.e.*, (1) that the capital offense was committed when the defendant was engaged in the commission of, or an attempt to commit, or flight after committing, or attempting to commit a kidnapping; and (2) that the capital offense was especially heinous, atrocious, or cruel. The jury found both aggravating circumstances existed beyond a reasonable doubt.

### i. The Underlying Kidnapping as an Aggravating Circumstance

¶231. Ambrose argues that the aggravating circumstance that the capital offense was committed when the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit a kidnapping is unconstitutionally duplicative of the elements of the underlying offense. In support, Ambrose relies on the Supreme Court's decisions in ***Ring v. Arizona***, 536 U.S. 584 (2002), and ***Apprendi v. New Jersey***, 530 U.S. 466, 482 (2000). As acknowledged by Ambrose, however, the Court "has repeatedly held that evidence of the underlying crime can properly be used both to elevate the crime to capital murder and as an aggravating circumstance." ***Ross v. State***, 954 So. 2d 968, 1010–11 (¶ 106) (Miss. 2007); *see also* ***Galloway v. State***, 122 So. 3d 614, 680 (¶ 238) (Miss. 2013) (rejecting the familiar "stacking" argument). Moreover, the Supreme Court has held the use of an underlying felony as an aggravator is constitutional. ***Ross***, 954 So. 2d at 1011 (¶ 106) (citing ***Lowenfield v. Phelps***, 484 U.S. 231, 233 (1986)). Ambrose's argument is without merit.

### ii. The Heinous, Atrocious, or Cruel Aggravating Circumstance

¶232. Next, Ambrose argues that the heinous, atrocious, or cruel aggravating circumstance instruction should not have been given because the evidence was insufficient to support it. Specifically, Ambrose argues that the aggravator should not have been given because no evidence was presented that Ambrose or any other of the assailants had mutilated Trosclair.

¶233. "To uphold the submission of the [heinous, atrocious, or cruel] aggravator, there must be evidence that the offense in question "was accompanied by such additional acts as to set the crime apart from the norm of capital felonie—the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *Hutto v. State*, 227 So. 3d 963, 991 (¶ 98) (Miss. 2017). We have held that the number of wounds and the fact that death was not immediate, but prolonged, all may be considered as evidence supporting a jury's finding of the heinous, atrocious, or cruel aggravator. *Id*. "Additional factors that may be considered under the [heinous, atrocious, or cruel] aggravator include whether the defendant inflicted physical pain before death, the mental anguish and physical torture suffered by the victim prior to death, and the vulnerability of the victim." *Id*.

¶234. Here, Trosclair was fatally beaten for approximately two hours at two different locations by three people who purported to be his friends. Trosclair's fatal injuries included three stab wounds, substantial head trauma, and strangulation. Trosclair's head and body were covered in abrasions. Evidence showed that Trosclair had tried to escape, but he was caught by Ambrose, Stevie, and Dedeaux. Evidence showed that, after they caught him, a defenseless Trosclair was beaten with a fully inflated tire with rim and a garden hose reel until he was unresponsive. After the beating, an unconscious Trosclair was tied up with a ratchet tow strap and dumped on the side of the road. The aggravating circumstance was

supported by the evidence. *See Hutto*, 227 So. 3d at 991 (¶¶ 98-102) (holding that sufficient evidence supported the submission of the heinous, atrocious, or cruel aggravator where the victim was beaten to death). Ambrose's argument is without merit.

**B.** **Whether the trial court erred by refusing Ambrose's proposed instructions D-2 and D-9.**

¶235. Ambrose argues that instructions D-2 and D-9 should not have been refused because the Mississippi capital sentencing statute, which permits a jury to make factual findings justifying a death sentence in the absence of proof beyond a reasonable doubt, violates the Sixth Amendment. Stated another way, Ambrose argues that neither the statute nor the instructions given during the penalty phase required the jury to make its statutory weighing of findings beyond a reasonable doubt. In support, Ambrose relies on *Hurst v. Florida*, 136 S. Ct. 616, 611 (2016).

¶236. In *Ronk*, we set out the standard of review when considering the trial court's decisions on jury instructions:

> "It is well settled that jury instructions generally are within the discretion of the trial court, so the standard of review for the denial of jury instructions is abuse of discretion." *Newell v. State*, 49 So. 3d 66, 73 (Miss. 2010) (citing *Davis v. State*, 18 So. 3d 842, 847 (Miss. 2009) (internal citations omitted)). When considering whether error lies in granting or refusing a jury instruction, the instructions actually given must be read as a whole and in context. *Ruffin v. State*, 992 So. 2d 1165, 1176 (Miss. 2008) (citations omitted). No reversible error exists if the instructions fairly, though not perfectly, announce the law of the case and create no injustice. *Rubenstein v. State*, 941 So. 2d 735, 784–785 (Miss. 2006) (citations omitted). "A defendant is entitled to have jury instructions given which present his theory of the case[;] however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Agnew v. State*, 783 So. 2d 699, 702 (Miss. 2001) (citations omitted). "In homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or

excuse that are supported by the evidence, no matter how meager or unlikely [.]" *Manuel v. State*, 667 So. 2d 590, 593 (Miss. 1995).

*Ronk*, 172 So. 3d at 1125 (¶ 20).

¶237. In the case *sub judice*, proposed instruction D-2 read:

The Court instructs the jury that each individual juror must decide for themselves whether the death penalty or life imprisonment without parole is an appropriate punishment for ABDUR RAHIM AMBROSE. Even if mitigating circumstances do not outweigh aggravating circumstances, the law permits you to impose a sentence of life imprisonment without the possibility of parole.

Only if you unanimously agree beyond a reasonable doubt that death is the appropriate punishment may you impose a sentence of death.

You should indicate your findings in the jury verdict form which you will have with you in the deliberation room.

¶238. The trial court refused Ambrose's proposed instruction D-2 following the Court's holding in *Ronk*. In *Ronk*, the Court held that the trial court did not abuse its discretion in refusing a nearly identical instruction. *Ronk*, 172 So. 3d at 1139-40 (¶¶ 69-70). The Court characterized similarly worded instructions as improper mercy instructions. *Id*. at 1140 (¶ 70). The Court also held that the substance of Ronk's proposed instruction was covered appropriately by another instruction informing the jury of its duty to "apply your reasoned judgment as to whether the situation calls for life imprisonment without parole or whether it requires the imposition of death." *Id*. Likewise, here, the jury was instructed that it "must apply your reasoned judgment as to whether this situation calls for life imprisonment without parole or whether it requires the imposition of death, in light of the totality of the circumstances present." Under *Ronk*, the trial court did not abuse its discretion in refusing instruction D-2. *See also Thorson v. State*, 895 So. 2d 85, 107-08 (¶¶ 50-51) (Miss. 2004).

¶239. Proposed instruction D-9 read:

The Court instructs the jury before ABDUR RAHIM AMBROSE can be sentenced to death, the aggravating circumstances must be proven to you beyond a reasonable doubt. It must also be proven to you beyond a reasonable doubt that the mitigating circumstances do not outweigh the aggravating circumstances. Finally, it must also be proven to you beyond a reasonable doubt that death is the appropriate punishment for ABDUR RAHIM AMBROSE.

If upon review of the evidence, any one of you has any reasonable doubt as to any of these matters, the jury must inform the Court, in writing, that you are unable to agree unanimously on punishment.

¶240. The trial court refused Ambrose's proposed instruction D-9 because it was fairly covered by instruction S-14A given to the jury. The State argues that the first sentence of proposed instruction D-9 was covered in instruction S-14A.

¶241. Instruction S-14A provided, in part, that "you must unanimously find, beyond a reasonable doubt, that the preceding aggravating circumstances exist in this case to return the death penalty." Instruction S-14A also provided, in part, that "[i]f one or more of the above aggravating circumstances is found to exist beyond a reasonable doubt, then each of you must consider whether there are mitigating circumstances which outweigh the aggravating circumstances."

¶242. The State argues that in *Thorson v. State*, 895 So. 2d 85, 110-11 (¶¶ 58-60) (Miss. 2004), the Court affirmed the trial court's refusal of a nearly identical instruction. The State also argues that Ambrose's reliance on *Hurst* is misplaced because it involved Florida's capital sentencing scheme, which was deemed unconstitutional because it permitted a trial judge, rather than a jury, to find the existence of an aggravating circumstance to warrant the

108

death penalty. In ***Evans***, we recently explained the applicability of ***Hurst*** with respect to Ambrose's argument:

> Although Evans argues that ***Hurst*** broadened the applicability of ***Apprendi*** and ***Ring***, ***Hurst*** merely applied ***Ring*** to Florida's sentencing scheme. ***Hurst*** clearly applied ***Ring***'s holding that "capital defendants are entitled to a jury determination of any fact on which the legislature conditions an increase in the maximum punishment." ***Hurst***, 136 S. Ct. at 620 (quoting ***Hurst***, 147 So. 3d at 445). The ***Hurst*** decision did not rest upon or even address the beyond-a-reasonable-doubt standard. Therefore, under ***Brown***, this issue is without merit.

***Evans***, 226 So. 3d at 38 (¶ 103) (relying on ***Brown v. State***, 890 So. 2d 901, 921 (Miss. 2004) (holding that the beyond a reasonable doubt requirement does not apply to the determination that the aggravating circumstances outweigh the totality of the mitigating circumstances)).

¶243. Under ***Thorson*** and ***Evans***, the trial court did not abuse its discretion in refusing proposed instruction D-9. *See **Thorson***, 895 So. 2d at 110-111 (¶¶ 58-60); ***Evans***, 226 So. 3d at 38-39 (¶¶ 102-104).

### C.     Whether the trial court erred by refusing proposed instruction D-4.

¶244. Ambrose argues that the jurors were insufficiently instructed on mitigation or on their individualized right and duty to decide the sentence as individuals, including their right to decide against a death sentence for reasons of mercy or sympathy. Ambrose sought to have the jury instructed in accord with his argument through proposed instructions, particularly D-4, which read:

> The Court instructs the jury that a mitigating circumstance is any fact relating to ABDUR RAHIM AMBROSE's character or history, or any aspect of the crime itself, which may be considered extenuating or reducing the moral culpability of the killing or making ABDUR RAHIM AMBROSE less

109

deserving of the extreme punishment of death. Mitigating circumstances are those circumstances that tend to justify the penalty of life imprisonment without the possibility of parole as opposed to death.

¶245. The trial court refused Ambrose's proposed instruction D-4. The State argues that instruction D-4 instruction was fairly covered elsewhere. Instruction S-14 informed the jury that mitigating circumstances are "those which tend to warrant the less severe penalty of life imprisonment without parole[.]" Instruction S-14A listed the mitigating circumstances, which included "[a]ny other matter, any other aspect of the Defendant's character or record, and any other circumstance of the offense brought to you during the trial of this case which you, the Jury, deem to be mitigating on behalf of the Defendant. Instruction S-14A also provided:

> If you individually find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether they outweigh or overcome the aggravating circumstances you previously found. In the event that you find that the mitigating circumstances do not outweigh the aggravating circumstances, you may impose the death sentence. Should you find that the mitigating circumstances outweigh or overcome the aggravating circumstances, you shall not impose the death sentence.

¶246. Ambrose recognizes that the Court previously has rejected the same argument he advances under the present assignment of error in **Batiste**.[20] *See **Batiste***, 121 So. 3d at 867 (¶ 157) (reaffirming that capital defendants are not entitled to a mercy instruction); *see also* **Thorson**, 895 So. 2d at 108 (¶ 51) (holding that an instruction that was nothing more than

---

[20] Under the assignment of error, Ambrose also takes issue with the refusal of D-7, which instructed the jury that a decision to afford Ambrose mercy and thereby sentence him to life imprisonment without the possibility of parole would not violate the laws of Mississippi or their oath as jurors. The instruction was refused properly as an improper mercy instruction under **Batiste**, 121 So. 3d at 867 (¶ 157).

a mercy instruction was refused properly by the trial court). The Court agrees with the State that the substance of the instruction was fairly covered elsewhere.

¶247. Ambrose also urges the Court to revisit the equipoise issue decided in *Batiste*, *i.e.*, that the sentencing scheme purports to permit a death sentence when the mitigation and aggravation are in equipoise. In *Batiste*, the Court rejected the same argument Ambrose repeats today. *See Batiste*, 121 So. 3d at 866-67 (¶¶ 155-157) (holding that the death penalty may be imposed when the State has proved beyond a reasonable doubt that the mitigation circumstances do not outweigh the aggravating circumstances, including where the aggravating circumstances and mitigating circumstances are in equipoise).

¶248. Finally, Ambrose urges the Court to revisit the constitutionality of Section 99-19-101, namely that the jury must find that mitigation outweighs aggravation in the weighing process because in all other respects the burden is firmly on the State to establish beyond a reasonable doubt everything that is required to impose a death sentence. A similar argument was raised and rejected in *Evans*. *See Evans*, 226 So. 3d at 38 (¶ 102) (where Evans argued that the statute is unconstitutional because it allows the jury to impose a death sentence by finding that sufficient aggravating circumstances exist and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances without prescribing the burden of proof). As in *Evans*, Ambrose's argument is without merit.

      **D.**     **Whether the trial court erred by refusing proposed instructions D-1 and D-3.**

¶249. Ambrose argues that the trial court erred by refusing proposed instructions D-1 and D-3, that accurately informed the jury that the consequence of disagreement was not a new

111

trial on sentencing, but a final disposition of the sentencing issue and defined what a "no parole" sentence actually entailed.

¶250. Proposed instruction D-1 read:

> The Court instructs the jury that should you be unable to agree unanimously on punishment and inform the Court that you are unable to agree, then the Judge shall sentence the Defendant, ABDUR RAHIM AMBROSE, to life imprisonment without parole or hope of early release.

¶251. The trial court denied Ambrose's proposed instruction D-1. The State argues that the instruction was cumulative of and fairly covered by instruction S-14A. *See Ronk*, 172 So. 2d at 1141-43 (¶¶ 74-76) (holding that the trial court did not err in refusing proposed instruction informing the jury that the trial court would sentence the capital murder defendant to life imprisonment without parole if the jury was unable to agree unanimously on punishment). In *Ronk*, the jury was given the option, just like the jury here, of returning a verdict stating, "We, the Jury, are unable to agree unanimously on punishment." *Id*. at 1142 (¶ 76). Under *Ronk*, the trial court did not abuse its discretion in refusing the instruction.

¶252. Proposed instruction D-3 read:

> The Court instructs the jury that if you choose to sentence ABDUR RAHIM AMBROSE to life imprisonment without parole, then he shall never be eligible for parole. Furthermore, his life sentence without the possibility of parole shall not be reduced or suspended.

¶253. The trial court denied Ambrose's proposed instruction D-3. Ambrose acknowledges that the Court has on several occasions declined to require either of the refused instructions, but has affirmed a judgment where D-1 was given. *See Cox*, 183 So. 3d at 57, and *Keller*, 138 So. 3d 817. We again decline to accept the argument advanced by Ambrose. *See Ronk*, 172 So. 3d at 1141 (¶ 73) ("by giving only the sentencing options of death or life

imprisonment without the possibility of parole, the trial judge properly gave the jury all the instructions that were needed"); *see also* **Flowers v. State**, 842 So. 2d 531, 557 (¶ 78) (Miss. 2003).

## X. WHETHER THE DEATH SENTENCE WAS IMPOSED IN VIOLATION OF THE UNITED STATES CONSTITUTION.

¶254. Ambrose acknowledges that the positions under the present assignment of error have not been adopted by a majority of the United States Supreme Court or the Mississippi Supreme Court; however, he urges the Court to revisit his arguments and overrule any precedent to the contrary. The Supreme Court has "time and again reaffirmed that capital punishment is not *per se* unconstitutional." **Glossip v. Gross**, 135 S. Ct. 2726, 2739 (2015).

### A. Whether the failure to include *mens rea* factors or aggravating circumstances in the indictment renders the death sentence unconstitutional.

¶255. Ambrose argues that the failure to include *mens rea* factors or aggravating circumstances in the indictment renders the sentence unconstitutional and requires that it be vacated. The Court recently addressed whether the failure to include aggravating circumstances in the indictment renders a death sentence unconstitutional. **Evans**, 226 So. 3d at 26 (¶ 105). We held that it does not. **Id**.

¶256. In **Goff**, Joseph Goff argued that his death sentence must be vacated because the indictment failed to include a statutory aggravating factor or the *mens rea* standard required for capital murder. **Goff**, 14 So. 3d at 665 (¶ 173). We held that Goff's argument was without merit because when he was charged with capital murder, he was put on notice that the death penalty might result, what aggravating factors might be used, and the *mens rea*

113

standard that was required. *Goff*, 14 So. 3d at 665 (¶ 177). In *Goff*, we explained "that

*Apprendi* and *Ring* address issues wholly distinct from the present one, and in fact do not

address indictments at all." *Goff*, 14 So. 3d at 665 (¶ 174). We also explained that "our

death penalty statute clearly states the only aggravating circumstances which may be relied

upon by the prosecution in seeking the ultimate punishment. *Id*. at 665 (¶ 176).

¶257. As in *Goff*, when Ambrose was charged with capital murder, he was put on notice that

the death penalty might result, what aggravating factors might be used, and the *mens rea*

standard that was required. *Goff*, 14 So. 3d at 665 (¶ 177).

> **B.     Whether the Mississippi's statutory death penalty scheme is unconstitutional for piecemeal reasons.**

¶258. Ambrose argues that the Mississippi capital sentencing scheme is unconstitutional for

piecemeal reasons.

¶259. Ambrose argues that Section 99-19-105 is unconstitutional on its face and as applied

by the Court because it fails to provide for adequate or meaningful appellate review. We

rejected the same argument in *Evans*, holding that our statutory scheme provides for

meaningful appellate review. *Evans*, 226 So. 3d at 40 (¶ 107); *see also Batiste*, 121 So. 3d

at 872 (¶¶ 179-180).

¶260. Ambrose argues that the death penalty scheme is being applied in a discriminatory and

irrational manner against males, poor persons, and defendants accused of killing white

victims. We have held that the death penalty is not being applied in a discriminatory and

irrational manner. *Evans*, 226 So. 3d 39 (¶ 107); *Batiste*, 121 So. 3d at 872 (¶ 181);

*Corrothers*, 148 So. 3d at 322-23 (¶¶ 127).

114

¶261. Ambrose argues that Mississippi's death penalty statutes are unconstitutionally overbroad and vague, both facially and as interpreted by the Court, and as applied to him in permitting the jury to consider imposing the death penalty based on the aggravating circumstance that the murder was "especially atrocious, heinous or cruel." We previously have rejected the same argument. *See Corrothers*, 148 So. 3d at 323 (¶ 128) (holding that the "especially heinous, atrocious, or cruel" provision of Section 99-19-101(5) is not so vague and overbroad as to violate the United States Constitution).

¶262. Ambrose argues that the Mississippi's capital sentencing scheme unconstitutionally allows the jury to apply the death penalty for felony murder, but not for cases of simple murder. We previously have rejected the same argument. *See Corrothers*, 148 So. 3d at 323 (¶ 129).

> **C.** **Whether Mississippi's capital statutory scheme permitting the imposition of a death sentence violates the Eighth Amendment *in toto*.**

¶263. Ambrose also challenges the Mississippi's death penalty *in toto*, arguing that it violates the Eighth Amendment. The United States Supreme Court repeatedly has reaffirmed that capital punishment is not *per se* unconstitutional. *Glossip*, 135 S. Ct. at 2739. Likewise, we recently reaffirmed our holding that Mississippi's death penalty scheme is not unconstitutional in part or *in toto*. *Evans*, 226 So. 3d at 25 (¶ 100) (citing *Corrothers*, 148 So. 3d at 322-32; *Batiste*, 121 So. 3d at 872; *Brown v. State*, 890 So. 2d 901, 921 (Miss. 2004); *Walker v. State*, 863 So. 2d 1, 28-30 (Miss. 2013); *Puckett v. State*, 737 So. 2d 322, 363-64 (Miss. 1999)). As such, Ambrose's argument is without merit.

**XI. WHETHER THE DEATH SENTENCE IN THIS MATTER IS CONSTITUTIONALLY AND STATUTORILY DISPROPORTIONATE.**

¶264. Under Section 99-19-105(3)(c), we must consider whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Miss. Code Ann. § 99-19-105(3)(c) (Rev. 2015).

¶265. Ambrose argues that his death sentence is constitutionally and statutorily disproportionate for a combination of two circumstances. First, Ambrose argues that he was sentenced to death with the jury's sole finding under Section 99-19-107(7) that he "contemplated that lethal force would be employed." Ambrose contends that consequently, the jury declined to find that Ambrose killed, attempted to kill or intended to kill Trosclair. Second, Ambrose argues that the codefendants Stevie and Dedeaux, who were identified as employing lethal force by eyewitnesses, did not receive a death sentence. In support of his argument, Ambrose relies on *Randall v. State*, 806 So. 2d 185, 234 (¶ 143) (Miss. 2011) where the Court held:

> Randall reminds us of *Bullock v. State*, 525 So. 2d 764, 770 (Miss. 1987) where we said that "Our point is this: when you review all of the other capital cases decided since *Bullock*, no capital defendant has had a death sentence affirmed in this state where the sole finding was that he contemplated lethal force. . . . ." Although the State cites to a whole host of cases to show that the death sentence was not disproportionate, Randall correctly asserts that all of the cases relied on by the State involve a defendant who was (1) found to have killed, attempted to kill and/or intended to kill, (2) was at least the "instigator" or mastermind of the crime, and/or (3) the co-defendant was also sentenced to death or was not subject to sentencing by a jury. While the co-defendants testified that Randall and Stokes both pointed guns at Daniels, there is no proof as to who actually killed him. The jury specifically declined to find that Randall killed or attempted to kill Daniels. Additionally, Stokes only received life in prison and the other co-defendants entered into plea agreements which spared their lives. Because the only fact, as found by the jury, was that Randall "contemplated" lethal force, the death sentence was disproportionate

116

based on the findings of fact as determined by the jury. However, on retrial, other facts may be developed sufficient to support a death sentence.

*Randall*, 806 So. 2d at 234 (¶ 143). Ambrose argues that in cases where *Randall* has been distinguished, the jury found that the capital murder defendant actually had killed or intended to kill. *See Jordan v. State*, 918 So. 2d 636, 659 (Miss. 2005); *Le v. State*, 913 So. 2d 913, 946 (Miss. 2005), *overruled on other grounds by Bonds v. State*, 138 So. 3d 914 (Miss. 2014); *Byrom v. State*, 927 So. 2d 709, 728 (Miss. 2006). Ambrose maintains that *Randall* is indistinguishable from the present case.

¶266. We disagree. *Randall* is distinguishable. Here, evidence showed that Ambrose was the instigator of the events leading to Trosclair's death. Sims begged Ambrose to stop beating a defenseless Trosclair, but he refused. Sims also pleaded for Ambrose to take Trosclair home after the assault at the Hill, but Ambrose did not. Ambrose admitted to telling Trosclair that once he received his "stuff," he was not going to "mess with him anymore. Ambrose admitted to driving Trosclair to Lawton's house. Ambrose admitted that the reason they assaulted Trosclair at Lawton's house was because Ambrose believed Trosclair had stolen his belongings out of his truck. Lee and Lawton testified that Ambrose prevented Trosclair's escape. Lee and Lawton testified that Ambrose struck Trosclair with a fully inflated tire with rim. Lee testified that Ambrose drove an unconscious Troslcair away from Lawton's home, where he was dumped on the side of the road. A passing motorist discovered Trosclair, who was tied up with a ratchet tow strap, unresponsive, lying on the side of the road.

117

¶267. After a full review of the record and after considering all of the aggravating and mitigating circumstances presented at trial, and after a comparison with the circumstances of other capital cases, we conclude the death penalty is not disproportionate or excessive.

**XII. WHETHER THE CUMULATIVE EFFECT OF THE ERRORS IN THE TRIAL COURT MANDATES REVERSAL OF THE VERDICT OF GUILT AND/OR THE SENTENCE OF DEATH ENTERED PURSUANT TO IT.**

¶268. Under the present assignment of error, Ambrose incorporates every factual and legal argument raised in the previous sections. Ambrose argues that, based on his foregoing arguments, the present case contains cumulative error warranting reversal of the conviction and sentence.

¶269. "Under the cumulative-error doctrine, even if any specific error is insufficient for reversal, we may reverse if the cumulative effect of all the errors deprived the defendant of a fundamentally fair trial." *Corrothers v. State*, 148 So. 3d 278, 324–25 (¶ 134) (Miss. 2014) (citing *Ross v. State*, 954 So. 2d 968, 1018 (¶ 138) (Miss. 2007)).

¶270. Because we hold that only one error exists, as explained in Section I, albeit harmless beyond a reasonable doubt, we hold that no cumulative error exists.

## CONCLUSION

¶271. We affirm Ambrose's conviction and sentence.

¶272. **AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING AND ISHEE, JJ.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

118

¶273. "[T]he penalty of death is different in kind from any other punishment imposed under our system of criminal justice." ***Pruett v. State***, 574 So. 2d 1342, 1345 (Miss. 1990) (citation omitted). This Court affords "heightened scrutiny on appeal" to cases in which the defendant is under a sentence of death, meaning that "procedural niceties give way to the search for substantial justice, all because death undeniably is different." ***Hansen v. State***, 592 So. 2d 114, 142 (Miss. 1991). "[W]hat may be harmless error in a case with less at stake [may become] reversible error when the penalty is death." ***Fulgham v. State***, 46 So. 3d 315, 322 (Miss. 2010) (quoting ***Bishop v. State***, 812 So. 2d 934, 938 (Miss. 2002)). Applying heightened scrutiny to death-penalty cases, we resolve "*all doubts . . .* in favor of the accused." ***Chamberlin v. State***, 989 So. 2d 320, 330 (Miss. 2008) (citing ***Lynch v. State***, 951 So. 2d 549, 555 (Miss. 2007)) (emphasis added). With respect, I dissent, because six errors require reversal of Abdur Rahim Ambrose's conviction and sentence.

**1.      The trial court's refusal to allow Ambrose the opportunity to confront the State's informant was not harmless error.**

¶274. Demetrius Lee participated in the April 10, 2013, killing of Robert Trosclair, for which Ambrose was convicted and sentenced to death. The jury learned that the State had given Lee the choice either to be a defendant or a witness in the capital murder case. But the jury never was informed that, at the time Lee testified in Ambrose's capital murder prosecution, Lee's involvement in the capital murder had placed him in peril of revocation of a three-year, non-adjudicated felony probation sentence for burglary of a dwelling. Nor did it learn that Lee was, at the time he testified against Ambrose, in peril of prosecution for an unrelated armed robbery. The majority acknowledges the trial court's error: "[b]y limiting

119

Ambrose's cross examination of Lee, the trial court denied Ambrose the opportunity to fully challenge Lee's credibility." Maj. Op. ¶ 67. Nevertheless, the majority concludes that, because the State proved Ambrose's guilt beyond a reasonable doubt without Lee's testimony, the error was harmless. With respect, the trial court's failure to allow cross examination of Lee on his agreement with the State deprived Ambrose of the argument that he was a mere accomplice. Accordingly, I cannot join the majority's finding of harmless error.

¶275. We have said that "[w]hat may be harmless error in a case with less at stake [may become] reversible error when the penalty is death." *Fulgham*, 46 So. 3d at 322 (quoting *Bishop*, 812 So. 2d at 938). It is the State's burden to prove, beyond a reasonable doubt, that the error was harmless beyond a reasonable doubt. *Gillett v. State*, 148 So. 3d 260, 266-67 (Miss. 2014) (citing *Chapman v. California*, 386 U.S. 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). This Court "must be able to say 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Gillett*, 148 So. 3d at 267 (quoting *Chapman*, 386 U.S. at 23-24). We have held that an error did not contribute to the verdict when "whatever [the jury] decided was ancillary to the overwhelming evidence of [the defendant's] guilt." *Moffett v. State*, 49 So. 3d 1073, 1100 (Miss. 2010).

¶276. Ambrose's theory of defense was that he had not been the instigator of the beatings and kidnapping which led ultimately to Trosclair's death, but that he had been a mere accomplice. The State theorized, however, that Ambrose had been the instigator of the acts which caused Trosclair's death. And Lee's testimony was consistent with the State's theory. The majority outlines the "overwhelming evidence" of Ambrose's guilt as follows: Ambrose

120

admitted fighting and participating in the beating of Trosclair because Trosclair had broken into his (Ambrose's) car, Ambrose "instructed Stevie, Dedeaux, and Lee to put Trosclair in the truck before they left." Maj. Op. ¶ 71. While "Ambrose claimed Trosclair did not go anywhere against his will, Ambrose admitted telling Trosclair that once he received his speakers [the speakers Ambrose thought Trosclair had stolen from him], he 'wasn't going to mess with him anymore.'" Maj. Op. ¶ 71. But the only witness testimony contradicting Ambrose's testimony that Trosclair willingly left "the Hill" came from Lee. And Lee was the only witness who claimed to have seen Ambrose restraining Trosclair with the tow strap, driving Trosclair from Jimmy Lawton's house, and leaving Trosclair on the side of the road.

¶277. Lee's testimony was crucial to the State's theory that Ambrose had kidnapped Trosclair, the underlying felony supporting Ambrose's capital murder conviction. *See* Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2014) ("The killing of a human being without the authority of law by any means or in any manner shall be capital murder . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . kidnapping . . . ."). While disturbing, various witnesses' observations of Ambrose beating Trosclair did not, standing alone, support Ambrose's capital murder conviction. The testimony of Lee was not merely ancillary to the overwhelming evidence of guilt. Lee's testimony was indispensable to prove the felony underlying the capital murder, that Ambrose kidnapped Trosclair. Yet the jury was not told of the considerable leverage the State wielded over Lee's testimony. It is impossible to say to what extent Ambrose was prejudiced by the trial court's refusal to allow cross examination, but it cannot be said to have been harmless beyond a reasonable doubt. Heightened scrutiny requires reversal.

121

### 2. Ambrose's death sentence should be vacated and remanded because the jury found only that Ambrose "contemplated that lethal force would be employed."

¶278. Mississippi Code Section 99-19-101(7) (Rev. 2015) requires the jury to "make a written finding of one or more of the following: (a) [t]he defendant actually killed; (b) [t]he defendant attempted to kill; (c) [t]he defendant intended that a killing take place; (d) [t]he defendant contemplated that lethal force would be employed." Presiding Justice Dickinson took the position that, because the United States Supreme Court, in *Tison v. Arizona*, approved only the first three categories, "the fourth category is hopelessly at odds with the United States Supreme Court's minimum requirements for the death penalty . . . ." *Cox v. State*, 183 So. 3d 36, 64-65 (Miss. 2015) (Dickinson, P.J., concurring in part and in result). In *Cox*, Presiding Justice Dickinson concurred in part and in result with this Court's imposition of a death sentence because the jury had not applied the fourth statutory factor in sentencing the defendant to death. *Id.* at 65. In the present case, however, the jury sentenced Ambrose to death based on its sole finding that Ambrose "contemplated that lethal force would be employed." The jury's finding does not comport with the minimum requirements articulated by the United States Supreme Court. Accordingly, this Court should vacate Ambrose's sentence.

¶279. The United States Supreme Court specifically limited capital murder death sentence eligibility to persons who "actually killed, attempted to kill, or intended to kill." *Tison v. Arizona*, 481 U.S. 137, 149-50, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987) (citing *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982)). While the Court held that "major participation in the felony committed, combined with reckless indifference to

human life" would suffice to support a death sentence, it criticized the Arizona Supreme Court's attempt "to reformulate 'intent to kill' as a species of foreseeability." *Tison*, 481 U.S. at 158, 150. The Arizona Supreme Court had held that "[i]ntend [sic] to kill includes the situation in which the defendant intended, contemplated, or anticipated that lethal force would or might be used or that life would or might be taken in accomplishing the underlying felony." *Tison*, 481 U.S. at 150 (quoting *State v. Tison*, 690 P. 2d 755, 757 (Ariz. 1984)). The United States Supreme Court held that "[t]his definition of intent is broader than that described by the *Enmund* Court" and reasoned:

> Participants in violent felonies like armed robberies can frequently "anticipat[e] that lethal force . . . might be used . . . in accomplishing the underlying felony." Enmund himself may well have so anticipated. Indeed, the possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen; it is one principal reason that felons arm themselves.

*Tison*, 481 U.S. at 150-51 (quoting *Tison*, 690 P. 2d at 757).

¶280.  Presiding Justice Dickinson opined that "[o]ur capital-murder statute has not been amended to meet the *Tison* Court's requirements. Our statute's language that allows a death sentence for those who "contemplated that lethal force would be employed," mirrors language that the United States Supreme Court repudiated in *Tison*." *Cox*, 183 So. 3d at 65. "In my view," Presiding Justice Dickinson continued, "a jury cannot constitutionally impose a death sentence when it merely finds that the defendant 'contemplated' the use of lethal force." *Id.* Yet, Presiding Justice Dickinson concluded that the "constitutional infirmity could not have affected [the defendant's] sentence," because "the jury found that Cox actually killed." *Id.*

¶281. In, in none of the cases cited by the majority and the State did this Court affirm a death sentence in a case in which the jury found solely that the defendant "contemplated that lethal force would be employed." *See Evans v. State*, 226 So. 3d 1, 12 (Miss. 2017), *cert. denied*, No. 17-7245 (June 28, 2018) ("The jury found beyond a reasonable doubt that Evans actually had killed [decedent]."); *Dickerson v. State*, 175 So. 3d 8, 33 (Miss. 2015), *cert. denied*, 136 S. Ct. 1713, 194 L. Ed. 2d 813 (2016) ("[T]he jury found that Dickerson actually killed [decedent]."); *Ronk v. State*, 172 So. 3d 1112, 1145 (Miss. 2015) ("[T]he jury found . . . [that] the Defendant actually killed [decedent]."); *Corrothers v. State*, 148 So. 3d 278, 322 (Miss. 2014) (The jury found that victim actually was killed); *Batiste v. State*, 121 So. 3d 808, 872 (Miss. 2013) ("[T]he jury found that all four factors were present in this case."); *Knox v. State*, 901 So. 2d 1257, 1268 (Miss. 2005) ("The jury found that Knox actually killed [decedent].").

¶282. This Court held in *Dickerson* that, "[u]nder *Enmund* and *Tison*, a defendant who participated in the commission of a felony, but did not actually kill or intend to kill the victim, cannot receive the death penalty." *Dickerson*, 175 So. 3d at 31. Yet, despite the jury's finding that Dickerson actually had killed the decedent, the majority relies on the *Dickerson* Court's confirmation of the constitutionality of Section 99-19-101(7) to conclude that Section 99-19-101(7) is constitutional as applied in this case. The majority's effort to upend what it recognized as binding authority from the United States Supreme Court in *Dickerson* fails. In this case, Ambrose "participated in the commission of a felony," but the jury did not find that he "actually kill[ed] or intend[ed] to kill the victim." *Dickerson*, 175 So. 3d at 31. Accordingly, Ambrose "cannot receive the death penalty." *Id.*

124

¶283. In another case, this Court reversed a death sentence because "the jury did not find beyond a reasonable doubt that Randall killed [decedent], that Randall attempted to kill [decedent], or that Randall intended that a killing take place." *Randall v. State*, 806 So. 2d 185, 234 (Miss. 2001). In a case referenced in *Randall*, this Court expressed concerns similar to those expressed by the United States Supreme Court in *Tison* about the breadth of Section 99-19-101(7)(d):

> One may contemplate lethal force while stopping short of a definite plan or design to kill. In a sense, Subsection (d) describes a contingent intent. Where, as a part of pre-crime planning, a defendant includes in his plans the substantial probability that fatal force will be employed, Subsection (d) is satisfied. On the other hand, mere tort foreseeability—an objective, reasonable man approach—falls well short of what the statute requires.

*White v. State*, 532 So. 2d 1207, 1221 (Miss. 1988). In *White*, this Court reversed and rendered the death sentence because "the evidence concerning the events before and after the robbery offers no indication which robber killed [decedent], or that any of the three contemplated in advance that lethal force would be employed." *Id.* at 1223, 1221. The Court continued: "[b]ecause nothing in the record legitimately suggests that White killed or contemplated any physical harm to [decedent], the death verdict dies." *Id.* at 1221.

¶284. In attempting to distinguish *White*, the majority avers that "the *White* Court was addressing whether the evidence was legally insufficient to support a sentence of death, not whether a sole Section 99-19-101(7)(d) finding was constitutional." Maj. Op. ¶ 88. But this Court observed in *White* that:

> Our holding, though predicated on the statute, is nonetheless consistent with *Enmund* and its latest interpretation. *Tison v. Arizona*, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987). Supporting the Court's remand in *Tison* is the requirement that proof be addressed concerning the state of mind of the

actors where the only primary proof of culpability relates to commission of the underlying felony. *Tison v. Arizona*, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987). This holding is wholly consistent with our holding today that a death sentence be supported by proof.

Yet the majority contends that "*White* stands for the proposition that a death verdict may be upheld if the legally sufficient evidence supports a finding that the defendant contemplated that lethal force would be used." Maj. Op. ¶ 90. The *White* Court observed that, to the extent Section 99-19-101(7)(d) is interpreted to mean "mere tort foreseeability—an objective, reasonable man approach," such interpretation "falls well short of what the statute requires" because "one may contemplate lethal force while stopping short of a definite plan or design to kill." *White*, 532 So. 2d at 1221. *White* does not say what the majority imputes to it.

¶285.   And *Abram v. State* offers no further support to the majority's position. In that case:

> Abram's confession reveals that he willingly and knowingly accompanied Herman Barnes to the Quick Stop with the specific, actual intent to commit a robbery. He was perfectly aware of the fact that Barnes brought along a shotgun with shells which Barnes stated was needed "for security." On location, Abram watched as Barnes entered the store with the loaded shotgun, then entered the store himself at Barnes'[s] request. After the fact, Abram claims he never intended for anyone to be killed.

*Abram v. State*, 606 So. 2d 1015, 1043 (Miss. 1992), *overruled on other grounds by Foster v. State,* 961 So. 2d 670 (Miss. 2007)). This Court, accordingly, held that a "fair-minded and rational jury, drawing on these facts and any reasonable inferences arising therefrom, could have concluded beyond a reasonable doubt that Abram 'included in his plans the substantial probability' that the loaded shotgun would be used as an instrument of lethal force 'to insure the robbery's success.'" *Abram*, 606 So. 2d at 1043 (quoting *White*, 532 So. 2d at 1221-22).

¶286. And while the *Abram* Court may have criticized the circuit court's holding that proof must exist "of an actual or definite plan or design to kill," since *Abram*, this Court since has held that: "[u]nder *Enmund* and *Tison*, a defendant who participated in the commission of a felony, but did not actually kill or intend to kill the victim, cannot receive the death penalty." *Dickerson*, 175 So. 3d at 31.

¶287. Accordingly, because the jury found only that Ambrose "contemplated that lethal force would be employed," Ambrose's death sentence should be vacated.

### 3b.     The trial court committed reversible error by seating an alternate juror during the sentencing phase.

¶288. Ambrose's death sentence also should be vacated because the trial court seated an alternate juror for the sentencing phase who had not participated in the guilt phase deliberations, an error which tainted the penalty phase jury and violated Mississippi Code Section 99-19-101(1) (Rev. 2015). During sentencing phase testimony, Juror Jeffrey Jenkins disclosed, in the form of a note, his personal relationship with Ambrose's family. Ambrose's counsel moved for a mistrial, arguing that the jury potentially had been corrupted by what Jenkins had told other jurors about Ambrose's family. But, instead of granting a mistrial, the trial court removed Jenkins from the sentencing phase jury and replaced him with the first alternate juror, Glen Turner.

¶289. Mississippi's capital sentencing statute requires that:

> Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. The proceeding shall be conducted by the trial judge before *the trial jury* as soon as practicable. If, through impossibility or inability, the trial jury is unable to

127

reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon *a jury* to determine the issue of the imposition of the penalty.

Miss. Code Ann. § 99-19-101(1) (Rev. 2015) (emphasis added). In *Evans*, this Court considered a case in which a juror, "after guilt-phase deliberations, but prior to the sentencing phase . . . was excused upon learning that her son had suffered an injury requiring emergency surgery" and was replaced with an alternate juror. *Evans*, 226 So. 3d at 24.

¶290. I agreed with Evans's argument that the trial court committed reversible error by seating the alternate juror in violation of Mississippi's capital sentencing statute. *Evans*, 226 So. 3d at 51 (Kitchens, J., dissenting). Because "the substitution of an alternate juror occurred after the completion of the guilt phase deliberations, but before the commencement of sentencing phase deliberations," I wrote, "the newly seated alternate juror lacked the benefit of having participated in the guilt phase deliberations, a characteristic shared by the other eleven sentencing phase jurors." *Id.* at 52. The statute provides that "[i]f, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a jury to determine the issue of the imposition of the penalty." Miss. Code Ann. § 99-19-101(1) (Rev. 2015). Because the trial court excused one of the jurors, I continued, the jury was "unable to reconvene," and the trial court was left with "no choice but to summon another jury to determine the penalty." *Evans*, 226 So. 3d at 52 (Kitchens, J., dissenting).

¶291. The majority concluded here that "Ambrose fails to show any actual prejudice by the trial court's ruling on the motion for a mistrial or on the removal and replacement of the juror." Maj. Op. ¶ 127. But "[t]he trial court's seating of an alternate juror for the sentencing

128

phase who had not participated in guilt phase deliberations with the other eleven jurors tainted the sentencing phase jury and violated Section 99-19-101." *Evans*, 226 So. 3d at 52 (Kitchens, J., dissenting). And, as in *Evans*, the trial court's failure to adhere to Section 99-19-101 violated Ambrose's right to due process of law under the Fourteenth Amendment to the United States Constitution and Article 3, Section 14, of the Mississippi Constitution. *Id.* With respect, I would vacate Ambrose's sentence.

> **4b1. The trial court committed reversible error by excusing a venireperson who was not disqualified and who should have been allowed to serve.**

¶292. Venireperson Allison Meleones, when asked whether she believed in the death penalty, responded: "I just don't know if I could actually go through with it. I don't know if I could live with that on my mind. I don't know. I haven't really given it a lot of thought before this. Now I mean, I just don't know the circumstances. Maybe." When asked whether she would choose death or life in prison if given the choice, Meleones said, "I would probably choose life in prison." The examination continued as follows:

MR. RISHEL: You say probably not. Why would you say probably not? [W]hy not just say no, I'm not voting for the death penalty ever. I'm not telling you what to say, but what is it that is sticking in your mind keeping you from making a full commitment?"

MS. MELEONES: To be honest, I haven't given a whole lot of thought about the death penalty or how I felt about it. I've only been a registered voter for two months, and this is my first jury duty, so I really don't know how I feel about it 100 percent. I feel like that is not something that I agree with.

MR. RISHEL:      So when you say probably, you don't really know, do you? You have to wait until you know what happened, don't you?

MS. MELEONES:   Yes.

MR. RISHEL:      Once you found out what happened you might be able to vote for the death penalty if you thought it was appropriate, would that be true?

MS. MELEONES:   Maybe. I don't—probably not. I can't say anything else besides probably not.

¶293. In *Witherspoon v. Illinois*, the United States Supreme Court reversed a death sentence because the State had "swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle." *Witherspoon v. Illinois*, 391 U.S. 510, 520-21, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). The nation's high Court held "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 521-22. In *Witherspoon*, the trial court had struck a juror who, similar to Venireperson Meleones, stated that "she would not 'like to be responsible for . . . deciding somebody should be put to death.'" *Id.* at 515.

¶294. In *Wainwright v. Witt*, the United States Supreme Court clarified that:

> That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with *Witherspoon*'s reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved:

many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

*Wainwright v. Witt*, 469 U.S. 412, 424-26, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985).

¶295. In *Fusilier v. State*, this Court reiterated the familiar standard:

As stated by the United States Supreme Court in *Adams* [*v. Texas*], "Neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty." *Adams* [*v. Texas*], 448 U.S. [38, ]50, 100 S. Ct. [2521, ]2529, 65 L. Ed. 2d [581, ]593 [(1980)]. Absent a clear showing that the prospective juror would be unable to follow the court's instructions and obey the juror's oath, that juror's feelings regarding the death penalty do not constitute grounds for a challenge and the granting of such a challenge is reversible error. . . .

*Fusilier v. State*, 468 So. 2d 45, 55 (Miss. 1985). This Court ultimately reversed the defendant's conviction and death sentence, in part, because "the failure to fully develop any voir dire regarding [the venireperson] rendered her dismissal for cause error." *Id.* The venireperson had stated "that she could be a fair and impartial juror," but stood up when the district attorney asked whether any venireperson "just could not vote [for] the death penalty no matter what the facts or what the circumstances are?" *Id.* at 54.

¶296. In this case, the trial court asked Venireperson Meleones, "if the evidence proved someone to be guilty of capital murder and the law *allowed* the death penalty as one of the penalties, do you think you could vote for it?" (Emphasis added.) Venireperson Meleones

131

replied, "[n]o." The trial court continued: "Are you telling the lawyers and me that you could not vote for the death penalty under any circumstances?" Venireperson Meleones said:

> [U]m, I . . . it's just hard to say if I don't know the case. Like, I'm a teacher, so I see a lot of kids that maybe they could have gone a different way if they had different parents or made different choices. It's hard to think somebody could be defined by just one mistake. I don't know. I don't know any details on the case. Maybe.

It cannot be said that the line of questioning employed by the trial court and the lawyers in this case created a "definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Venireperson Meleones's answers were equivocal, to be sure, but it does not appear that the trial court or the lawyers asked her whether she could follow the trial court's instructions and obey the juror's oath. She was asked only whether, if the law *allowed* for the imposition of the death penalty, she would vote in support of its employment or whether, if presented with life imprisonment or death as sentencing possibilities, she would choose death.

¶297. As in *Fusilier*, Venireperson Meleones's ability to set aside her conscientious scruples about the death penalty and to apply the law as instructed by the judge and in obedience to the juror's oath was not fleshed out adequately on *voir dire*. Failure to apply the correct standard for determining whether a venireperson's conscientious scruples against the death penalty disqualifies him or her from serving on a jury in a capital case amounts to reversible error.

7. **The indictment charging Ambrose with capital murder was fatally defective because it failed to allege conduct by the defendant that constituted kidnapping.**

¶298. "In *all* criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI (emphasis added). Mississippi's counterpart to the Sixth Amendment to the United States Constitution guarantees that, "[i]n *all* criminal prosecutions the accused shall have a right . . . to demand the nature and cause of the accusation." Miss. Const. art. 3, § 26 (emphasis added). At the time of Ambrose's trial, Uniform Rule of Circuit and County Court Practice 7.06 applied.[21] Rule 7.06 required that "[t]he indictment upon which the defendant is to be tried shall be a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation." URCCC 7.06. This Court requires an indictment to contain: "(1) the essential elements of the offense charged, (2) sufficient facts to fairly inform the defendant of the charge against which he must defend, and (3) sufficient facts to enable him to plead double jeopardy in the event of a future prosecution for the same offense." ***Gilmer v. State***, 955 So. 2d 829, 836-37 (Miss. 2007) (citing ***Hamling v. United States***, 418 U.S. 87, 117, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974)).

¶299. Ambrose's indictment alleged that:

> ABDUR RAHIM AMBROSE . . . in the First Judicial District of Harrison County, Mississippi, on or about April 7, 2013[,] did then and there willfully, unlawfully, feloniously and with or without design to effect death, kill and murder Robert Trosclair, a human being, without authority of law, while in the commission of the crime and felony of Kidnapping, as defined by Section 97-3-53, Miss. Code of 1972, (as amended), contrary to Section 97-3-19(2)(e),

---

[21] Uniform Rule of Circuit and County Court Practice 7.06 was replaced by Mississippi Rule of Criminal Procedure 14.1(a) on July 1, 2017. *See* M.R.Cr.P. 14.1(a).

Miss. Code of 1972, (as amended), and against the peace and dignity of the State of Mississippi.

I respectfully dissent because, while the felony crime of kidnapping and the applicable code section were referenced in Ambrose's indictment, Ambrose's indictment did not contain "a plain, concise and definite written statement of the essential facts constituting the offense charged" nor did it "fully notify [him] of the nature and cause of the accusation." URCCC 7.06. Ambrose's indictment did not contain "the essential elements of the offense charged, . . . sufficient facts to fairly inform the defendant of the charge against which he must defend, and . . . sufficient facts to enable him to plead double jeopardy in the event of a future prosecution for the same offense." *Gilmer*, 955 So. 2d at 836-37 (citing *Hamling*, 418 U.S. at 117). The glaring omission of elements of or facts constituting the underlying felony crime of kidnapping falls woefully short of what is required by the federal and state constitutions and this Court's rules and case law.

¶300. In *Fulgham v. State*, I observed in a special concurrence that reference to a statute "informs the accused of the *nature* of the accusation; but it does not inform him or her of the *cause*, i.e., 'you committed a robbery [the cause], and here's what robbery you committed [the cause].'" *Fulgham v. State*, 46 So. 3d 315, 344 (Miss. 2010) (Kitchens, J., specially concurring[22]) (emphasis in original). I wrote that "[t]he indictment under which Fulgham was charged did not provide her an accurate description of the charge against her so she could

---

[22] I wrote a special concurrence because, while Fulgham's indictment was insufficient, the issue had not been raised on appeal and "Fulgham's appellate counsel was the same as her trial counsel, so she will have an opportunity (should she so desire) to raise the issues in a properly filed petition for post-conviction relief." *Fulgham*, 46 So. 3d 315.

134

adequately prepare her defense." *Id.* In that case, Fulgham's indictment incorporated, without further comment, the word "[r]obbery" and incorrectly cited "Section 97-3-19(e)," by which the State presumably intended Section 97-3-19(2)(e). *Id.* As I observed, "Fulgham was never put on notice of what personal property she was alleged to have taken, or from whom the property was taken, or that the property was taken 'by force or threat of force,'" the elements of robbery. *Fulgham*, 46 So. 3d at 344 (Kitchens, J., specially concurring) (quoting *Crocker v. State*, 272 So. 2d 664, 665 (Miss. 1973)). "Indeed, were Fulgham charged with robbery alone, the indictment would fall woefully short." *Fulgham*, 46 So. 3d at 344 (Kitchens, J., specially concurring).

¶301. Here, Ambrose was charged with capital murder which occurred in the course of a kidnapping. The elements of and punishment for kidnapping are outlined as follows:

> Any person who, without lawful authority and with or without intent to secretly confine, shall forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will, . . . upon conviction, shall be imprisoned for life in the custody of the Department of Corrections if the punishment is so fixed by the jury in its verdict. If the jury fails to agree on fixing the penalty at imprisonment for life, the court shall fix the penalty at not less than one (1) year nor more than thirty (30) years in the custody of the Department of Corrections.

Miss. Code Ann. § 97-3-53 (Rev. 2014). While Ambrose's indictment for capital murder incorporated Section 97-3-53 by reference, as in *Fulgham*, it informed Ambrose only of the *nature* of the accusation, i.e., that Ambrose had committed a kidnapping, not the *cause* of the accusation, i.e., the precise kidnapping of which Ambrose was being accused. Because no specific act constituting kidnapping was alleged by the State, it was impossible for Ambrose to prepare an adequate defense.

135

¶302. Unlike in *Fulgham*, Ambrose raised the insufficiency of the indictment before the trial court in the form "Motion to Require the State to Submit a Bill of Particulars Regarding the Charge Against the Defendant," in which Ambrose argued that "the indictment does not allege what acts the defendant allegedly committed that would constitute kidnapping." He reiterates those arguments on appeal.

¶303. Ambrose's indictment is similar to the indictment accusing Robert Carson of capital murder with the underlying offense of robbery:

> ROBERT CARSON, a/k/a "BAY BAY," on or about the 30th day of April, 2012, in the county aforesaid and within the jurisdiction of this Court, did, without authority of law and with or without any design to effect death, kill and murder Jose Gurrola Ortiz, a human being, while the said ROBERT CARSON, a/k/a "BAY BAY" was then and there engaged in the commission of the crime of a robbery, in violation of Miss. Code Ann. § 97–3–73 (1972, as amended), and in violation of Miss. Code Ann. § 97–3–19(2)(e) (1972, as amended)[.]

*Carson v. State*, 212 So. 3d 22, 37 (Miss. 2016) (Kitchens, J., dissenting). The *Carson* majority overruled *Rowland v. State*, 98 So. 3d 1032, 1039 (Miss. 2012), in which this Court had held that a capital murder indictment that "omits the name of the victim of the underlying crime (robbery in *Rowland*) 'does not contain sufficient facts to fairly inform the defendant of the charge against which he must defend and to enable him to plead double jeopardy' . . . ." *Carson*, 212 So. 3d at 36-37 (Kitchens, J., dissenting).

¶304. The *Rowland* Court said that "[w]e specifically have provided that 'an indictment must state the name of the victim of an offense *where that is an element of the offense*, and a failure to state it, or a material variance between statement and proof is fatal, but an

immaterial variance is not.'" ***Rowland***, 98 So. 3d at 1039 (quoting ***Burks v. State***, 770 So.

2d 960, 963 (Miss. 2012) (emphasis in ***Rowland***)). The Court continued:

> A capital-murder indictment that fails to identify the victim of the underlying crime does not contain sufficient facts to fairly inform the defendant of the charge against which he must defend and to enable him to plead double jeopardy in the event that he is separately punished or later prosecuted for the underlying felony; in other words, the identity of the victim of the underlying felony is an element of the offense of capital murder that must be stated in the capital-murder indictment.

***Rowland***, 98 So. 3d at 1039. Startlingly, this analysis evaporated in ***Carson***. Yet, "for double

jeopardy purposes, the facts alleged must be sufficient to distinguish the charged crime from

other crimes." ***Carson***, 212 So. 3d at 40 (Kitchens, J., dissenting) (citing ***Goforth v. State***,

70 So. 3d 174, 189 (Miss. 2011)).

¶305.   In ***Carson***, I wrote that "[b]ecause Carson's indictment did not name the victim, his

indictment was fatally defective," since "[i]t did not contain sufficient facts to inform Carson

fairly of the nature of the charge and to enable him to plead double jeopardy in the event of

a later prosecution for the underlying crime." ***Carson***, 212 So. 3d at 41-42 (Kitchens, J.,

dissenting). I also observed that:

> The fact that Carson's indictment identifies the victim of the underlying crime by naming the homicide victim does not aid the State. The victim of the underlying crime in a capital murder case is not always the person who was killed. For example, in ***Rowland***, Rowland was convicted of the capital murder of James Campbell while in the commission of the armed robbery of a different person, Pat Bolton. ***Rowland***, 98 So.3d at 1033. He also was convicted of the capital murder of Paul Hughes while in the commission of the armed robbery of O.B. Singleton. ***Id.*** It would be a logical fallacy to assume that identifying the homicide victim also identifies the victim of the underlying crime.

***Carson***, 212 So. 3d at 41 n.10 (Kitchens, J., dissenting).

137

¶306. Here, the majority simply says "[n]othing would prevent Ambrose from pleading double jeopardy if the State sought to prosecute him in the future for the kidnapping." Maj. Op. ¶ 218. But nothing in the indictment informed Ambrose of the particular kidnapping for which he had been accused; more importantly, while Trosclair's name is referenced in the capital murder portion of the indictment, the indictment does not inform Ambrose that he had been accused of kidnapping Trosclair. In other words, the State later could bring kidnapping charges against Ambrose, alleging that Ambrose kidnapped Trosclair or anyone else, and Ambrose would be unable to prevent the State from doing so on double jeopardy grounds. He could not say that the State was precluded on double jeopardy grounds from prosecuting him for the particular kidnapping alleged in his capital murder indictment.

¶307. And the majority's reliance on *Batiste* is misplaced. As I observed in *Carson*, *Batiste* "held that an indictment for capital murder with the underlying felony of robbery need not list the items taken in the robbery." *Carson*, 212 So. 3d at 41 (Kitchens, J., dissenting). *Batiste* did not address "a capital murder indictment's failure to identify the victim of the underlying crime, and *Batiste* simply relied on *Goff*[ *v. State*, 14 So. 3d 625 (Miss. 2009),] without citing the later-decided *Rowland*, indicating that the Court simply failed to consider it." *Id.*

¶308. The majority's "we all know what the State meant" approach blatantly violates the Sixth Amendment to the United States Constitution and Article 3, Section 26, of the Mississippi Constitution. I would reverse Ambrose's conviction and dismiss the indictment.

**12.    Cumulative error requires reversal.**

¶309. "The question under all cases is whether the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial." ***Walker v. State***, 913 So. 2d 198, 249 (Miss. 2005) (citation omitted). Recognizing that Ambrose "is not entitled to a perfect trial, only a fair trial," ***Walker***, 913 So. 2d at 249 (citations omitted), the multitude of errors which occurred during Ambrose's trial deprived him of a fundamentally fair and impartial trial. I would reverse Ambrose's capital murder conviction and death sentence under the doctrine of cumulative error.

**KING AND ISHEE, JJ., JOIN THIS OPINION.**

# APPENDIX

# DEATH CASES AFFIRMED BY THIS COURT

*Curtis Giovanni Flowers v. State*, 240 So. 3d 1082 (Miss. 2017), *following remand from U.S. Supreme Court in* 136 S. Ct. 2157, 195 L. Ed. 2d 817 (2016).

*Timothy Nelson Evans v. State*, 226 So. 3d 1 (Miss. 2017).

*James Cobb Hutto III v. State*, 227 So. 3d 963 (Miss. 2017).

*David Cox v. State*,183 So. 3d 36 (Miss. 2015).

*David Dickerson v. State*, 175 So. 3d 8 (Miss. 2015).

*Timothy Robert Ronk v. State*, 172 So. 3d 1112 (Miss. 2015).

*Curtis Giovanni Flowers v. State*, 158 So. 3d 1009 (Miss. 2014) (on remand), *vacated and remanded on certiorari by U.S. Supreme Court in* 136 S. Ct. 2157, 195 L. Ed. 2d 817(2016).

*Caleb Corrothers v. State*, 148 So. 3d 278 (Miss. 2014), *leave to seek PCR granted in part and denied in part* (Feb. 2, 2017), *rehearing denied* (May 11, 2017).

*Jason Lee Keller v. State*, 138 So. 3d 817 (Miss. 2014), *leave to seek PCR granted in part and denied in part* (May 25, 2017).

*Leslie Galloway III v. State*, 122 So. 3d 614 (Miss. 2013).

*Bobby Batiste v. State*, 121 So 3d 808 (Miss. 2013), *granted leave to seek PCR* (Jan. 21, 2016).

*Roger Lee Gillett v. State,* 56 So. 3d 469 (Miss. 2010).

*Moffett v. State*, 49 So. 3d 1073 (Miss. 2010).

*Pitchford v. State*, 45 So. 3d 216 (Miss. 2010).

*Goff v. State*, 14 So. 3d 625 (Miss. 2009).

140

*Wilson v. State*, 21 So. 3d 572 (Miss. 2009).

*Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

*Loden v. State*, 971 So. 2d 548 (Miss. 2007).

*King v. State*, 960 So. 2d 413 (Miss. 2007).

*Bennett v. State*, 933 So. 2d 930 (Miss. 2006).

*Havard v. State*, 928 So. 2d 771 (Miss. 2006).

*Spicer v. State*, 921 So. 2d 292 (Miss. 2006).

*Hodges v. State*, 912 So. 2d 730 (Miss. 2005).

*Walker v. State*, 913 So. 2d 198 (Miss. 2005).

*Le v. State*, 913 So. 2d 913 (Miss. 2005), *granted leave to seek second PCR*, 2013-DR-00327-SCT (Feb. 23, 2016).

*Brown v. State*, 890 So. 2d 901 (Miss. 2004).

*Powers v. State*, 883 So. 2d 20 (Miss. 2004)

*Branch v. State*, 882 So. 2d 36 (Miss. 2004).

*Scott v. State*, 878 So. 2d 933 (Miss. 2004).

*Lynch v. State*, 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State*, 875 So. 2d 140 (Miss. 2004).

*Byrom v. State*, 863 So. 2d 836 (Miss. 2003).

*Howell v. State*, 860 So. 2d 704 (Miss. 2003).

*Howard v. State*, 853 So. 2d 781 (Miss. 2003).

*Walker v. State*, 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State*, 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State*, 806 So. 2d 241 (Miss. 2002).

*Knox v. State*, 805 So. 2d 527 (Miss. 2002).

*Simmons v. State*, 805 So. 2d 452 (Miss. 2002).

*Berry v. State*, 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*,  800 So. 2d 472 (Miss. 2001).

*Mitchell v. State*, 792 So. 2d 192 (Miss. 2001).

*Puckett v. State*, 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State*,  787 So. 2d 639 (Miss. 2001).

*Jordan v. State*, 786 So. 2d 987 (Miss. 2001).

*Manning v. State*, 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State*, 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State*, 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State*, 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State*, 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State*, 735 So. 2d 238 (Miss. 1999).

*Turner v. State*, 732 So. 2d 937 (Miss. 1999).

*Smith v. State*, 729 So. 2d 1191 (Miss. 1998).

*Burns v. State*, 729 So. 2d 203 (Miss. 1998).

*Jordan v. State*, 728 So. 2d 1088 (Miss. 1998).

*Gray v. State*, 728 So. 2d 36 (Miss. 1998).

*Manning v. State*, 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State*, 726 So. 2d 524 (Miss. 1997).

*Bell v. State*, 725 So. 2d 836 (Miss. 1998), *post-conviction relief granted in part and denied in part*, 725 So. 2d 836 (Miss. 2011).

*Evans v. State*, 725 So. 2d 613 (Miss. 1997).

*Brewer v. State*, 725 So. 2d 106 (Miss. 1998).

*Crawford v. State*, 716 So. 2d 1028 (Miss. 1998).

*Doss v. State*, 709 So. 2d 369 (Miss. 1996).

*Underwood v. State*, 708 So. 2d 18 (Miss. 1998).

*Holland v. State*, 705 So. 2d 307 (Miss. 1997).

*Wells v. State*, 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State*, 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State*, 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State*, 684 So. 2d 1179 (Miss. 1996).

*Davis v. State*, 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State**, 554 So. 2d 887 (Miss. 1989); **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding; **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State**, 538 So. 2d 329 (Miss. 1989); **Pinkney v. Mississippi**, 494 U.S. 1075 (1990) vacating and remanding; **Pinkney v. State**, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State**, 535 So. 2d 1354 (Miss. 1988); **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding; **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding; *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCING PHASE

*Justin Barrett Blakeney v. State*, 236 So. 3d 11 (Miss. 2017).

*Sherwood Brown v. State*, 2017-DR-00206=SCT (Oct. 26, 2017) (order granting post-conviction relief and vacating underlying convictions and sentences and remanded to the DeSoto County Circuit Court for a new trial).

*Erik Wayne Hollie v. State*, 174 So. 3d 824 (Miss. 2015).

*Manning v. State*, 158 So. 3d 302 (Miss. 2015) (reversing denial of post-conviction relief).

*Byrom v. State*, 2014-DR-00230-SCT (April 3, 2014) (order).

*Ross v. State*, 954 So. 2d 968 (Miss. 2007).

*Flowers v. State*, 947 So. 2d 910 (Miss. 2006).

*Flowers v. State*, 842 So. 2d 531 (Miss. 2003).

*Randall v. State*, 806 So. 2d 185 (Miss. 2002).

*Flowers v. State*, 773 So. 2d 309 (Miss. 2000).

*Edwards v. State*, 737 So. 2d 275 (Miss. 1999).

*Smith v. State*, 733 So. 2d 793 (Miss. 1999).

*Porter v. State*, 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State*, 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State*, 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Howard v. State*, 701 So. 2d 274 (Miss. 1997).

*Lester v. State*, 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Bell v. State*, 160 So. 3d 188 (Miss. 2016).

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
## PUNISHMENT AND REMANDED FOR A NEW TRIAL
## <u>ON SENTENCING PHASE ONLY</u>

*Fulgham v. State*, 46 So. 3d 315 (Miss. 2010).

*Rubenstein v. State*, 941 So. 2d 735 (Miss. 2006).

*King v. State*, 784 So. 2d 884 (Miss. 2001).

*Walker v. State*, 740 So. 2d 873 (Miss. 1999).

*Watts v. State*, 733 So. 2d 214 (Miss. 1999).

*West v. State*, 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State*, 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi*, 498 U.S. 1 (1990) *reversing, in part, and remanding*; *Shell v. State* 595 So. 2d 1323 (Miss. 1992) *remanding for new sentencing hearing.*

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) *vacating and remanding*; *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) *remanding for new sentencing hearing.*

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) *vacating and remanding*; *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) *remanding for new sentencing hearing.*

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi,* 487 U.S. 1230 (1988) *vacating and remanding*; *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) *remanding for new sentencing hearing.*

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd,* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); *aff'd*, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986); *cert. denied,* *Wiley v. Mississippi*, 479 U.S. 1036 (1988); *resentencing ordered*, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) *following writ of habeas corpus issued pursuant to* *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); *resentencing affirmed.*

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.*

(Revised July 9, 2018, MJE.)